# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF IOWA

PAUL DORR, AND ALEXANDER
DORR, individually and on behalf of all
other persons similarly situated,

        Plaintiffs,

vs.

DOUGLAS L. WEBER, individually
and in his capacity as Sheriff of Osceola
County; and OSCEOLA COUNTY,
IOWA,

        Defendants.

Court File No. 5:08-CV-04093

## APPENDIX

**Page**

Deposition of Douglas L. Weber, dated
November 30, 2010.................................................................................APP 1

Weber Deposition Exhibit 1 – Paul Dorr
Applications for Permit to Carry Weapons ......................................APP 168

Weber Deposition Exhibit 2 – Douglas L. Weber and
Osceola County's Answers to Plaintiffs's Interrogatories,
Response to Plaintiffs' Request for Production of
Documents and Response to Plaintiffs' Request
for Admissions, dated April 9, 2009 ...............................................APP 186

Weber Deposition Exhibit 3 – July 24, 2008
Letter from Douglas Weber, Sheriff to
Mr. Paul Door, denying his Application
for Permit to Carry.........................................................................APP 205

Weber Deposition Exhibit 4 – July 10, 2008
Letter from Daniel E. DeKoter, Esq., attorney
for Osceola County Public Safety Commission,
to Paul and Debra Dorr regarding advice on
the issuance of concealed weapon permits .......................................................APP 206

Weber Deposition Exhibit 5 – Various Applications
for Permit to Carry Weapons with missing information ...............................APP 208

Weber Deposition Exhibit 6 – Defendants'
Initial Disclosures ...............................................................................................APP 242

Weber Deposition Exhibit 7 – Douglas Weber
and Osceola County's Answer to First Amended
Complaint .............................................................................................................APP 245

Weber Deposition Exhibit 8 – Class Action
First Amended Complaint ...................................................................................APP 265

Weber Deposition 9 – Transcript of conversation
Between Paul Dorr and Sheriff Weber on
August 9, 2007 ....................................................................................................APP 299

Weber Deposition 10 – Sibley Gazette-Tribune
September 26, 2007 Public Notice from the
Osceola County Public Safety Commission
Denying a concealed weapon permit to Paul Dorr .......................................APP 301

Weber Deposition 11 – Examples of Applications
for Permit to Carry Weapons for persons
below the age 21 .................................................................................................APP 303

Weber Deposition 12 – Examples of Denied
Applications for Permit to Carry Weapons ....................................................APP 307

Paul Dorr, Deposition, Excerpt Page 29,
dated November 30, 20009 ...............................................................................APP 309

Paul Dorr Deposition, Except Pages 21,
24, 29, and 30, dated January 13, 2010 ..........................................................APP 335

# ORIGINAL

<pre>
 1                UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF IOWA

 3    * * * * * * * * * * * * * * * * *

 4    PAUL DORR and ALEXANDER DORR,      *   File No. 5:08-CV-04093
      individually and on behalf of all
 5    other persons similarly situated,  *

 6            Plaintiffs,                 *

 7    vs.                                 *        DEPOSITION OF

 8    DOUGLAS L. WEBER, individually and *     DOUGLAS L. WEBER
      in his capacity as Sheriff, and his
 9    successors, THE OSCEOLA COUNTY      *
      SHERRIF'S DEPARTMENT, IOWA, and
10    OSCEOLA COUNTY, IOWA,               *

11            Defendants.                 *
      * * * * * * * * * * * * * * * * *
12

13    The deposition of Douglas L. Weber was taken on behalf of

14    the Plaintiffs at the Osceola County Courthouse in Sibley,

15    Iowa on Monday, November 30, 2009 commencing at 10:00 a.m.

16                         APPEARANCES

17    For the Plaintiffs:     MR. VINCENT J. FAHNLANDER
                              Attorney at Law
18                            33 South Sixth Street, Suite 4100
                              Minneapolis, Minnesota 55402
19
      For the Defendants:     MR. DOUGLAS L. PHILLIPS
20                            Attorney at Law
                              4280 Sergeant Road, Suite 290
21                            Sioux City, Iowa 51106

22    Other Appearances:      Paul R. Dorr

23

24    Reported By:   Jenna L. Mumm, CSR
                     703 Jackson Avenue, Spirit Lake, Iowa 51360
25                   (712) 336-4125   (800) 551-5027
</pre>

# INDEX

| Examination | Page |
|---|---|

Direct     By Mr. Fahnlander---------- 3
              Certificate of Reporter---- 167

## SEPARATE INDEX TO EXHIBITS

| No. | Description | Pages Referred To |
|---|---|---|
| 1 | Various Applications for Permit to Carry Weapons submitted by Paul Dorr | 57,59,77 |
| 2 | Defendants' Answers to Plaintiffs' Interrogatories, Response to Plaintiffs' Request for Production and Response to Plaintiffs' Request for Admissions | 71,77,151 |
| 3 | Letter to Mr. Paul Dorr from Sheriff Doug Weber dated 7/24/08 | 95 |
| 4 | Letter to Paul and Debra Dorr from Daniel E. DeKoter dated 7/10/08 | 97 |
| 5 | Various Applications for Permit to Carry Weapons | 105,109 |
| 6 | Defendants' Initial Disclosures | 118-119,125,147 |
| 7 | Defendants' Answer to First Amended Complaint and Jury Demand | 138-140,147 |
| 8 | Class Action First Amended Complaint | 139,147 |
| 9 | Transcript of Conversation Between Paul Dorr and Sheriff Doug Weber dated 8/9/07 | 141 |
| 10 | Sibley Gazette-Tribune Public Notice dated 9/26/07 | 156 |
| 11 | Various Applications for Permit to Carry Weapons | 158 |
| 12 | Various Applications for Permit to Carry Weapons | 159-160 |

**STIPULATION**

IT IS STIPULATED and agreed by and between the parties hereto by their respective counsel of record, whose appearances have been hereinbefore noted, that the deposition of DOUGLAS L. WEBER may be taken at the Osceola County Courthouse on November 30, 2009 before Jenna L. Mumm, Certified Shorthand Reporter for the State of Iowa;

That said deposition is taken for the purpose of discovery or for such use at trial as permitted under the Federal Rules of Civil Procedure or for each of said purposes;

That all objections may be reserved until the time of trial except objections relating to the form of the question and the responsiveness of the answer.

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **DOUGLAS L. WEBER** |
| 3 | having been duly sworn, was examined and testified as |
| 4 | follows: |
| 5 | **DIRECT EXAMINATION** |
| 6 | **BY MR. FAHNLANDER:** |
| 7 | Q    Good morning, Sheriff. |
| 8 | A    Good morning. |
| 9 | Q    Could I have you state your name for the record, |
| 10 | please? |
| 11 | A    Douglas L. Weber. |
| 12 | Q    And your-- your position, your employer? |
| 13 | A    Osceola County Sheriff. |
| 14 | Q    Okay.  And how long have you been the Osceola County |
| 15 | Sheriff? |
| 16 | A    Since January 1st of 2005. |
| 17 | Q    And have you ever had your deposition taken before? |
| 18 | A    Yes. |
| 19 | Q    Okay.  I'll just go over a few of the ground rules just |
| 20 | to make sure that we're all on the same page.  I'm here to |
| 21 | ask you some questions and-- and you are here to provide |
| 22 | answers, and both of our-- my questions and your answers are |
| 23 | under oath just as if you were in a court of law.  You |
| 24 | understand that? |
| 25 | A    Yes. |

1  Q    And I would like you to answer audibly as opposed to

2  nodding or shaking your head.  Is that okay?

3  A    Yes.

4  Q    And then uh-huhs and huh-uhs are difficult for the--

5  the court reporter to transcribe, so I would ask you to

6  make-- answer yes or no and then provide whatever additional

7  response is necessary.  Is that okay?

8  A    Yes.

9  Q    If you don't understand any of my questions, you could

10  ask me to repeat them or restate them and I will do so.  If

11  you answer the questions we'll assume you understood the

12  questions.  Is that okay?

13  A    Yes.

14  Q    And if you need a break or something along the way,

15  certainly you may ask for a break and-- we're not here to

16  torture anyone or to make it uncomfortable for anyone.  Is

17  that all right?

18  A    Yes.

19  Q    Okay.  I'd like to get a little bit of information

20  about your background.  I understand you went to-- was it

21  NIACC?

22  A    Yes.

23  Q    And what did you study at NIACC?

24  A    Initially I was-- well, I was in the music program and

25  the law enforcement program.

1  Q     Okay.  And that's a two-year school, correct?

2  A     Correct.

3  Q     Were you in Quad Levit?  You know what that is?

4  A     No.

5  Q     Okay.  It's-- my wife went to NIACC also, and there's a

6  musical in the spring or something called Quad Levit.

7  A     I don't think that was maybe there when I was there.

8  I'm not familiar with that.

9  Q     Okay.  And did you get a degree from NIACC?

10  A     Yes.

11  Q     And what was that degree in?

12  A     Well, I have actually two.  I have one in law

13  enforcement, one in-- an associate's degree in music.

14  Q     Okay.  So associate degrees in both?

15  A     Right.

16  Q     Okay.  And-- and then you went to Upper Iowa?

17  A     Correct.

18  Q     And what did you study there?

19  A     I have-- well, I-- I studied some music, but then I-- I

20  completed my degree in public administration, my Bachelor of

21  Science.

22  Q     And so you ended up with a bachelor's in public

23  administration?

24  A     Correct.

25  Q     And did you get a minor in music or anything?

1  A    Not from there, no.

2  Q    Okay.  Did you have some other college education?

3  A    Well, I've taken different classes, but not-- not--

4  that's the only degree I have.

5  Q    Okay.  And-- and what other classes did you take and at

6  what institutions?

7  A    Well, at NCC I've taken public-- or I've taken social

8  problems.

9  Q    Where was that again?

10  A    In Sheldon, North Iowa Community College.

11  Q    Okay.

12  A    Taken small engine repair, home electrical, other

13  vocational type things.

14  Q    Okay.  And what is-- that's in Sheldon?

15  A    Yes.

16  Q    Is it Northwest Iowa Tech?

17  A    It used to be.  Now they call it-- I believe they call

18  it Northwest Iowa Community College.

19  Q    Okay.

20  A    It used to be "Technical College," I believe.

21  Q    Okay.  And where'd you go to high school?

22  A    Mason City.

23  Q    Mason City High?

24  A    Uh-huh (yes).

25  Q    Okay.  What year did you graduate from Mason City?

1   A      '74.

2   Q      And you were at NIACC for, what, '75, '76?

3   A      Correct.

4   Q      And Upper Iowa '76 to '78 or thereabouts?

5   A      Just one year at Upper Iowa.

6   Q      Okay.  And what year would that have been?

7   A      Seventy-- '76, '77.

8   Q      Okay.  And then you graduated in '77?

9   A      No.  I completed it later.  I didn't complete it at

10  that time.  I completed it-- the degree later.

11  Q      And when did you complete your degree?

12  A      I think it was 2000 or '99 or-- I think the diploma

13  says, "2000."  I completed it in '99, but the diploma says,

14  "2000," I believe.

15  Q      And what did you do after leaving Upper Iowa College?

16  A      I took some additional classes at NIACC and then I got

17  a job in Sanborn, Iowa as a police officer in '78.

18  Q      And what was your position at Sanborn Police?

19  A      Just patrolman, police officer.

20  Q      Okay.  And how many people were on the force there?

21  A      Just two of us, well, two-- there's a part-time, two

22  and a half.

23  Q      And how long were you a Sanborn police officer?

24  A      About a year, and then I was hired up here the next

25  year, in '79.

1  Q    And have you been with the Osceola County Sheriff's

2  Department ever since 1979?

3  A    Yes.

4  Q    And tell me all your-- all your positions you've had

5  with Osceola County since you were first hired.

6  A    Well, I was hired as a deputy and-- I'm not sure what

7  you mean by positions.  I-- I was promoted to first deputy,

8  I've been chief deputy and then I've been sheriff.

9  Q    Okay.  Do the-- do the duties differ between being a

10 deputy and a first deputy?

11 A    Not necessarily.  I mean, I had some different

12 responsibilities, but...

13 Q    What were some of the different responsibilities?

14 A    I-- interviewing and investigation type work.

15 Q    That's something that a first deputy does, but a deputy

16 doesn't do?

17 A    No, but I-- I was, you know-- it wasn't a-- a formal

18 recognition, I guess, but that's what some of my duties

19 were.

20 Q    As a first deputy you're talking about now?

21 A    Well, even before that I was doing that and...

22 Q    Okay.  And what about as a chief deputy, do those

23 duties differ from being a deputy or a first deputy?

24 A    A little bit.  I was given some personnel issues to

25 take care of, doing the scheduling, still doing the

1 investigative work and still doing the patrol function,

2 responding to accidents and that sort of thing.

3 Q   Okay.  And I should probably ask this too.  What were

4 the duties of the-- of a deputy, for example, when you were

5 first hired?

6 A   What-- what are the duties?

7 Q   Yeah, what were-- what were your duties?

8 A   General-- general law enforcement.

9 Q   And tell me what that means.

10 A   I mean, the Code, it spells out quite a few of them.  I

11 mean, it just-- generally just investigating all crimes,

12 complaints, answering all calls for service, responding to

13 investigating-- accident investigations, had jail duties.

14 We had to take care of inmates, booking them in and out of

15 jail, transporting prisoners, testifying in court, serving

16 civil papers.

17 Q   And tell me-- tell me a little bit about what goes--

18 what you mean by investigations.  What goes into an

19 investigation?

20 A   A criminal investigation?

21 Q   Yes.  And let me-- let me stop you for a second.  Is

22 there a difference between a criminal investigation and some

23 other type of investigation?

24 A   Well, if you have to prove something beyond a

25 reasonable doubt, yeah, there could be.

1  Q    Okay.  And I just want to-- when I asked about

2  investigations, you asked, "Criminal investigations?" and

3  I'm just trying to figure out, is there a difference between

4  a criminal investigation and some other kind of

5  investigation?

6  A    Well, there could be.  It depends what it is, I guess.

7  Q    Okay.  Well, tell me what goes into an investigation,

8  then.

9  A    Well, just the basics, get the who, the what, where,

10 when, how and why, that sort of thing.  It depends what kind

11 of case it is and...

12 Q    And what's the purpose of doing an investigation?

13 A    It is to get to what happened.

14 Q    Okay.  And to figure out whether a crime has been

15 committed?

16 A    Well, yes.  You know, we look a little bit further down

17 the road on a criminal investigation.  I mean, I'm sure

18 you're aware we can make an arrest on probable cause, but we

19 don't-- as we look down the road, can we prove this in court

20 beyond a reasonable doubt, so...

21 Q    But would part of the investigation process be to

22 determine whether-- whether a crime has been committed and

23 whether to charge someone with a crime?  Would that be part

24 of the--

25 A    Correct.

1    Q    Okay.  And is-- is part of your duties-- oh, and let me

2    back up now.  Were the-- was there a time period during

3    which you became the first deputy and became the chief

4    deputy?  Was there a clear time period when you switched

5    from being a deputy to a first deputy and then--

6    A    Yes.

7    Q    Okay.  What was that time period?

8    A    I-- I can't tell you the exact dates.

9    Q    Okay.  Do you remember the approximate year?

10   A    Probably-- approximately, I could tell you, probably

11   first deputy around '89, 1989, and chief deputy probably

12   around 1996.

13   Q    And then you became sheriff in 2005?

14   A    Correct.

15   Q    And you ran for election in 2004, November of 2004,

16   that was when the election was, then you were sworn in

17   January 1 of 2005?

18   A    Correct.

19   Q    And what are the duties of the sheriff?

20   A    Well, then again, the Code spells out-- it's quite a

21   long list and I can't quote it for verbatim to you, but--

22   Q    Sure.  That's-- what in general are the duties of the

23   sheriff?

24   A    General is your basic law enforcement duties,

25   maintaining the county jail and overseeing the civil

1  process. That would-- you know, that's the three main

2  things we do.

3  Q    And when you say, "civil process," what do you mean by

4  that?

5  A    Securing garnishments, serving civil papers, levies,

6  just various civil duties, serving subpoenas.

7  Q    And what goes into, is it, maintaining the jail?  Is

8  that what you said?

9  A    Overseeing and that.

10 Q    Overseeing the jail?

11 A    Maintaining, running the jail and the inmates and...

12 Q    Okay.  Where-- where in this-- in those three prongs

13 would granting or denying gun permits fall?

14 A    I suppose, under the law enforcement part.

15 Q    Okay.  And as a law enforcement person, as a deputy,

16 first deputy, chief deputy and sheriff, have you had

17 additional education or training?

18 A    In law enforcement, yes.

19 Q    Okay.  And what sort of training-- additional training

20 have you had?

21 A    Well, obviously I've been through the law enforcement

22 academy, had some other law enforcement training in

23 interviewing.

24 Q    Where's the law enforcement academy?

25 A    Camp Dodge, Johnston, Iowa.

1  Q    And how long of a camp is that-- or academy is that?

2  A    Right now it's 12 weeks.

3  Q    And when did you graduate from there?

4  A    In '79.  I attended a-- a satellite course that was at

5  NCC in Sheldon.  And back then they had some of those around

6  the state where they did the training off-sight, off of Camp

7  Dodge, and did them at maybe a community college.

8  Q    Okay.  And have you had additional training beyond the

9  camp-- the law enforcement academy?

10 A    Yes.

11 Q    I think you described some additional-- and what are

12 the courses or studies that you've had since--

13 A    Well, various-- various law enforcement courses, like I

14 said, interviewing techniques, drug investigation,

15 leadership courses, hazardous materials.  Just trying to

16 think through the years now.  It's--

17 Q    Is there an annual requirement or something?

18 A    Yes, 12 hours.

19 Q    12 hours per year?

20 A    Yes.

21 Q    Have you-- and during-- during what time period-- or

22 during what-- which of your positions has handling gun

23 permitting or handgun permitting been part of your

24 responsibilities?

25 A    As sheriff.

1  Q    Just as sheriff?

2  A    Yeah.

3  Q    Did you-- were you involved in any of that when you

4  were a deputy?

5  A    No.

6  Q    Okay.  And did you-- have you had any training

7  regarding granting or denying gun permits?

8  A    No specific training, no.

9  Q    And when you say, "no specific," is there something

10  else that-- that--

11  A    Well, just reviewing the Code, reading that.

12  Q    And when you say, "the Code," you mean the Iowa Code?

13  A    Right, Iowa Code, talking to the previous sheriff, but

14  not a formal class that you would take, if that's what you

15  mean.

16  Q    Okay.  And when you say, "talking to the previous

17  sheriff," who are you talking about?

18  A    Ed Harskamp.

19  Q    And when did you talk to Sheriff Harskamp regarding

20  permitting of guns?

21  A    Oh, I can't give you the exact date, but it was

22  sometime in 2004 while he was still in office and, you know,

23  I wasn't the sheriff yet.

24  Q    Did you have those conversation-- was it one

25  conversation or a number of conversations?

```
 1  A    I've talked to him more than once on it, but I can't
 2  tell you exactly, you know, when, how many times.
 3  Q    Okay.  Would they-- would those conversations have been
 4  before you were elected sheriff or after you were elected
 5  sheriff?
 6  A    Both.
 7  Q    Okay.  Some before and some after you were elected?
 8  A    Right.
 9  Q    Okay.  And since you were-- have been sworn in have you
10  had any conversations with him about the gun permitting
11  process?
12  A    Yes.
13  Q    Okay.  And what would the purpose of your conversations
14  with Sheriff Harskamp have been regarding the gun permitting
15  process?
16  A    Just asking him, you know, how does this work, what do
17  you-- what do you normally do and what the procedure was
18  and...
19  Q    And what did he tell you about those issues?
20  A    Well, he just-- just looks over the application and,
21  you know, whether or not he knows the person.  He told me it
22  was up to the sheriff's discretion whether a permit is
23  issued or not.
24  Q    And did he tell you about any factors that go into
25  whether-- whether to grant a permit or not to grant a
```

1  permit?

2  A    Not that I recall, no.

3  Q    And do you understand there to be any-- any limitations

4  to the sheriff's discretion or is it unlimited discretion?

5  A    I would-- I'm not sure, I guess, just sheriff's

6  discretion on it.

7  Q    Okay.  In your mind are there any limitations on how

8  you exercise that discretion?

9  A    Not-- not that I can think of, no.

10 Q    Did Sheriff Harskamp say anything to you about

11 conducting a-- an investigation into someone's application

12 in making a decision about whether to grant a permit or to

13 deny a permit?

14 A    No.

15 Q    And did you have-- have you had any conversations with

16 Sheriff Harskamp about what you do to reasonably determine

17 whether to grant a permit or-- or to deny a permit?

18 A    Well, I asked him about an application in '98, but that

19 was the only-- the only time that I can think of where I

20 asked him that question.

21 Q    You asked Sheriff Harskamp about an application in

22 1998?

23 A    I mean, that was from 1998.

24 Q    Okay.  Was it a particular person's application or

25 just--

```
 1   A     Yes.

 2   Q     Okay.  And whose application was that?

 3   A     Mr. Dorr's.

 4   Q     And when did you ask Sheriff Harskamp about Mr. Dorr's

 5   application from 1998?

 6   A     Oh, I'm not-- I'm not sure, maybe a year ago or so.

 7   It's been a little while.

 8   Q     Okay.  So you're saying sometime in 2008?

 9   A     It could have been.  I'd have to look and see if I made

10   a notation of that, but I came across that application and I

11   asked him what-- what his thinking was on that particular

12   application.

13   Q     And why-- and when you say, "Mr. Dorr," you're talking

14   about Paul Dorr?

15   A     Yes.

16   Q     Okay.  And why did you ask specifically about the 1998

17   application?

18   A     Well, there was a lengthy response on the justification

19   by Mr. Dorr and there was nothing written on the bottom by

20   Sheriff Harskamp, so I asked him what-- "What did you do?

21   What was your actions on this?  There's no notation on it."

22   And he told me that he denied that application because the

23   writing was kind of bizarre, it was unusual so he denied it,

24   and then I think the next year, I think, he granted the

25   permit to carry.
```

1  Q    In 1999?

2  A    Correct.

3  Q    Paul Dorr reapplied, and that permit was granted?

4  A    That's my understanding.  I'd have to look at the

5  records or clarify that with Ed Harskamp, but I was

6  interested in the '98 one because there was no-- it wasn't

7  marked approved, it wasn't marked denial-- denied.

8  Q    Okay.  And so you were wondering whether it was

9  approved or denied?

10 A    Correct.

11 Q    And he told you that it was denied?

12 A    Yes.

13 Q    Okay.  And where does Mr. Harskamp-- or Sheriff

14 Harskamp live now?

15 A    In Sibley.

16 Q    Okay.  Is he-- is he working or is he retired or...

17 A    He's-- he's retired.

18 Q    Retired?  Now, is this-- this conversation and this

19 discussion about Paul Dorr's 1998 application, is that

20 something that-- is that a conversation or an inquiry you--

21 you made after Paul Dorr filed his lawsuit?

22 A    You know, I don't know for sure.

23 Q    Okay.

24 A    It-- it could-- could have been.

25 Q    And, now, there's an Iowa Code Section 724.8 that deals

1   with the concealed carry permit application; is that

2   correct?

3   A    Correct.

4   Q    And-- and so that contains a number of factors to-- to

5   analyze in determining whether to grant or deny a permit,

6   correct?

7   A    Correct.

8   Q    And did you-- did you have a discussion about which of

9   those factors led to Sheriff Harskamp's denial of Paul

10  Dorr's 1998 application?

11  A    No.

12  Q    And do you believe that, as the sheriff, you need to

13  decide under one of those factors or another-- or that you

14  have to make a decision under one of the factors as to

15  whether to-- to deny or grant an application?

16  A    Just those factors?

17  Q    Yes.

18  A    Well, not just that.  I mean, there is the discretion

19  that comes into play.

20  Q    Okay.  So it's your belief that someone could pass

21  every one of those factors and you could still deny the

22  application?

23  A    Correct.

24  Q    Okay.  Would that lead to somewhat random results, in

25  your opinion?

1  A    No.

2  Q    Well, you could-- would you agree that-- that someone

3  could pass all those factors and be given a permit and then

4  someone else could pass all those factors and be denied a

5  permit?  Do you agree that that could happen under how

6  you've described the process?

7  A    I'm sorry.  Could you repeat-- or rephrase that or

8  repeat it?

9  Q    Okay.  Well, if someone-- if someone-- if one applicant

10 passes all those criteria in the Code and is given a permit

11 and then someone else passes all those criteria and then is

12 denied a permit, do you believe that's a-- a random result?

13 A    Well, I don't know.  I can just speak for myself, and

14 I'm not doing anything in a random manner.  Okay?  I-- you

15 know, I don't know what the rest of the state's doing, the

16 other counties.  My decisions aren't random.

17 Q    Okay.  And what are they based on, your decisions?

18 A    Well, like you just said, the criteria in the-- in the

19 Code, and the discretion that comes into play is on a

20 person's reputation, reputation in the community, their

21 neighborhood.

22 Q    And when you're-- when you're basing those decisions

23 on-- on your own discretion and what you believe is the

24 reputation of the applicant, do you believe that those

25 results could be somewhat unfair?

1   A      What do you mean, be unfair?

2   Q      Well, do you think it might be unfair to-- for one

3 applicant to be-- to pass all the criteria and be denied a

4 permit and another applicant to pass all the criteria and be

5 granted a permit? Do you think that's unfair?

6   A      No. It depends what the-- what all the circumstances

7 are in-- in the situation.

8   Q      And-- and what other circumstances? I'm trying to get

9 at what all the circumstances are.

10   A      Well, I'm just talking about like a person's

11 reputation. I don't see how that--

12   Q      Is that-- is that it?

13   A      Well, right. I don't see how that's unfair if you take

14 that into consideration.

15   Q      Okay. Is--

16   A      For example-- maybe I'm not being clear enough. For

17 example, as sheriff and as a law enforcement officer I

18 hear-- you hear a lot of things. And I could have

19 information on, say, somebody that's a drug dealer who

20 doesn't have a criminal record or hasn't been arrested and

21 maybe we're trying to build one, but we don't have enough

22 intel to-- to charge a person, so-- but their reputation is

23 that they're a drug dealer or drug user or something like

24 that. So that could-- that could be a factor--

25   Q      Okay.

```
 1  A      -- if that makes sense.

 2  Q      Sure.  And in the situation that you've just described,

 3  you're describing a situation where someone is breaking the

 4  law, but you just haven't proved it yet?

 5  A      Correct.

 6  Q      Okay.  And are there any other sort of circumstances

 7  that-- that would lead you to-- to deny someone an

 8  application even if-- if they pass the criteria in the

 9  statute?

10  A      Well, like I just said, if I had some real concerns

11  that-- because of a person's reputation, that they could be

12  a danger or-- then I would use my discretion to deny the

13  application.

14  Q      And what-- what sort of concerns would lead you to

15  consider someone being a danger?

16  A      Well, it could be a number of things, just could be

17  their-- their mental state, how they behave, how they treat

18  other people.

19  Q      Any other factors?

20  A      I'm-- I'm sure there is.  I can't think of any right--

21  right at the moment.

22  Q      Okay.  Would you agree that making a decision about

23  someone's reputation is-- is fairly subjective?

24  A      No.  I mean, it's...

25  Q      Would you agree with me that two people could analyze
```

1  someone's reputation and-- and come up to-- with different

2  results about what that person's reputation is?

3  A    It-- it could, yeah.

4  Q    Have you had any conversations with other sheriffs or

5  any other law enforcement about-- other than Sheriff

6  Harskamp, about the process for granting or denying handgun

7  permits?

8  A    The process?

9  Q    Yes.

10  A    Not about the actual process, no.

11  Q    Okay.  Have you talked to other sheriffs in other

12  counties about the process they use for determining whether

13  to grant or deny a concealed carry permit?

14  A    Not-- not the process, no, not directly, no.

15  Q    Okay.  Have you had-- it sounds like you've had some

16  other conversations with other sheriffs about something

17  relating to this.

18  A    I've-- I've seen some e-mails on it.  I believe there

19  was a meeting in Des Moines about-- talking about this same

20  issue, yeah, because there's some talk about changing the

21  law from shall-- from may issue to shall issue.

22  Q    Okay.  And when have you seen those e-mails?

23  A    Oh, just the past year, I guess.

24  Q    And are those-- who are those e-mails from?

25  A    Well, I think-- I think it was through the Iowa

1  Sheriffs and Deputies Association.

2  Q    And those are, as you say, within the last year?

3  A    I believe so, yes.

4  Q    So prior to, say, July 2007 you don't recall seeing any

5  e-mails regarding issuing or denying permits to carry a

6  handgun?

7  A    I don't recall that, no.

8  Q    Okay.  And just by way of terminology, some-- you know,

9  I'll refer to the concealed carry permitting process and

10 sometimes I may say, "handgun permitting process."  Do you

11 understand what I'm saying if I'm talking about the

12 permitting process or the handgun permitting process?

13 A    You mean like it's gonna be the same thing?

14 Q    Yes.

15 A    Okay.  Yes.

16 Q    So I may say, "concealed carry process."  I'm talking

17 about the same process of the sheriff determining whether to

18 grant a handgun permit to concealed carry.  Is that clear

19 enough for you to understand and--

20 A    Yes.

21 Q    Okay.  I just want to make sure that we're on-- we

22 understand each other.  So prior to July 2007 do you recall

23 receiving e-mails from other sheriffs or any information

24 from other sheriffs about the handgun permitting process?

25 A    No.  No, I don't.

1  Q    And have you received any-- any information about the

2  handgun permitting process from the Iowa Attorney General or

3  any other law enforcement bodies?

4  A    Not the attorney general.  From the Department of

5  Public Safety I've received some information.  There's the--

6  basically talks about what the Code of Iowa states.

7  Q    And when do you recall receiving information from the

8  Department of Public Safety?

9  A    Well, in-- within the past two years.

10 Q    And within the past two years, that takes us back to

11 November of '09.  Is-- is that the time period or does it--

12 A    November of '07?

13 Q    I'm sorry, November of '07.

14 A    Yeah, right.

15 Q    Okay.  So that's information you would have received

16 after you denied Paul Dorr's 2007 permit?

17 A    Correct.

18 Q    That's-- okay.  And did you solicit some information

19 from the Department of Public Safety or did they send you

20 that information unsolicited?

21 A    I-- I asked for it.

22 Q    And why did you ask for that information?

23 A    Just to see if there was something I wasn't aware of or

24 that I missed.

25 Q    What do you mean by that?

1  A    Well, I just wanted to-- to verify that I was following

2  the Code.  And the person there that oversees that is Sam

3  Knowles with a "K."

4  Q    I'm sorry?

5  A    Sam Knowles.

6  Q    K-n-o-l-l-s?

7  A    L-E-S, I think.

8  Q    Okay.

9  A    And he-- he pretty much reiterated the Code of Iowa and

10 then he said, "Also remember, Sheriff, that you can use your

11 discretion on issuing permits to carry."

12 Q    Okay.  Was-- was that a communication you made about

13 Mr. Knowles specifically to-- in regard to Paul Dorr's

14 application?

15 A    Correct.  Yeah, that's why, yes.

16 Q    Okay.  Did the Iowa Sheriffs-- or I'm sorry.  Let me

17 strike that.  Did the Department of Public Safety give you

18 any information about how you reasonably determine whether

19 an applicant constitutes a danger?

20 A    Not that I recall, no.

21 Q    And has any other law enforcement provided you any

22 information about how you as the sheriff reasonably

23 determine whether an applicant constitutes a danger to any

24 person?

25 A    Not that I recall.

1  Q    And that's just something that you believe you have the

2  discretion to determine?

3  A    Yes.

4  Q    Do you believe that you as the sheriff have any

5  obligation to conduct an investigation to determine what

6  constitutes a reasonable determination that an applicant

7  constitutes a danger?

8  A    Could-- could you repeat that, please?

9  Q    Sure.

10  A    I want to make sure.  (The last question was read

11  back.)  I believe the applicant needs to convince me that

12  they're a good guy or a good person.

13  Q    Okay.  So the-- the applicant has the burden of proof,

14  in your mind?

15  A    Yes.

16  Q    And what-- what is the standard of that burden of

17  proof?  Do you understand my question?

18  A    I-- I don't know how to answer, sir.

19  Q    Well, for example, in a criminal case you understand

20  that law enforcement has the burden to prove beyond a

21  reasonable doubt the guilt of a-- of a person before they're

22  convicted.  You understand that--

23  A    Yeah.

24  Q    -- burden of proof, correct?  Do you-- is that the same

25  burden of proof that you use in determining whether an

1  applicant gets a permit or not?

2  A    Well-- well, a criminal investigation is a different--

3  whole different animal, in my opinion.

4  Q    Sure.  I'm just trying to figure out, in your mind what

5  is the standard for an applicant to convince you that they

6  should get a permit?  Is it--

7  A    Well, it's not a written standard.  It's-- I'm a cop.

8  I do have some intuition, some gut feelings, been a cop for

9  over 30 years.  Like I said, they need to convince me that

10  they're a good person and I need to feel comfortable with

11  that.

12  Q    So is the-- is the-- and that's the standard you use,

13  that the applicant has to convince you that they're a good

14  person?

15  A    In simple terms, yes.

16  Q    Okay.  And do you personally know-- or do you make it

17  a-- a point to personally know each applicant so that you

18  can determine whether they're a good person?

19  A    If it's a-- yes.  If it's a new-- new applicant I make

20  it a point to have a interview with them.  It's just-- and,

21  then again, the gut feeling, intuition kicks in.  Someone

22  could slip through the system that's not a good person, but

23  I do-- do try to make a point to meet with everybody, not

24  for renewals, but for-- for a new applicant--

25  Q    Okay.

1    A    -- unless I learn something-- learn something

2    different, you know, when they renew.

3    Q    Okay.  And what goes into this interview with a new

4    applicant?

5    A    I just ask them who they are, what's-- a little bit of

6    their background, maybe, you know, where are they working,

7    what their intentions are, you know, why they want the

8    permit.

9    Q    Do you have-- do you have any written questions or

10   written policy that you follow in conducting this interview?

11   A    No.

12   Q    It's just basic information about the-- where the

13   applicant works and why they want the permit, things like

14   that?

15   A    Correct.

16   Q    And how long would you say this interview lasts?

17   A    It depends on the-- on the person, but not very long,

18   10, 15 minutes.  And I-- I should-- if I may, I usually will

19   ask my staff, "Have you heard anything about this person?

20   Do you know anything?" and...

21   Q    When you say you ask your staff, which staff members do

22   you ask?

23   A    Well, whoever present or-- it depends.

24   Q    Are you talking deputies or-- or other people?

25   A    Deputies and dispatchers.  I don't-- I don't ask all my

1  staff, but I ask some of them.

2  Q    And then-- so that's the-- that's the process for

3  determining whether a new applicant gets a permit, correct?

4  A    Well, it's part of the process, yes.

5  Q    Okay.  And what's-- is there more to the process?

6  A    Well, they need to take the-- the Firearms Safety

7  Class.

8  Q    Is that something that the-- just the new applicant has

9  to do or do all applicants have to take the safety class?

10  A    Well, all new applicants.  The renewals don't--

11  Q    Okay.

12  A    -- have to take it.

13  Q    And who teaches the safety class?

14  A    It-- it depends.  It's usually a law enforcement

15  officer, but it depends, and it's usually conducted down

16  at-- at the Sheldon college.

17  Q    And then-- so is that a class that the applicant has to

18  just take one time and then-- then you make your own

19  decision each year based on whether they get-- to determine

20  whether they get a renewal?

21  A    That's my understanding, yes.

22  Q    Okay.  I mean, is there any-- do they have to take it

23  every ten years or every five years or something?  That's

24  what I'm--

25  A    Not that I'm aware of.

```
 1  Q    Okay.  I'd like to ask you a few questions about Alex

 2  Dorr's application to get a concealed carry permit.  You're

 3  familiar with his application?

 4  A    Yes.

 5  Q    And did you-- did he take the Firearms Safety Class?

 6  A    I believe he did, yes.

 7  Q    Did he pass it?

 8  A    I believe so.

 9  Q    And did he fill out an application?

10  A    Yes.

11  Q    And did he complete the application process correctly?

12  A    I believe so.

13  Q    Did you conduct an interview with him?

14  A    I don't believe I met with-- with Alex.

15  Q    And why do you-- why is that your recollection?

16  A    Pardon?

17  Q    Is there a reason why you-- you don't recall meeting

18  with Alex?

19  A    I think I just met with-- with Paul Dorr.

20  Q    Okay.  Now, you-- you testified that you-- you would

21  typically meet with each new applicant, correct?

22  A    Correct.

23  Q    And do you believe that you-- you would meet with every

24  applicant-- every new applicant?

25  A    Well, I don't remember what the situation I was-- I was
```

```
 1  dealing with Paul Dorr on it and I don't recall Alex Dorr
 2  coming in to ask me.
 3  Q    Well, he would have filled out the application and
 4  provided it to you, correct?
 5  A    Correct.
 6  Q    And did you make your decision to deny his application
 7  before asking him for an interview?
 8  A    Yes.
 9  Q    Okay.  And--
10  A    Well, I didn't-- let me-- I didn't ask for an
11  interview.  I mean, I-- it's-- they bring in their
12  application, they leave it-- leave it at the sheriff's
13  office.  It's their burden, their responsibility to come
14  back and pursue it.
15  Q    Okay.  And would you initiate the request for an
16  interview with a new applicant, typically?
17  A    Typically I would leave a note on the applicant that I
18  need to interview the-- the person.
19  Q    Okay.  And that's how you communicate to the new
20  applicant the remaining step needed to get a permit--
21  A    Right.
22  Q    -- is you would-- you would provide a note or put a
23  note on their application--
24  A    Right.
25  Q    -- that they need to come in for an interview?
```

1  A    Right, correct.

2  Q    Okay.  And you didn't do that with Alex?

3  A    Well, I'm trying to remember.  I-- his and his-- Paul

4  Dorr's were, I believe, at the same time and I-- he just

5  didn't come in.  I didn't-- I don't recall meeting with him.

6  Q    And you don't recall sending him a note to say, "Stop

7  by my office for an interview"?

8  A    No, I don't.

9  Q    You made the decision to deny his application without

10  the interview?

11  A    Yes.

12  Q    Okay.  Is there a reason why you didn't give Alex an

13  opportunity to come in and-- and interview?

14  A    No, other than that it wasn't necessary.

15  Q    And why wasn't it necessary?

16  A    Because the issue was that he was 18, and I-- I

17  personally feel that that is too young to carry a concealed

18  weapon.

19  Q    Have you ever granted any other permits to applicants

20  under the age of 21?

21  A    Not that I recall.

22  Q    Do you know if Sheriff Harskamp granted permits for

23  concealed carry to applicants under the age of 21?

24  A    That I don't know.

25  Q    And, now, you understand that the statute points out

1  the age of 18, correct?

2  A    Correct.

3  Q    But you disagree with that-- that age that's provided

4  in the statute?

5  A    I-- I personally don't feel comfortable issuing a

6  permit to carry to a person that's under 21.

7  Q    Okay.  But, again, you're familiar with the Iowa Code

8  that's-- that talks about 20-- or 18 being the important

9  age, correct?

10  A    Correct.

11  Q    And so you-- you have substituted your own age of 21 in

12  place of the legislature providing the age of 18, correct?

13  A    Well, that's-- I wouldn't use that word.  I-- I believe

14  the Code also says they have to be 21 to purchase a handgun

15  and they need to be 21 to purchase handgun ammunition, and

16  it's just my feeling that 18 year is in the Code to

17  provide-- say if they became a security officer or if I

18  hired a deputy that was under 21, that leaves that door open

19  so you could give them a permit, I guess.

20  Q    So there are some circumstances under which you would

21  consider granting an applicant a concealed carry permit if

22  they were under the age of 21?

23  A    The only-- the only way would be if a deputy was hired.

24  Q    Okay.  Or if they were working in security, as you

25  mentioned?

```
 1   A     Well, I guess I-- I haven't had that issue come up that
 2   I'm aware of, so--
 3   Q     Okay.
 4   A     -- I don't know.  I haven't thought about it.
 5   Q     Okay.  And did you-- did you ever ask Alex Dorr whether
 6   he intended to be security or get into law enforcement?
 7   A     No.  I just went by what he wrote on his application.
 8   Q     Do you have a concealed carry permit?
 9   A     Do I personally?
10   Q     Yes.
11   A     I have a professional concealed carry.
12   Q     Okay.  And do your deputies have a concealed carry
13   permit?
14   A     Professional.
15   Q     Okay.  And what's the difference between a professional
16   and a nonprofessional?
17   A     They need to be a certified officer.
18   Q     Okay.
19   A     And then when their employment is-- is through, then
20   that expires on that date.  When their-- like I say, if they
21   would resign or retire or whatever, then that expires.
22   Q     Okay.  And why do-- why do your deputies-- why do you
23   and your deputies have a professional concealed carry
24   permit?
25   A     Probably because we're required to have one.
```

1  Q    You're required to have a concealed carry permit

2  outside of your work as-- in law enforcement?

3  A    Oh, I-- I guess I don't under-- in order to-- to work

4  and be a Certified Peace Officer we need a professional

5  permit to carry.

6  Q    Okay.  Now, the-- the Iowa Code uses the phrase

7  reasonably determine whether-- whether the applicant

8  constitutes a danger to any person.  You understand that

9  language to be in the statute, correct?

10  A    You know, I don't know the statute verbatim, but if you

11  could show it to me, then I can--

12  Q    Sure.

13  A    -- take a look.

14       MR. PHILLIPS:  I'll show it to him.

15       MR. FAHNLANDER:  You've got it?

16       MR. PHILLIPS:  Yes.

17       MR. FAHNLANDER:  Okay.

18  Q   (BY MR. FAHNLANDER)  You agree with me that the

19  subsection 5 of Iowa Code 724.8 uses the phrase reasonably

20  determines that the applicant does not constitute a danger

21  to any person?

22  A    Right.

23  Q    Okay.  And what in your mind does reasonably determine

24  mean?

25  A    I guess, what a reasonable person-- how a reasonable

1   person would look at the-- look at the situation.

2   Q    And what does that mean to you?

3   A    Well, is it normal?

4   Q    Anything else?

5   A    Not that I can think of.

6   Q    Okay.  And what does "constitute a danger to any

7   person" mean to you?

8   A    Well, to me-- I mean, it could be several different

9   things, obviously.  If someone pointed a gun at you it's

10  quite apparent.

11  Q    Okay.  Is there anything else that you would consider--

12  A    Well, I think--

13  Q    -- a danger other than pointing a gun?

14  A    Well, I think, a person's reputation.  Recently we

15  heard the news on the Fort Hood incident that there was

16  warning signs, but-- but those weren't acted upon or looked

17  into.  I-- you know, I don't know all the issues there, but

18  obviously there was-- I think there was some danger there,

19  but it was overlooked.  So I-- you know, I think, a person's

20  reputation, what-- what does the community as a whole

21  perceive.

22  Q    Okay.  And when you're talking about reputation, are

23  you just-- are you talking about whether his reputation is

24  such that people generally like him or generally dislike him

25  or are you talking about--

```
 1  A    No, I--
 2  Q    What are you factoring in when you talk about
 3  reputation?
 4  A    It's much deeper than that.  It's not a question of
 5  like or dislike.
 6  Q    What is it a question of?
 7  A    When-- when people come up and tell me that, "Boy, I
 8  think that guy's a nut.  I think-- you know, I could see
 9  that guy-- I think-- I can see that guy snapping and
10  shooting people.  I could see him doing that, wouldn't
11  surprise me at all."  When I hear things like that, then
12  that concerns me.
13  Q    So if-- if someone says that so-and-so-- or an
14  applicant could snap and start shooting people, that would--
15  that would give you some concern?
16  A    Well, if you hear it once, that's one thing--
17  Q    Uh-huh (yes).
18  A    -- but when you hear it a number of times from a number
19  of different people, then it adds to it.
20  Q    Okay.  And-- and what-- in the situation you're
21  describing, what if you-- what if you personally know
22  someone and you disagree with the contention that so-and-so
23  might snap and start shooting people?
24  A    I haven't heard that about anybody.  I haven't heard
25  that comment about...
```

1  Q    Any applicants?

2  A    Other than Mr. Dorr.

3  Q    Okay.  So you're saying that you've heard-- you heard

4  that comment about Mr. Dorr?

5  A    Yes.  I've heard a comment about one other applicant

6  that I denied.

7  Q    Okay.  And who is that?

8  A    Bill Johnson.

9  Q    And did he receive a permit or not receive a permit?

10  A    Well, he had a permit for years, and Bill Johnson was a

11  good guy.  I knew-- he lives in the same town I do and he

12  was a good guy and hard worker, just a good guy.  And then

13  through the years he-- he had changed, and I-- you know, I

14  think he has some mental health issues going on, in my

15  opinion, and he just-- it changed his behavior.  It wasn't

16  normal.  And I had, you know, a resident tell me that Bill

17  Johnson's made comments that, you know, he-- he thinks the

18  sheriff should be shot.  So there was that concern, but

19  that's the only other one I can think of.

20  Q    And was he-- did he-- was he denied a permit?

21  A    Yes, I denied him a permit.

22  Q    In what year?

23  A    In 2005.

24  Q    And he had been given a permit prior to 2005?

25  A    Yes.

1   Q    And-- and so there was some-- in your mind what changed

2   between the time when you granted him a permit and you

3   denied a permit?

4   A    I never granted him a permit.

5   Q    Oh, that was granted by the prior sheriff?

6   A    Sheriff or sheriffs.  I'm not sure how long Bill had--

7   Bill Johnson had a permit, but he-- he had one for a number

8   of years, I-- I believe.

9   Q    And was it the mental health issues that convinced you

10  to deny his permit?

11  A    Well, he-- yes.  It wasn't necessarily something that

12  he did.  He didn't-- that I'm aware of.  He didn't attack

13  anybody, he didn't shoot anybody, but he just behaved in a

14  not normal manner.  For instance, he-- and this just didn't

15  happen in one day.  Okay?  I mean, this wasn't, you know,

16  like they show it-- he was like this and then, bang, he was

17  like this.  It was a progressive type of-- of situation.

18  But he would say he's working for like the CIA and he was

19  working for the FBI and he's working on drug cases and-- you

20  know, that just to me isn't normal.

21  Q    So he was saying these things which you knew were

22  obviously not true?

23  A    In the public.  Well, I felt they weren't true, yeah--

24  Q    Okay.

25  A    -- and so...

1  Q    Well, let me stop you for a second.  So you-- did you

2  hear Mr. Johnson say-- make these comments about him working

3  in the CI-- working for the CIA and FBI?

4  A    Me personally, no.

5  Q    You-- other people relayed to you that he had been

6  saying that he worked for the FBI and CIA?

7  A    Right.

8  Q    And you knew that that wasn't true or you believed that

9  wasn't true?

10  A    Correct.

11  Q    And so you thought, this guy is-- is disconnected from

12  reality because he's making stuff up?

13  A    I think there's that potential, yes, I--

14  Q    Okay.

15  A    I think he's-- progressively is...

16  Q    And then you said that you heard that he thought the

17  sheriff should be shot?

18  A    He made that comment to another resident.

19  Q    Who did he make that comment to?

20  A    I think it's George Klein from Ashton.

21  Q    You live in Ashton?

22  A    Yes.

23  Q    Okay.  And where's that from here?

24  A    About six miles south-- six, seven miles south.

25  Q    Okay.  And what's the population of Ashton?

```
 1  A    Oh, about 450.

 2  Q    Did you do anything to confirm whether Mr. Johnson

 3  thought that the sheriff should be shot?

 4  A    No.

 5  Q    You-- you-- did you trust the source that you heard it

 6  from?

 7  A    I-- I believe he wouldn't make that up, yes.

 8  Q    Okay.  Was-- was there-- did you make any other

 9  observations about Mr. Johnson that led you to believe that

10  he should not be granted a concealed carry permit?

11  A    Well, just like I told you, the-- the different--

12  different things I heard, and this wasn't just in one day.

13  It was just over a period of time.

14  Q    What period of time?

15  A    Oh, probably in the last five, six years or so.

16  Q    Are you talking the last five or six years from now or

17  are you talking about the last five or six years prior to

18  when you denied his application in 2005?

19  A    From now, and maybe it was more like seven years or--

20  well, maybe five, six years from-- from now--

21  Q    Okay.

22  A    -- about, about.

23  Q    So for a period of a year or two prior to your denial

24  of his application you had been hearing these things about

25  Mr. Johnson?
```

1 A    Well, yes, I mean, not-- you'd hear something and-- and

2 it's not like you hear it every day or you hear it multiple

3 times a day.  You just-- okay, you hear-- hear something

4 and--

5 Q    And is he a personal acquaintance of yours as well?

6 A    Well, I-- I know-- I know him and I've talked to him

7 before.  I mean, we don't pal around together, anything like

8 that, but-- but, yeah, I know who he is and he knows who I

9 am.

10 Q    And prior to your decision to deny his application did

11 you have some conversations with him that led you to believe

12 that he was unstable or something like that?

13 A    With him?

14 Q    Yes.

15 A    I-- I'm sure I have.  I can't remember.  He calls once

16 in a while.  He calls even yet today, I mean.  Last week I

17 think he called on something else, but he'll call

18 periodically.

19 Q    Call to you personally or to the sheriff's office?

20 A    Well, to the sheriff's office to me.

21 Q    And what sort of things does he talk to you about when

22 he calls?

23 A    Well, right now he's upset because he lost his driver's

24 license, and I think he has poor eyesight and I think that

25 could be part of why he lost it, but--

1  Q    How old a man is he?

2  A    Oh, I'm just guessing, 70-- 65, 70.  Maybe he's not

3  quite 70, maybe in his 60s.

4  Q    Going back to Iowa Code Section 724.8 where it talks

5  about the sheriff reasonably determining that an applicant

6  constitutes a danger, is that standard vague in your mind?

7  A    Well, like I said, my-- I don't know what you mean.

8  It's my-- it's what a reasonable person would think and...

9  Q    Does that provide much guideline to you in making

10  your-- in making your decision?

11  A    It's just if you're reasonable, so...

12  Q    Okay.

13  A    I guess I don't know how to answer your question.

14  Q    Do you view that as just giving you the discretion that

15  you believe is separate from the statute?

16  A    I think-- I think the Administrative Code has some

17  language about discretion, but-- for the sheriff's

18  discretion, you mean?

19  Q    Yes.

20  A    I-- I think there's a provision in the Administrative

21  Code on that.

22  Q    What-- what is the-- what do you recall the

23  Administrative Code saying about that?

24  A    Well, then again, I'd have to-- I'd have to look at the

25  document.

1  Q    Well, as you sit here what-- what guidance does the

2  Administrative Code provide to you?

3  A    I just remember the discretion part and it's up to the

4  sheriff's discretion.

5  Q    Okay.  And, again, just-- has anyone given you any

6  guidelines as to what the phrase reasonable determination

7  means under the Iowa Code section?

8  A    I don't know what you mean by any-- anyone.

9  Q    Well, have you gotten from any other law enforcement or

10  any other people--

11  A    Oh.

12  Q    -- any guidelines as to what "reasonably determine"

13  means?

14  A    Not-- not that I'm aware of, no.

15  Q    Okay.  And has anyone provided you any guidelines as to

16  what the, quote, "applicant constitutes a danger to any

17  person," end of quote, means?

18  A    Not that I'm aware of, no.

19  Q    Now, have you ever had any written criteria that your

20  sheriff's department uses in-- in making a decision about

21  granting or denying handgun permits?

22  A    Not that I'm aware of, no, I haven't.

23  Q    You've never written down any criteria to-- to make

24  that determination?

25  A    No.

1  Q    And have you-- did you at one time embark on writing

2  down criteria to use?

3  A    I thought about it.

4  Q    Okay.  And-- and why did you think about that?

5  A    Well, just to see if it was necessary.

6  Q    What went into your thinking about having written

7  criteria?

8  A    Well, I guess I-- the main thing is, you know-- I had

9  the Code of Iowa, and the main thing is what is the person's

10 reputation and can they convince me they're a good-- good

11 person.

12 Q    Okay.  But I-- I think my question's a little bit

13 different.  Why was it that you thought about having some

14 written criteria?  Do you understand my question?

15 A    Yeah, I think so.  Well, maybe-- I just thought maybe I

16 missed something.

17 Q    Okay.  Did you think about having written criteria so

18 that your decision making would be more objective and less

19 subjective?

20 A    No.

21 Q    Okay.  Did you have any discussions with anyone about

22 developing written criteria?

23 A    Yes.

24 Q    And who did you have conversations with about

25 developing written criteria?

1  A    Well, I didn't have discussion, but Dan DeKoter brought

2  it-- he suggested it.

3  Q    He suggested it to you?

4  A    Right.

5  Q    And when did he make this suggestion to you?

6  A    Oh, I-- I mean, it was after '07, I mean, after the

7  denial.  I don't remember the--

8  Q    So it was after Paul Dorr's application was denied?

9  A    Right.

10 Q    Was that a conversation that you had in response to

11 Paul Dorr's attempting to-- to get a concealed carry permit?

12 A    I don't-- I don't know why it came up for certain, just

13 that he inquired about if I had any criteria and if we

14 should look into that.

15 Q    Okay.  Well, tell me more about what Mr. DeKoter said

16 about that.

17         MR. PHILLIPS:  Excuse me.  Before you do that I

18 need to ask you a question so that I know what instructions

19 to give you.  When you were talking to Mr. DeKoter was he

20 representing the sheriff?

21         THE WITNESS:  No.

22         MR. PHILLIPS:  Okay.  Go ahead and answer the

23 question.

24 A    Well, he contacted me because he felt-- he just felt

25 that there was a-- a lawsuit that was gonna come down the

1  pike, so to speak, and-- and he threw out a couple criteria

2  that we've already addressed and I said, "Well, I already--"

3  I already make those considerations, a person's reputation,

4  you know, what do I think-- what are my gut feelings, what

5  do I think about them, so I said, "I'm already doing that.

6  I just don't necessarily have it in writing."

7  Q    (BY MR. FAHNLANDER)  Okay.  Did Mr. DeKoter make these

8  criteria in-- in writing or in e-mail, or how-- how was it

9  that you recall he made those criteria?

10 A    He-- he made a list, a written list, but I didn't adopt

11 them.

12 Q    And how was it that he sent that written list to you?

13 A    Well, I don't remember.  It could have-- could very

14 well have been an e-mail.

15 Q    Okay.  Do you still have that e-mail?

16 A    I don't know.  I'd have to look.

17 Q    Was that sent to a home e-mail address or a work

18 e-mail?

19 A    If-- if it was sent, it was sent to the sheriff's

20 office.

21 Q    Okay.  Might he have sent it by any other form other

22 than e-mail?

23 A    Well, unless he sent it in the mail, but I just don't

24 remember.

25        MR. FAHNLANDER:  And, Counsel, I'll ask for that.

1   I think it's covered by my previous request for documents,

2   but after the deposition I can make a separate request.

3           MR. PHILLIPS:  You'd better send me something.

4   I'm not telling you that I wouldn't respond.  I'm telling

5   you that I won't remember if this is--

6           MR. FAHNLANDER:  Sure.

7           MR. PHILLIPS:  -- this is all the notice I'm

8   getting.  Send me something.

9           MR. FAHNLANDER:  Sure, I'll send it.

10          MR. PHILLIPS:  A letter is fine.  I don't care

11  what it is.  I just need a reminder.

12  Q    (BY MR. FAHNLANDER)  And do you recall how many

13  conversations or how much correspondence you had with

14  Mr. DeKoter about developing this written criteria?

15  A    No, I don't.  It wasn't-- you know, it wasn't a great

16  amount.

17  Q    (Pause)

18          THE WITNESS:  Sir, could I take a couple-minute

19  break?

20          MR. FAHNLANDER:  Certainly.

21     (Off the record from 11:13 to 11:23 a.m.)

22  Q    (BY MR. FAHNLANDER)  Sheriff, we were talking a little

23  bit about your communications with Dan DeKoter regarding

24  developing written criteria.  And are you familiar with the

25  Osceola County Public Safety Commission?

1   A     Yes.

2   Q     And who-- who is that?

3   A     Well, that comprises two supervisors and a

4 representative from each of the communities in the-- the

5 county, except for Sibley has two--

6   Q     And--

7   A     -- elected officials, like from the mayors or their

8 designee.

9   Q     Okay. And are you a member of the-- is it Osceola or

10 Osceola?

11   A     Well, up here we call it Osceola. Down in Florida I

12 think they call it Osceola.

13   Q     Okay. Are you a member of the Osceola County Public

14 Safety Commission?

15   A     I'm not a member. I'm not-- I can't vote, but I do

16 attend the meetings.

17   Q     How often do they have meetings?

18   A     Usually once a month.

19   Q     And did they make a decision-- or did they-- did they

20 seek to develop written criteria regarding issuing of

21 concealed carry permits?

22   A     No.

23   Q     Is Mr. DeKoter a member of the Osceola County Public

24 Safety Commission?

25   A     No.

```
 1  Q    Was he retained by the Osceola County Public Safety

 2  Commission?

 3  A    No.

 4  Q    Are you familiar with a letter that he wrote that he

 5  claimed that he was retained by the Osceola County Public

 6  Safety Commission to give legal advice on the issuance of

 7  concealed weapon permits?

 8  A    Well, he claimed that.  You would have to talk to him

 9  about that.  That's his language.  He wasn't retained, no.

10  Q    Okay.  And why-- and so you know that is not true?

11  A    Well, if I could try to clarify it.

12  Q    Sure.

13  A    It was Mr. DeKoter's idea to do the-- the criteria in

14  thinking that there would be a lawsuit pending or filed, and

15  I talked to him about if he'd be interested in, you know,

16  over-- or taking on the case.  It wasn't my decision.  I

17  said we'd have to talk to the public safety board.  I just

18  talked to the chairperson, and he thought that would be

19  okay.

20  Q    Who's the chairperson?

21  A    Jerry Johnson.

22  Q    Okay.

23  A    So we didn't have a meeting on it and they didn't vote

24  on it, the commission didn't, but I think Mr. DeKoter took

25  it that he was retained and he really wasn't.
```

1  Q    Okay.  So Mr. DeKoter started having these discussions

2  about developing written criteria in anticipation of a

3  lawsuit?

4  A    Well, that's my understanding.

5  Q    In anticipation of a lawsuit from anyone in particular?

6  A    Mr. Dorr.

7  Q    Okay.  Do you know why he felt that Mr. Dorr was going

8  to file a lawsuit?

9  A    No.  He didn't say, no.

10  Q    So your understanding is that Mr. DeKoter was not

11  retained by the Osceola County Public Safety Commission to

12  develop this written criteria?

13  A    Not officially, no.

14  Q    Okay.

15  A    They didn't vote on it.

16  Q    And did anyone else retain Mr. DeKoter to develop

17  written criteria?

18  A    Not that I'm aware of.

19  Q    Did you retain Mr. DeKoter to develop written criteria

20  for issuance of concealed carry permits?

21  A    He took-- no.  He took it upon himself to do that.

22  Q    And was there any discussion either between you and

23  Mr. DeKoter or the Osceola County Public Safety Commission

24  as to whether he would be paid for doing this work?

25  A    Not that I remember.  He wasn't paid for anything.  I

1  don't think it went that far.

2  Q    Do you-- how many-- do you know-- do you have any idea

3  how much work he-- he performed as far-- along the lines of

4  developing written criteria?

5  A    No, I don't.

6  Q    Now, Mr. DeKoter indicated in some correspondence that

7  written criteria was needed because of the Heller case from

8  the United States Supreme Court.  Are you familiar with the

9  Heller case?

10  A    You'd probably have to refresh me on that.

11  Q    Okay.  Well, I just want to find out, were you aware

12  that there was a-- a case that came down from the United

13  States Supreme Court dealing in general terms about the

14  Second Amendment?

15  A    Is that the Washington D.C....

16  Q    Yes.

17  A    Okay.  A little bit, yeah.

18  Q    Do you-- do you agree with Mr. DeKoter that because of

19  the Heller decision there needed to be some written

20  guidelines for issuing of concealed carry permits?

21  A    No.

22  Q    No?  So you would disagree with Mr. DeKoter if he said

23  that written criteria was necessary because of the Heller

24  case?

25  A    Well, for what you're telling me right now, yes.  I

1 think the Code is straightforward and it's the sheriff's

2 discretion.

3 Q    Okay.  And no written guidelines were eventually made,

4 correct?

5 A    Correct.

6 Q    And the reason why is you believe that the only

7 suggestions that Mr. DeKoter made regarding developing

8 written criteria are things that you already used?

9 A    That's what I remember, yes.

10 Q    Now, you described some communications from the Iowa

11 Sheriffs and Deputies Association regarding "may issue" and

12 "shall issue"?

13 A    Yes.

14 Q    Okay.  And what do you recall of those e-mails or those

15 communications?

16 A    Well, the gist of it, I think, is sheriffs wanted to

17 leave it the "may issue," the discretion on the sheriff's

18 part.

19 Q    And is there some other group that wants "shall

20 issue"?

21 A    I suppose.  I-- I don't know.  I'm not sure--

22 Q    Okay.

23 A    -- on that.

24 Q    Did any of these e-mails render any opinion about what

25 the law was-- if the law was gonna change or if it's gonna

1  stay the same with the may issue process?

2  A    No, not that I remember.

3  Q    And just-- just to be clear, under a may issue process

4  you understand that the sheriff has discretion to issue or

5  to not issue; is that correct?

6  A    That's my understanding, yes.

7  Q    And then under a shall issue process, if the applicant

8  meets certain objective criteria, then the sheriff shall

9  issue the permit.  Is that your understanding?

10  A    Yes.

11  Q    Okay.  Now, how many permits are there-- or how many--

12  how many different types of permits does the sheriff grant?

13  A    Different types?

14  Q    Yes.

15  A    Just a permit to acquire, you know, like to purchase

16  handguns, permit to carry nonprofessional and permit to

17  carry a concealed weapon professional.

18  Q    The permit to acquire, what standards are used for that

19  permit?

20  A    Well, the background check-- criminal background check

21  and-- I-- I'd have to look at the-- one of the documents

22  to-- to list all their criteria on that.

23  Q    Is-- does the sheriff have discretion under that

24  process?

25  A    I don't believe so.

1 Q    So your understanding is if the applicant meets certain

2 objective criteria, you shall issue the permit to acquire?

3 A    Yes.

4 Q    If an applicant in your opinion constitutes a danger to

5 any person, can you deny the permit to acquire?

6 A    I don't believe so.

7         MR. FAHNLANDER:  Can you mark this, please?

8         (Deposition Exhibit No. 1 marked for identification.)

9 Q    (BY MR. FAHNLANDER)  Sheriff Weber, I'm showing you

10 what's been marked as Deposition Exhibit 1.  And do you

11 recognize Exhibit 1?

12 A    (Pause) Yes.

13 Q    Okay.  Is Exhibit 1 a series of applications from Paul

14 Dorr and then the last one from Alex Dorr to obtain a

15 concealed carry permit?

16 A    (Pause) I believe so, yes.

17 Q    And towards the back, about the sixth page or so from

18 the-- from the back, is there an application from Paul Dorr

19 dated-- dated 1998?

20 A    Yes.

21 Q    And is that the application that you were talking

22 about-- you were testifying about earlier?

23 A    Yes.

24 Q    Now, on page 2 it appears that there's a signature by

25 Ed Harskamp.  Do you see that?

1  A    Yes.

2  Q    Does that appear to be his signature?

3  A    It appears to be.

4  Q    Are you able to tell whether Sheriff Harskamp approved

5  or-- or disapproved of this application?

6  A    No.

7  Q    The fact that he signed it, does that seem to indicate

8  that it was approved?

9  A    No.  That's why I called him and asked him about it

10  when I came across this.  I-- I wanted to know what his

11  thinking was on it.

12  Q    And you-- you called Sheriff Harskamp in 2007 or 2008

13  regarding this application?

14  A    Probably in 2008.

15  Q    After the-- after Paul-- Paul Dorr filed his lawsuit?

16  A    I don't know if it was after the lawsuit or before.  I

17  was looking through the file and came across this-- this

18  application and seen it wasn't marked approved or

19  disapproved, so I-- I called Ed Harskamp.

20  Q    Okay.  Now, when applications were made to you, would

21  you always mark the blank either approved or disapproved?

22  A    Well, I would try to do that.

23  Q    And why do you say that?

24  A    Well, unless there's-- I don't want to testify under

25  oath that I did every single time.  I mean, I could have

1  neglected to do one, but...

2  Q    Can you think of any reasons why you would not have

3  marked either the approved or disapproved block?

4  A    Well, unless they didn't-- didn't act on it at all.  I

5  don't-- I don't know--

6  Q    Okay.

7  A    -- because I forgot.

8  Q    If you had signed it, but neither of the blocks was--

9  for approved or disapproved was marked in, would that to you

10 indicate that you approved it or disapproved it?

11 A    If none of the blocks were marked in?

12 Q    If neither of the two blocks were approved, either the

13 approved block or the disapproved block, but you signed it

14 below that, would that indicate that it was approved or

15 disapproved?

16 A    I don't know.

17 Q    Okay.  Now, this-- the form that we're-- that we're

18 looking at in Exhibit 1, is that the same form throughout

19 the 1998 through 2007 time period-- or 2008 time period?

20 A    The same form?

21 Q    Yes.  At least does it appear to be the same form used?

22 A    It appears to be.  I haven't checked, you know, every

23 word to see if anything was changed, but...

24 Q    Do you know who developed this form?

25 A    I think, the Department of Public Safety.

1   Q    The Iowa Department of Public Safety?

2   A    Yes.

3   Q    Okay.

4   A    I mean, that's--

5   Q    This is not an Osceola County form, in other words?

6   A    No, no.

7   Q    Now, you would agree that Paul Dorr was granted a

8 permit-- a concealed carry permit for the years 1999 through

9 2006, correct?

10   A    Yes.

11   Q    And you yourself granted Mr.-- Mr. Paul Dorr permits in

12 2005 and 2006, correct?

13   A    Correct.

14   Q    And then you denied him his permit in 2007, correct?

15   A    Correct.

16   Q    And you have indicated-- you indicated to Mr. Dorr in

17 correspondence that you wouldn't consider any further

18 applications from him, correct?

19   A    Correct.

20   Q    And is that your position to this day?

21   A    Oh, yes.

22   Q    Okay.  So you-- you simply won't grant Mr. Dorr a-- a

23 permit to-- for a concealed carry permit?

24   A    No.

25   Q    Now, in the-- in the reasoning at the bottom of the two

1  thousand-- of Paul Dorr's 2007 application you wrote-- is

2  that your handwriting, by the way?

3  A    Yes.

4  Q    And does it say, "Concerns from public.  Don't trust

5  him"--

6  A    Correct.

7  Q    -- end of quote?  That's what it says?

8  A    Yes.

9  Q    And that's what you wrote?

10 A    Yeah.

11 Q    Now, you-- you didn't say that you believe that he

12 failed any of the criteria under 724.8, did you?

13 A    No.

14 Q    And you didn't say that you believe that he constitutes

15 a danger to anyone, did you?

16 A    Well, concerns from the public and that I don't trust

17 him is some concern.

18 Q    Okay.  So were you denying him this permit using your

19 discretion or-- or using one of the criteria or any of the

20 criteria under 724.8?

21 A    Using my discretion.

22 Q    Using your discretion.  So he met all of the 724.8

23 criteria, in your opinion?

24 A    I-- I believe so.

25 Q    Okay.  And you don't have any evidence that Mr. Dorr

1  has engaged-- Mr. Paul Dorr has engaged in any unlawful

2  conduct, do you?

3  A    Unlawful conduct?

4  Q    Correct.

5  A    I thought he's been arrested.

6  Q    Okay.  And what's your understanding of that?

7  A    Like a protest type situation.

8  Q    Do you know when or what he was protesting?

9  A    I-- I'd have to look at the criminal history on that.

10  Q    Do you have such a criminal history on Mr. Dorr for his

11  protesting activity?

12  A    We should have.

13  Q    Did you-- did you look at that in making your decision

14  to deny him his permit in 2007?

15  A    For the discretionary part?

16  Q    Correct.

17  A    No.

18  Q    Did you have an understanding that Mr. Dorr's

19  protesting activity was nonviolent protesting?

20  A    Right.

21  Q    He didn't constitute a threat to anyone in that

22  protesting activity, did he?

23  A    Well, I don't know.  I wasn't there and I don't--

24  Q    Okay.

25  A    I can't say.

```
 1   Q    Okay.  You don't-- let me ask it this way.  You don't
 2   have any evidence that in Mr. Dorr's protesting activity
 3   that led to his being arrested he constituted a danger to
 4   anyone?
 5   A    I don't know.
 6   Q    Okay.  And you've never conducted any sort of an
 7   investigation to determine whether Mr. Dorr constituted a
 8   danger to any person in connection with his protesting
 9   activity?
10   A    No.
11   Q    And do you have an understanding that Mr. Dorr's
12   protesting activity occurred a number of years prior to his
13   2007 application?
14   A    I believe so, yes.
15   Q    Do you believe that Mr. Dorr ceased doing the protest
16   activity that led to his being arrested?
17   A    I don't know if he did or not.
18   Q    Now, when you wrote in the-- on the-- on Paul Dorr's
19   application-- his 2007 application for the reasons
20   disapproved, "Concerns from public," what do you mean by
21   that?
22   A    You mean what was said or--
23   Q    Yes.
24   A    Well, probably the most reoccurring thing that I hear
25   said over and over is that they think he's a nut.  And
```

1  you've heard of the phrase a village idiot, and I'm not

2  saying he's-- he's that, but he's considered a village nut,

3  and I've heard that a lot prior to '07.  I-- I didn't

4  document that or write it down, but I would hear that, and--

5  and people don't talk about Mr. Dorr just to talk about

6  him.  I mean, he may think that everyone's concerned about

7  what he thinks, what he says, but that's not the case.

8       My-- this is my opinion, this is what I hear out on the

9  street.  When he interjects himself into the media either by

10 writing a letter to the editor, putting fliers on the

11 windshields of cars while they're parked at church, inside

12 at a church service, or he sends out mass e-mails or he puts

13 fliers on-- on-- inside doors at homes, then people talk

14 about him.  And then I hear things like, "Oh, that guy's a

15 nut.  I wouldn't give him a gun permit either," or I would

16 hear things like, "Boy, I could see him snap.  I could see

17 him just shooting people, just going off the deep end."  So

18 those are the kind of comments I hear when I'm out and about

19 in the community, and those are what-- just what I-- what I

20 hear.

21 Q    Okay.  Now, you have lived in this county for 30 years?

22 A    Right.

23 Q    And for how many years have you known Paul Dorr?

24 A    Well, I-- you know, I don't know how to answer that.  I

25 knew of him for a number of years, and I don't know what you

1   mean by know him.  I've had-- you know, as time went on I've

2   had a little more contact with him, you know, face to face

3   or-- or a letter from him or something like that.

4   Q    Let me ask you it this way.  When do you recall meeting

5   Paul Dorr?

6   A    Meeting him, I think, had to do with some-- that I

7   remember, some anonymous letter or letters that was sent

8   to-- I think it's called Bethany Christian Services, and

9   they felt that Mr. Dorr was involved in that.

10  Q    So you met-- you met Paul Dorr in connection with some

11  anonymous letters regarding Bethany Christian Services?

12  A    Yes.

13  Q    Was that in the early 1990s?

14  A    I-- I believe so.

15  Q    So you met Paul Dorr in the early 1990s?

16  A    That I remember, yes.

17  Q    And you met him in connection with some complaint about

18  Mr. Dorr?

19  A    Well, they received these mail or mailings, anonymous,

20  wasn't signed.  The complainant thought that Paul Dorr could

21  have been involved in that-- doing that.

22  Q    Okay.  And the complainant was-- do you recall the name

23  of the complainant?

24  A    Adri Ruisch.

25  Q    Adri Ruisch?

 1  A    I believe so.

 2  Q    And Adri is A-d-r-i?

 3  A    I believe so.

 4  Q    And Ruisch, R-u--

 5  A    There's an "i" in there, so it would be R-u-s-i-c-h--

 6  Q    Okay.

 7  A    -- or something like that.

 8  Q    And where does Mrs. Adri Ruisch live-- or where did she

 9  live at that time?  Was it in Osceola County?

10  A    She didn't-- I don't believe she lived here.  She, I

11  think, lives in Sioux County somewhere, Orange City or

12  something like that.

13  Q    And she made a complaint to you or to the sheriff's

14  office-- or what complaint did she make?

15  A    Well, to the sheriff's office.

16  Q    And what was the-- what was the complaint?

17  A    That they received this anonymous mailing and that she

18  felt that Paul Dorr may have done it.

19  Q    And was there something illegal about making this

20  anonymous mailing?

21  A    Well, potentially could be harassment if it continued,

22  that sort of thing.

23  Q    Well, did you ever make any determination as to whether

24  that mailing constituted a crime?

25  A    Beyond a reasonable doubt?

1  Q    Yes.

2  A    No, I mean-- no.

3  Q    Okay.  You made a determination that this mailing did

4  not constitute a crime?

5  A    No, I didn't say that.  I-- I-- I looked into it.  I

6  visited with Mr. Dorr on it.  He denied mailing it, so I

7  don't know.

8  Q    Okay.  Was this a one-time mailing?

9  A    I don't remember, sir.  It was a long time ago.  I'd

10  have to--

11  Q    Okay.

12  A    -- look at it.

13  Q    So this-- if this was a one-time mailing, in your

14  opinion would it constitute a crime?

15  A    Probably not necessarily, no.

16  Q    Okay.  And what Iowa Code deals with harassment by

17  sending an anonymous piece of mail, do you know?

18  A    I'd have to look it up.

19  Q    Okay.  Have you ever charged someone with the crime of

20  making an unauthorized mailing?

21  A    We've-- yes, we've-- with harassment, whether it's

22  texting-- now it's more with texting type things or computer

23  or mail or-- or phone, verbal.

24  Q    Do you have any-- any idea in your mind as to how

25  frequent this-- some mailing or texting has to be before it

1   constitutes harassment?

2   A   Well, usually we try talk to the person, tell them to

3   cease from doing that, don't do that anymore.   If it

4   continues, then-- then we'll look at it again.

5   Q   Okay.   And was there anything else that you can recall

6   regarding this anonymous mailing involving Adri Ruisch?

7   A   Oh, yeah.   She said she was very fearful of Paul Dorr

8   way back then, even.   She-- she said she did not-- she was

9   afraid of him.

10   Q   Well, do you recall what the subject of this-- this

11   mailing was?

12   A   No.

13   Q   And, do you know, was Mrs. Ruisch on-- on-- on a

14   particular side of an issue that-- that led to this

15   unlawful-- or this anonymous mailing?

16   A   Well, I'm sure it had to do with her-- her job, but I

17   don't recall.

18   Q   Do you know what her job was?

19   A   Well, I think it had something to do with adoption and

20   that sort of thing, but I'm--

21   Q   Okay.

22   A   You know, it was a long time ago.   I don't remember all

23   the details on it.

24   Q   Okay.   So you met with Mrs. Ruisch regarding that?

25   A   I didn't meet with her personally.   I talked with her

1 | over the phone.

2 | Q    Okay.

3 | A    That's my recollection of it.

4 | Q    Do you recall how many times you talked to her?

5 | A    Oh, a couple times.

6 | Q    And did you-- in connection with this complaint did you

7 | conduct any other investigation?

8 | A    No.

9 | Q    Did you talk to Mr. Dorr?

10 | A    Yes.

11 | Q    Okay.  And did you meet with him in person or talk to

12 | him on the phone?

13 | A    I remember meeting with him in person in his office in

14 | Ocheyedan.

15 | Q    So you drove over to meet with him?

16 | A    Yes.

17 | Q    And you had a conversation with him?

18 | A    Yes.

19 | Q    And do you recall how long that conversation lasted?

20 | A    No, not-- not real long.

21 | Q    Was it just one conversation you had with Mr. Dorr?

22 | A    I believe so.

23 | Q    And based on that conversation you concluded that there

24 | was no crime?

25 | A    Well, Mr. Dorr denied doing it, so I don't know.

1  Q    If he had admitted to you that he sent this anonymous

2  letter, would you have told him to knock it off or would you

3  have brought some charges against him?

4  A    Probably would have told him to knock it off.

5  Q    Okay.  And did-- do you know whether Mrs. Ruisch made

6  any continuing-- complaints about continuing to receive

7  anonymous letters?

8  A    Not that I'm aware of, no.

9  Q    Is that the only formal complaint that was made against

10 Mr. Dorr?

11 A    Formal complaint?

12 Q    Yes.

13 A    There had been a couple from one of his neighbors.

14 Q    Okay.  And do you recall what the-- that was one

15 neighbor or multiple neighbors?

16 A    Well, I've heard from other neighbors, but the one

17 where there was actually an incident report created was with

18 Lois Stahl.

19 Q    Okay.  And-- and tell me what you mean by an incident

20 report.  What is an incident report?

21 A    Where there was-- where it was written in a paper form.

22 Q    Okay.  So was-- this incident involving Adri Ruisch,

23 was-- did that constitute an incident report?

24 A    Probably, yes.

25 Q    Okay.  And do you remember actually finding an incident

1  report regarding that incident?

2  A    No.  I think I looked for one, and I can't find one.

3  Q    Okay.  And then you found an incident report relating

4  to Mr. Dorr from her neighbor-- from-- from his neighbor?

5  A    Correct.

6  Q    And that's Lois Stahl?

7  A    Correct.

8  Q    And is-- is that the only incident report that you

9  found relating to Mr. Dorr?

10  A    An incident report, yes.

11  Q    Okay.  And you-- you found that report-- or you located

12  that report after Mr. Dorr brought this lawsuit?

13  A    No.  I took the report.

14  Q    Okay.  You took the report sometime in 2006?

15  A    Uh-huh (yes).

16  Q    Is that a yes?

17  A    Yeah.  Sorry.  Yes, yes.

18  Q    Okay.  And after you took that incident report you

19  issued Mr. Dorr a concealed carry permit in 2006, correct?

20  A    I don't know if it was before or after that.

21      (Deposition Exhibit No. 2 marked for identification.)

22  Q    Sheriff, I'm showing you what's been marked as Exhibit

23  2.  Do you see that?

24  A    Yes.

25  Q    And are you familiar with this document?

1  A    Yes.

2  Q    And this is Douglas L. Weber and Osceola County

3  Sheriff-- Osceola County's Answers to Plaintiffs'

4  Interrogatories, Response to Plaintiffs' Request for

5  Documents and Response to Plaintiffs' Request for

6  Admissions, correct?

7  A    Correct.

8  Q    And-- and did you sign off on that on page-- page 15--

9  or 16, rather?

10  A    Yes.

11  Q    Okay.  Now, there are a couple of pages attached after

12  your signature page.  Do you see those?

13  A    Yes.

14  Q    And the first two pages attached after your signature

15  are the Iowa-- are the incident report from Lois Stahl's

16  complaint about Mr. Dorr, correct?

17  A    Yes.

18  Q    And-- and this is the report that you made or was it--

19  A    No.  This was a different one, I believe.

20  Q    Now, this is a document that you produced in this

21  litigation, correct?

22  A    Correct.

23  Q    And you were listed as the supervising officer,

24  correct?

25  A    Yes.

1  Q    And on the page-- on page 1 of this in the upper,

2  right-hand corner there is a reported date, correct?

3  A    Yes.

4  Q    And that's April 14, 2006?

5  A    Correct.

6  Q    And it was reported at 5:15 p.m. that day?

7  A    Correct.

8  Q    So is that the date that--

9  A    There--

10 Q    -- the sheriff's department received this-- this

11 complaint from Mrs. Stahl?

12 A    There should be another one that I actually did.  This

13 looks like the reporting officer was Dan Minten.  There's

14 one that I took also.

15 Q    Well, in connection with this lawsuit you've made your

16 best effort to locate all the incident reports relating to

17 Paul Dorr, correct?

18 A    Well, I must have missed one.

19 Q    Okay.  Well, again, I'll request any others if-- if you

20 believe there are some.

21 A    I thought you had it, so I don't know what-- I'm not

22 sure what the situation is.

23 Q    Okay.  Well, again, back to the first page of this

24 incident report which is dated April 14, 2006, at the bottom

25 of that-- or towards the bottom of that on the first page

1  still--

2  A    Oh, okay.

3  Q    -- it states under the narrative-- do you see the

4  narrative part?

5  A    Yes.

6  Q    It states, quote, "Lois Stahl reported hearing a loud

7  bang about three months ago.  A couple of days ago she found

8  two 12 gauge shells on her yard."  Did I read that

9  correctly?

10  A    I believe so, yeah.

11  Q    So what Mrs. Stahl was complaining about was that about

12  three months prior to April 14, 2006 she heard a loud bang;

13  is that true?

14  A    That's what she reported.

15  Q    Okay.  And then a couple of days ago, so sometime a

16  couple days prior to April 14, she found a couple of 12

17  gauge shells on her yard?

18  A    (Witness nodded head in an affirmative manner.)

19  Q    Is that true?  Did I read that correctly?

20  A    Yes.

21  Q    And is that your understanding of the-- of what

22  happened?

23  A    On this particular incident, yes.

24  Q    Okay.  And did the Osceola County Sheriff's Department

25  charge anyone in connection with this incident report?

1  A     I don't believe so.

2  Q     And then on page 2-- is page 2 part of the page 1

3  report or is that a different report?

4  A     It should be part of the same-- same report.

5  Q     Is there anything on page 1 of this incident report

6  that would confirm that it was Officer Minten that

7  investigated this?

8  A     Well, down on the bottom-- on the first page, you

9  mean?

10  Q     Yes.

11  A     No, just on the second page.

12  Q     Okay.  And based on the front page, is there anything

13  to indicate to you that Paul Dorr committed any sort of a

14  crime on the front page of this report?

15  A     That he did?

16  Q     Correct.

17  A     No.

18  Q     And on the-- about two thirds-- about, yeah, a little

19  over halfway down the page, page 2 of this report, it

20  states, quote, "She thinks the Dorr boys fired the shotgun.

21  (One shell appeared to be years old) She also complained

22  about the Dorr boys urinating out of the back door and

23  driving through her bushes with their snowmobile.  She says

24  they also threw a large rock onto her yard and bounce balls

25  off of her house," and I'll stop there.  Did I read that

1   correctly?

2   A    Yes.

3   Q    And based on that information the Osceola County

4   Sheriff's Department concluded that there was no basis to

5   bring any sort of charges against Paul Dorr or any other

6   Dorrs?

7   A    Well, I'm not sure what Mr. Minten's actions were on

8   this.  I guess I'd have to talk to him.

9   Q    Okay.  Well, you're the supervising officer there,

10  correct?

11  A    Well, my name's on the report, but I didn't look into

12  this incident.

13  Q    Okay.  And why didn't you look into this incident?

14  A    Didn't see a need to.

15  Q    Because you believe that no law had been broken,

16  according to this report, correct?

17  A    Well, there's-- there could have been if you could

18  determine who-- if they fired a gun in town or if-- I mean,

19  some of this is older information, so may not be relevant.

20  Q    Okay.  For example, a shotgun shell which appeared to

21  be years old wouldn't be the basis for a crime, would it?

22  A    Probably not.

23  Q    And you would need something much more definitive than

24  her statement that she thinks the Dorr boys fired the

25  shotgun in order to charge someone with a crime, correct?

1  A    Right.

2  Q    And then at the end of that it says, quote, "On

3  10/30/2006 at 8:50 a.m. Lois reported the Dorr boys took a

4  large rock out of the drainage ditch and placed it on her

5  front yard," correct?

6  A    Correct.

7  Q    And based on that information no-- no criminal charges

8  were brought against Paul Dorr or any of his children,

9  correct?

10 A    Correct.

11 Q    Now, okay, going back to Exhibit 1, I'd like to have

12 you look at pages 3 and 4 of Exhibit 1.

13 A    (Witness complying.)

14 Q    Now, that's Paul Dorr's 2006 application for a

15 concealed carry permit, correct?

16 A    Correct.

17 Q    And you signed that approving it on July 20, 2006,

18 correct?

19 A    Correct.

20 Q    Now, that would be approximately three months after

21 this incident report which you've-- which is attached to

22 Exhibit 2, correct?

23 A    Correct.

24 Q    So despite this complaint by Lois Stahl that-- that the

25 Osceola County Sheriff investigated, you issued the permit

```
 1  to Paul Dorr for a concealed carry in 2006, correct?
 2  A    I didn't investigate that incident.  Dan Minten did.
 3  Q    Sure.
 4  A    And I granted the permit in '06--
 5  Q    Okay.
 6  A    -- but there was another incident from Lois Stahl
 7  that's, I believe, after this.  I'd have to check the
 8  records.
 9  Q    Okay.  And-- well, I just want to get confirmation that
10  this incident report is dated April 14, 2006, correct?
11  A    Correct.
12  Q    And Officer Minten was the reporting officer, correct?
13  A    Correct.
14  Q    You were the supervising officer, correct?
15  A    Correct.
16  Q    You would have had knowledge of this incident prior to
17  Paul Dorr making his 2006 application, correct?
18  A    I had knowledge of it, yes.
19  Q    And you issued him the permit even though there was
20  this incident report, correct?
21  A    Correct.
22  Q    And-- and you have made reference to some incident that
23  you believe may have occurred after this incident report,
24  correct?
25  A    Yes.
```

1   Q    And you didn't make any charges against Paul Dorr or

2   any of his children based on that report either, did you?

3   A    No.

4   Q    Now, on this report-- at the bottom of this report, as

5   we said, on-- it says, quote, "On 10/30/06 at 8:50 a.m. Lois

6   reported that the Dorr boys took a large rock out of a

7   drainage ditch and placed it on her front yard."  It states

8   that on this incident report from 2006, correct?

9   A    Yes.

10  Q    Would that seem to indicate to you that after the April

11  2006 complaint Mrs. Dorr-- Mrs. Stahl made another complaint

12  and the sheriff's department simply put it on the bottom of

13  that report?

14  A    That's what it looks like to me.

15  Q    Okay.  Would that indicate-- since a separate incident

16  report-- well, let me strike that.  Since a separate

17  incident report was not made for the October 30, 2006

18  complaint, would that indicate to you that the sheriff's

19  department did not consider it terribly important?

20  A    No.  I consider it that Deputy Minten's being lazy.  He

21  should have made out another incident report, and I've had

22  some issues with him on report writing.

23  Q    Okay.  And you had knowledge of this October 30, 2006

24  report, correct?

25  A    I-- I think I did.  I remember that, but I don't know

1  if it's because I read it since then or if I knew it when it

2  happened.  I don't remember.

3  Q    Okay.  But regardless of what was complained about, you

4  and Officer Minten made a-- made a decision that no crime

5  had been committed?

6  A    No, me and-- me and Mr. Minten didn't make a decision.

7  He made a decision.  This is a simple-- if it was a crime,

8  it would be a simple misdemeanor, so it's-- it's-- it's a

9  simple matter, this thing, in and of itself.

10 Q    Okay.

11 A    I took a report from Lois Stahl where she says she's

12 scared to death of Paul and she didn't want anything

13 pursued, didn't want him talked to because she's scared of

14 him, doesn't want any hassle.  She's an elderly lady and I--

15 you know, I have to get you that report.  I thought you had

16 it.

17 Q    Okay.  But you-- you made the determination based on--

18 even after your meeting with Mrs. Stahl, that Paul Dorr and

19 his boys had not committed any crime?

20 A    I didn't meet with Mrs. Stahl.

21 Q    You talked to her on the phone?

22 A    Not on this issue.

23 Q    Well, when-- when did you talk to her?

24 A    Well, I'd have to find that other report.

25 Q    Do you recall what she was complaining about?

```
 1  A     It was-- it was something relatively minor like this,
 2  but what stuck in my mind was that she said she was scared
 3  to death of him, and the other people in the neighborhood
 4  were too, concerned.
 5  Q     Which other people?
 6  A     Well, like Dale Block, Kevin Hertz.  Kevin Hertz told
 7  me he supported my decision on the gun permit.
 8  Q     What specifically has Dale Block told you with regard
 9  to Paul Dorr?
10  A     Just thinks Paul Dorr's a nut, mentally unstable.
11  Q     And what specifically did Kevin Hertz tell you about
12  Paul Dorr?
13  A     Just that he's-- they shared an office.  He's known him
14  for years.  At one time Mr. Dorr, I think, was a good guy.
15  He was respected, well liked in the community when he worked
16  in the bank, but through the years he progressively has
17  gotten more extreme and vicious and causes concern that they
18  just think he's mentally unbalanced.  Like I said before, I
19  hear the word nut many, many times, and just concerned that
20  he could snap and do something very foolish.
21  Q     Now, when someone complains about someone else being a
22  nut, that can mean simply that they disagree with their
23  positions on various issues, correct?
24  A     Could it mean that or--
25  Q     Yes.
```

```
 1  A    In this case, no.
 2  Q    Well, I'm talking about people use nut to describe
 3  people that they disagree with on-- on political issues, for
 4  example; isn't that true?
 5  A    This has nothing to do with political issues.
 6  Q    Well, what does it have to do with?
 7  A    He just has a pattern of behavior through the years.
 8  Now-- now, Lois Stahl told me that they used to have potluck
 9  in the summertime as neighbors and-- but through the years
10  he's just gotten stranger and stranger and weird, and just
11  can't trust him.
12  Q    In what ways has he gotten stranger and stranger and
13  weirder and weirder?
14  A    Well, he's just become more extremist, more radical,
15  and I don't mean just his political thoughts.  It's just his
16  whole approach, the way he treats people.
17  Q    And tell me what you mean by that.
18  A    How he treats people?
19  Q    Yes.
20  A    Like Harriet VandeHoef wrote a very nice letter to the
21  editor, just in part said that she doesn't like all the
22  negative letters in the-- to the editor from-- she didn't
23  name names, but she meant Mr. Dorr and Mr. DeKoter.  It was
24  a very nice letter, but--
25  Q    Okay.  Who's-- I'm sorry.  Who's that again?
```

1    A    Harriet VandeHoef.  Her husband is Richard VandeHoef,

2    retired senator from Iowa.

3    Q    So she disagrees with-- she thinks Paul Dorr writes

4    things in the paper that are too negative?

5    A    She didn't say his name.  She just-- she just didn't

6    like seeing all the negative editorials in the paper--

7    Q    Okay.

8    A    -- about whatever.

9    Q    So she didn't name Paul Dorr specifically, but you

10   believe that she's talking about Paul Dorr?

11   A    Yes.

12   Q    So the beef she has with Paul Dorr is that he writes

13   negative editorials?

14   A    Well, I'm getting-- I'm trying to tell the story, but

15   yeah.

16   Q    Okay.  Do you agree with me so far?

17   A    Well, I don't know about what else she thinks, but...

18   Q    Okay.  Is that all that you know about what she thinks

19   of Mr. Dorr and what-- why she's concerned about Mr. Dorr?

20   A    Yes.

21   Q    Okay.  That he writes negative editorials?

22   A    I talked to her husband about it because it affected

23   him too, but...

24   Q    Okay.  Go on.

25   A    Because--

1  Q    Continue on.

2  A    Well, the-- Mr. Dorr put-- or allegedly put fliers on

3  car windshields while the VandeHoefs were in church at a

4  church service so everybody who came out all had this-- his

5  response to Harriet VandeHoef's letter.

6  Q    And what-- what was that relating to?  What were the

7  fliers relating to?

8  A    Well, about Harriet VandeHoef's letter to the editor

9  about didn't appreciate all the negative things put in the

10 paper.

11 Q    Okay.  There wasn't anything threatening or dangerous

12 about this exchange of letters to the editor or fliers, was

13 there?

14 A    The-- the fliers just alarms people.  You know, it's

15 not normal.  It's not what we see in northwest Iowa.  You

16 know, we just don't see that kind of behavior, and it

17 angered and concerned the VandeHoefs.  Rich VandeHoef told

18 me afterward-- he says, well, he-- he thinks Paul Dorr is--

19 has some mental health issues and he thinks that he's

20 obsessed with being right and having the last word, so he

21 didn't respond to it.  He wanted to, but he-- but he didn't

22 respond to it because of that reason.

23 Q    Okay.  Anything else?

24 A    Well, I'm just-- no, not on that issue, no.

25 Q    Okay.

1  A    Well, I mean, I-- what was your original question?

2  Q    Tell me-- my original question had to do, I think, with

3  this evidence that you had or were relying on that-- based

4  on conversations from people, that Paul was more radical.

5  What do you-- what do you mean by that?

6  A    Well, just extreme.  He's just an extremist.  And I've

7  had a-- a neighbor here-- his-- you know, that lives a few

8  miles out of town is concerned, because his family lives

9  close to Ocheyedan, and just is-- described Mr. Dorr as a

10  jihadist, he's just an extremist.  And he's just concerned,

11  feels the same way.

12  Q    What do you mean by a jihadist?

13  A    Well, I don't know.  You have to ask that person.  I

14  think he just meant extreme.

15  Q    Who is that?

16  A    Preston DeBoer.

17  Q    Okay.  Now, the-- the word jihadist reflects at least

18  one way of-- is a Muslim holy warrior.  Now, you're not

19  taking Mr. DeBoer's comments as indicating that Paul Dorr is

20  a Muslim holy warrior or something like that, are you?

21  A    No, I'm not.

22  Q    Okay.  How are you using that word-- or how do you--

23  how do you believe that Mr. DeBoer is using that word?

24  A    I think, just an extremist, unreasonable extremist.

25  Q    An unreasonable person?

1  A    And extreme.

2  Q    In terms of being difficult to argue with?

3  A    In I'd-- probably everything.

4  Q    Okay.  Someone who wants to get the last word in?

5  A    Well, that was what Rich VandeHoef said, get the last--

6  obsessed with being right and having the last word.

7  Q    Okay.  Obsessed with being right, what do you-- how do

8  you mean that?

9  A    I don't know.  You'd have to ask Mr. VandeHoef.

10  Q    Okay.  Now, you personally have known Paul Dorr since

11  you met with him back in the early 1990s, correct?

12  A    Well, know of him, and personally I didn't-- you know,

13  we didn't pal around together, so I don't have that much

14  contact with him.

15  Q    How many times have you been at the same meeting or

16  same room or-- with Paul Dorr over the years?

17  A    I don't know.

18  Q    Are we talking dozens, are we talking five?  What's--

19  what's your best estimate?

20  A    I don't know, maybe-- maybe 10, 12.

21  Q    Okay.  And as the sheriff you have the ability to meet

22  with Mr. Dorr and to investigate him, correct?

23  A    Yes.

24  Q    And in connection with these various complaints that

25  you've heard about Mr. Dorr you've not-- you've not had the

1  cause to investigate him, have you?

2  A    A cause?  You mean a criminal cause?

3  Q    Yeah.

4  A    No.

5  Q    And if he were doing illegal things you could

6  investigate him, correct?

7  A    Correct.

8  Q    And if there were complaints about Mr. Dorr that you

9  believe rose to a criminal level you could investigate

10  Mr. Dorr, correct?

11  A    Correct.

12  Q    But you haven't done so?

13  A    Correct.

14        MR. PHILLIPS:  It's 12:20, Counsel.  What do you

15  want to do?

16        MR. FAHNLANDER:  Why don't we go about another 15

17  minutes and then we can break for lunch.  How's that sound?

18      (Off-the-record conversation.)

19  Q    (BY MR. FAHNLANDER)  Now, if-- if a person fears Paul

20  Dorr, that's not the same as meaning that he's a danger to

21  them, is it?

22  A    It could be.

23  Q    But it's not necessarily the same thing?

24  A    In this case it is.

25  Q    Okay.  And why would that be-- why would-- why would--

1  if someone fears Paul Dorr, why would that constitute a

2  danger?

3  A    Well, for instance, Adri Ruisch told me that she--

4  she was scared of him then and she still is afraid of him.

5  And just a few years ago she did some teaching at the

6  college.  And I'm not-- I can't remember if it's the Sheldon

7  college or if it was Orange City, but she had her husband

8  come with her because she was afraid that she would be

9  confronted by Paul Dorr.  She was that fearful of him.  So

10 she was afraid to go out in the parking lot without her

11 husband there and, you know, that just isn't normal.  This

12 is northwest Iowa and people just shouldn't have to live

13 that way.

14 Q    Was she afraid he would have a conversation with her?

15 A    I-- she's just scared to death of him and always--

16 Q    Did she say what she was afraid of?  Was she afraid

17 that he would talk with her and disagree her?

18 A    No.  I think it's much more deeper than that, I think.

19 Q    What did she tell you about her fear?

20 A    Well, I think she-- he's unpredictable, doesn't know

21 what's gonna happen.

22 Q    But would you agree with me that there's no evidence to

23 date that-- that Paul Dorr has done anything dangerous to

24 other people?

25 A    Dangerous, no.

```
 1  Q    Okay.  You-- okay.  So you would agree with me that he
 2  hasn't done anything to date that's dangerous to other
 3  people?
 4  A    He hasn't assaulted anybody that I'm aware of or--
 5  Q    Okay.  In other words you agree with my statement,
 6  correct?
 7  A    Correct.
 8  Q    Okay.  Now, if you-- if you believed that Paul Dorr
 9  were a danger to people you could investigate him, correct?
10  A    Well, it depends what it-- what it is.
11  Q    Well, if it were serious you could investigate it,
12  correct?
13  A    Well, it depends what he did.  We're in the department
14  of what happened, you know, so-- what happened in a criminal
15  matter.  Okay?
16  Q    And you haven't-- there aren't any incident reports
17  other than the-- the one that you provided us, correct?
18  A    Well, there should be another one.
19  Q    Okay.  Other than those-- those one or two, there--
20  there aren't any others that you're aware of, are you?
21  A    No, not that I'm aware of.
22  Q    Now, your comment in-- in denying Paul his 2007
23  application, the comment that, quote, "Don't trust him," end
24  of quote, is there anything different about that portion of
25  your statement than these concerns from the public that
```

```
 1  we've been talking about?

 2  A     What do you mean by that?

 3  Q     Well, you wrote two things.  You wrote, quote,

 4  "Concerns from public," and, "Don't trust him."  Are they

 5  kind of the same thing in your mind or are those two

 6  separate things?

 7  A     Well, I don't-- you know, I don't trust him because I--

 8  I feel he's mentally unbalanced, he's not normal.  He-- you

 9  know, I think I perceive him as a social bully.  He's been

10  trying to bully me for over two years now over this gun

11  permit, and usually his bully tactics work because people

12  get weary of his-- his bullying.  They don't want to fight,

13  they give up.

14  Q     What-- what do you mean by bullying?

15  A     Intimidation, putting scathing, vile letters in the--

16  in the paper.

17  Q     So he's verbally bullying, is that what you're--

18  A     Yeah.  I don't mean, you know, "Gimme your lunch

19  money," I don't mean, "or I'll punch you."

20  Q     You mean he's a bully in an argument or in a-- in

21  writing letters?

22  A     Excessively.

23  Q     Okay.

24  A     Excessively.

25  Q     Is there-- is-- do you mean-- do you have anything else
```

1  to add to what you mean by bullying?

2  A    Well, I guess I don't mean what you mean.  I'm not

3  saying like he's gonna grab somebody and steal their lunch

4  money, but...

5  Q    You don't-- you don't believe that's the case, correct?

6  A    At this point he hasn't done that, but it wouldn't

7  surprise me if he did.

8  Q    Okay.  So the evidence of bullying that you're talking

9  about is in an argument or in letter writing you think he's

10  a bully in trying to get his way?

11  A    Yes.

12  Q    Okay.  And whatever-- whatever concern from the

13  county-- or the citizens of the county or lack of trust that

14  you've mentioned in your-- in your report, there wasn't

15  enough there to open an investigation into Paul Dorr,

16  correct?

17  A    Well, I-- right, right.

18          MR. FAHNLANDER:  Okay.  Why don't we take a break

19  now.

20          MR. PHILLIPS:  Okay.  It's as good a time as any

21  for a break.

22     (Off the record from 12:28 to 1:16 p.m.)

23  Q    (BY MR. FAHNLANDER)  Sheriff, was your denial of Paul

24  Dorr's application based on hearsay that you received from

25  other people in the county?

1  A    Well, it was a little more than what I'd call hearsay.

2  Certainly I heard things, but I have been a cop for 30 years

3  and I do have some-- you know, that intuition like I

4  mentioned, gut feeling--

5  Q    Okay.

6  A    -- and just observation on how other people are treated

7  and-- and, yeah, some hearsay in the county, sure.

8  Q    Well, what-- what portion of your decision to deny Paul

9  Dorr a concealed carry permit was based on something other

10  than hearsay?  Do you understand the question?

11  A    Right.  Well, I'm used to dealing with hearsay in a

12  criminal matter.  This obviously is--

13  Q    Well, hearsay is what someone else told you as opposed

14  to--

15  A    Right.

16  Q    -- your own personal observations.

17  A    Right.  And in a criminal matter we always try to

18  substantiate anything like that, but in this case, I mean,

19  we're talking about what Mr. Dorr's reputation is in the

20  county, which is lousy.  I mean, it is lousy, and he created

21  it.  He-- he won't understand that.  He won't see that

22  because he won't look in the mirror.

23  Q    Okay.

24  A    I mean, I'm just telling you just my observations.  He

25  won't look in the mirror and say, "Could this be me?"  He'll

1  look out the window and find somebody or somebodies to blame

2  for all of this.

3  Q    Okay.

4  A    So-- but if you put a man on the street, not Mr. Dorr,

5  you know, and you just polled the people, they would have

6  that impression of Mr. Dorr.

7  Q    Okay.  So that again is hearsay?

8  A    Right.

9  Q    What my question is getting at is, other than other

10  people's opinions and so forth, what was the basis for your

11  decision to deny Paul Dorr the concealed carry permit?

12  A    What was the basis?

13  Q    Yeah--

14  A    Well--

15  Q    -- other-- you know, other than these other opinions--

16  these other people's opinions that you've told me about.

17  A    Well, that would be it.

18  Q    Just simply the hearsay from other people?

19  A    Well, hearsay and seeing how he treats other people and

20  how he makes them feel and puts them in fear and--

21  Q    Well, what-- what personal observations have you made

22  about how Paul treats people?

23  A    Well, I seen how he treated me, tried to bully me for

24  over two years now.

25  Q    You mean since your decision to deny him the permit?

```
 1  A    Yes.

 2  Q    Okay.

 3  A    Yeah.

 4  Q    Well, what I'm trying to get at is, prior to your

 5  decision to deny him his permit what-- what information or

 6  what evidence that's not hearsay provided you the-- the

 7  basis for denying him his permit?

 8  A    Well, I would say most of it is hearsay.

 9  Q    Okay.  Is all of it hearsay?

10  A    I-- well, I would have to think about that, but I-- I'd

11  say a good portion of it is.

12  Q    Well, and I'm-- you know, I'm just asking the question,

13  is there anything that you can think of as you sit here

14  that's not hearsay that formed your basis for denying him

15  his concealed carry permit?

16  A    No.

17  Q    Okay.  Now, Paul Dorr came into your office to meet

18  with you about his concealed carry permit application,

19  correct?

20  A    Correct.

21  Q    And during that meeting you told him that you were

22  denying him his permit, correct?

23  A    Correct.

24  Q    You didn't give him any opportunity at that meeting to

25  change your mind, did you?
```

1   A    No.

2   Q    Your mind was already made up, right?

3   A    Right.

4   Q    And since that decision to deny him his permit you

5   haven't given him any opportunity to change your mind,

6   correct?

7   A    Correct.

8   Q    And there isn't any process for him to-- to change the

9   result from your denial, is there?

10  A    Well, he can reapply.

11  Q    Reapply in another year or the same year?

12  A    Well, probably within a year.  He just did that in

13  October.  I haven't acted on it yet, but he reapplied for

14  his permit to carry.

15  Q    But you sent him a letter saying that even if he

16  reapplied you wouldn't give him the permit; isn't that true?

17  A    Correct.

18       (Deposition Exhibit No. 3 marked for identification.)

19  Q    Sheriff Weber, I'm showing you what's been marked as

20  Exhibit 3.  Do you recognize Exhibit 3?

21  A    Yes.

22  Q    That's a letter that you wrote on or about July 24,

23  2008?

24  A    Correct.

25  Q    And it's a letter that you sent to Paul Dorr?

1  A    Yes.

2  Q    And that's your signature at the bottom?

3  A    Yes.

4  Q    Okay. In that letter you are confirming that you're

5 denying Alexander Dorr's application for a permit to carry,

6 correct?

7  A    Correct.

8  Q    And you would only consider a new application from him

9 after he turns 21, correct?

10  A    Correct.

11  Q    And you're granting Paul's wife Debra a permit--

12  A    Correct.

13  Q    -- to concealed carry?

14  A    Yes.

15  Q    Okay. And you indicate in your last sentence that,

16 quote, "I have previously denied your application and would

17 deny any new application from you," end of quote, correct?

18  A    Correct.

19  Q    And is that your thinking to this day?

20  A    Yes.

21  Q    Okay. And you've never given Paul Dorr an opportunity

22 to respond to the complaints that you've articulated today

23 that other people think he's a nut?

24  A    Right.

25  Q    And, now, it's a small county and you have had the

1  opportunity or could have the opportunity to talk to Paul

2  and determine for yourself whether he's a nut, correct?

3  A    Well, I have some indications, yes.

4  Q    Now, did you ever suspend applications for concealed

5  carry permits in-- in July 2008?

6  A    On-- on anybody?

7  Q    On anybody.

8  A    I'd have to look at the-- the record.

9  Q    Okay.  Are you-- are you familiar that Dan DeKoter has

10 claimed that you quit issuing-- or that the application

11 process was suspended?

12 A    Oh, he-- yeah, he recommended that, but I didn't--

13 didn't adopt that.

14 Q    Okay.

15 A    That would have been around the time he was doing the

16 criteria thing, I-- I believe.

17      (Deposition Exhibit No. 4 marked for identification.)

18 Q    I'm showing you what's been marked as Exhibit 4.  And

19 there's also another exhibit marker that says, "2," on it,

20 but it's Deposition Exhibit 4.  Do you see that?

21 A    Yes.

22 Q    And are-- have you seen this letter before?

23 A    I-- I believe I have.

24 Q    Okay.  And this is a letter from Daniel DeKoter to Paul

25 and Debra Dorr dated July 10, 2008, correct?

1  A    Correct.

2  Q    And he says in paragraph two, "Effective July 10, 2008

3  the Sheriff of Osceola County is suspending-- suspending the

4  issuance of concealed weapon permits pending consideration

5  and adoption of written permit criteria."  I'll stop there.

6  And you disagree with that statement by Mr. DeKoter?

7  A    Well, he said that, but I didn't adopt that, so I

8  didn't follow that.

9  Q    Okay.

10  A    I just kept on renewing applications or-- or new ones

11  or whatever came over my desk.

12  Q    Okay.  So you didn't actually suspend issuance of

13  concealed weapon permits?

14  A    No.

15  Q    Now, concealed weapon permits, does that apply to

16  anything other than handguns, in your opinion?

17  A    It's for handguns.

18  Q    Just for handguns?

19  A    Yes.

20  Q    Okay.  I was just wondering-- it says, "concealed

21  weapons," and I was wondering if that applies to anything

22  other than handguns or is it your understanding that it's

23  just handguns?

24  A    Well, I-- I suppose it could apply to a knife, but

25  that's not usually why people are applying.  It's for

1  firearms, handguns.

2  Q    Okay.  And I'll read Section 724.8, the first

3  sentence.  It says, quote, "No person shall be issued a

4  professional or nonprofessional permit to carry weapons

5  unless," and I'm just-- you interpret the weapons-- the word

6  weapons as meaning handguns?

7  A    Yes.

8  Q    Okay.  Now, in paragraph 5 it says, "The issuing

9  officer reasonably determines that," then it goes over that

10  language that we've already talked about.  Who is the,

11  quote, "issuing officer," end of quote, as used in

12  724.8(5)?

13  A    That would be the sheriff.

14  Q    That's you?

15  A    Yes.

16  Q    Okay.  And does anyone other than you at the-- at the

17  county-- Osceola County issue the permits or is it just you?

18  A    Just the sheriff.

19  Q    Okay.  And have you ever given anyone else the

20  authority to issue those permits?

21  A    No.

22  Q    And during the time that you've been sheriff-- are you

23  the highest ranking law enforcement person in the county?

24  A    Well, the county attorney might say he is, but--

25  Q    Okay.

1   A     -- yeah, yeah.

2   Q     And you develop the criteria for deciding whether to

3   issue a concealed carry permit?

4   A     Correct.

5   Q     Okay.  Well, does the county attorney do that?

6   A     No.

7   Q     Has he ever issued any written-- or any-- any guidance

8   to you to issue concealed carry permits?

9   A     We-- we've talked about it.

10  Q     And who is the county attorney?

11  A     Bob Hansen.

12  Q     And has he been the county attorney the entire time

13  you've been sheriff?

14  A     Yes, yep.

15  Q     So-- but so far he's allowed you to make the decision

16  about whether to issue concealed carry permits?

17  A     Correct.

18  Q     And he's allowed you to develop whatever policy is

19  necessary to issue concealed carry permits?

20  A     Well, I don't know if allow is the right word, because

21  I don't think he can prevent me, but--

22  Q     I see.

23  A     -- right, I-- it's my policy, my decision.

24  Q     Okay.  Okay.  He hasn't-- he hasn't made the policy

25  that you follow in issuing the concealed carry permits?