1  A    Right, correct.

2  Q    Now, has Paul Dorr notified you that there have been

3  some threats made against him?

4  A    His wife told me that.  I don't know if Mr. Dorr has.

5  Q    Okay.  But, regardless, you've learned that some

6  threats have been made against Paul Dorr?

7  A    That's what his wife told me, yes.

8  Q    Okay.  And did you ever ask any follow-up questions to

9  Mr. or Mrs. Dorr about those threats?

10 A    Well, I asked her if he reported that to law

11 enforcement and I think her response was she didn't know.

12 Q    Okay.  Did you ever contact Paul to find out if any

13 threats had been made against him?

14 A    No.

15 Q    Is that something you would investigate if you knew to

16 be the case?

17 A    If they report it.

18 Q    What?

19 A    If it was reported.

20 Q    You would investigate it?

21 A    Try to, yes.

22 Q    Okay.  If threats had been made against Mr. Dorr, would

23 that be a reason in your mind to issue him a concealed carry

24 permit?

25 A    Not necessarily, no.

1  Q    If threats were made against Mr. Dorr and you did not

2  allow him to have a concealed carry permit, would you be

3  endangering him?

4  A    No.

5  Q    Now, this morning you were describing a number of

6  complaints by various citizens against Paul Dorr, you know,

7  saying he's the-- a nut and a village idiot and so forth.

8  A    No, I didn't say, "village idiot." I said, "village

9  nut," I said, like-- you know the term village idiot.

10 Q    Yes.

11 A    He's not that, village nut--

12 Q    Okay.  All right.

13 A    -- where it's well known.

14 Q    Okay.  And they've complained about him being unstable

15 and all those other things that you told me about this

16 morning.  Have-- have citizens of Osceola complained about

17 any other handgun permit applicants other than Paul Dorr?

18 A    Not that I'm aware of.

19 Q    And in your work as the sheriff or in your 30 years of

20 law enforcement in this county have you ever heard any other

21 people complain about people other than Paul Dorr as being a

22 nut and so forth?

23 A    Oh, sure.

24 Q    And how do you respond when you-- when someone

25 complains that someone else is a nut?

1  A    Well, depends what context it is.  As sheriff you hear

2  a lot of things, you know, a lot of different kinds of

3  things, could be a nut, could be a pervert, could be drugs,

4  could be whatever, domestic abuse but, you know, it's just--

5  you hear a lot of different things.  And so to answer your

6  question, I-- you know, I don't know what--

7  Q    Okay.  And some of those are-- are accurate and some

8  are simply by someone who doesn't like someone else.  Would

9  you agree with that?

10  A    Could be, yes.

11  Q    Now, when a concealed carry permit is denied, can the

12  applicant ask for proof that he doesn't meet whatever

13  requirements there are?

14  A    I don't know.

15  Q    What are reasons why people apply for concealed carry

16  permits?

17  A    Most-- most of the applicants just write on there for

18  hunting and target shooting.  They really don't need it for

19  that, because the Code provides that they-- they can go

20  hunting with a concealed weapon, handgun, if they're engaged

21  in hunting, and they can be at the target range with a

22  concealed weapon if they're at a target range.

23  Q    Even if they don't have a concealed carry permit?

24  A    Correct, correct, so-- I'm sorry.  I didn't--

25  Q    No, go ahead.

1  A    So, I mean, that's-- most of them put on their

2  applications for that reason.

3  Q    And those really aren't reasons for getting a concealed

4  carry permit, is that what you're testifying to?

5  A    No, it's a reason, but it doesn't really need it, but I

6  am pro gun.  I've been a hunter and a trapper all my life.

7  I've had a hunting license since I was 14 every year-- I'm

8  gonna be 54-- so, I mean, I'm-- I'm pro gun, I am, so-- so

9  if someone wants a permit, I'll gladly grant it as long as

10 they're a good guy--

11 Q    Sure.

12 A    -- if they convince me they're a good person.

13 Q    Okay.  But back to my question, you-- I thought you

14 testified that most applicants for a concealed carry permit

15 put as the reasons hunting and target shooting.

16 A    Well, I'd have to go back and look at them, but just

17 the ones that come over my desk, a lot of them say that

18 and...

19 Q    But I think what you're-- what you meant by your answer

20 is that a person doesn't need a concealed carry in order--

21 permit in order to hunt.

22 A    Correct.

23 Q    Okay.  And they don't need a concealed carry in order

24 to target shoot, correct?

25 A    Correct.

1  Q    Okay.

2       (Deposition Exhibit No. 5 marked for identification.)

3  Q    Sheriff Weber, I'm showing you what's been marked as

4  Deposition Exhibit 5.

5  A    Okay.

6  Q    And these are some applications for concealed carry

7  permits from Osceola County.

8  A    Yes.

9  Q    Is that what that appears to you to be?

10 A    So far, yes.

11 Q    And in the lower, right-hand corner there's some Bates

12 numbers, and I'll direct your attention to what's

13 Bates-numbered in the lower, right-hand as Weber 1577.

14 A    Okay.

15 Q    All right.  And on page-- on the next page, is that

16 your signature at the bottom approving this application?

17 A    Correct.

18 Q    Okay.  Now, when-- this is an application of Ben

19 Christians.

20 A    Yes.

21 Q    Is that what this appears to be?

22 A    Yep.

23 Q    Okay.  When Mr. Christians submits this application to

24 you, what would you do to make sure that the criteria is met

25 to issue this permit or to deny the permit?

1   A    Well, we run a criminal history to see if there was any

2   arrests--

3   Q    Okay.

4   A    -- convictions, arrests, so forth.

5   Q    And you do that in your own office?

6   A    Yes.

7   Q    Okay.  What else do you-- would you do?

8   A    On this particular individual or...

9   Q    Yes.

10  A    I mean, I-- I know this person.  I mean, we don't

11  socialize, but I know who he is, so I'd probably just--

12  Q    How do you verify whether he's over age 18-- any

13  applicant is over age 18?

14  A    Well, they put it on their-- on the application that we

15  run the criminal history, to my recollection.  It's on

16  there.

17  Q    Okay.  So you-- you check those-- the age.  Iowa Code

18  Section 724.8(2) states, quote, "The person has never been

19  convicted of a felony," end of quote.  And you do that by

20  the criminal check-- or the criminal history check?

21  A    Yes.

22  Q    And then the third prong is, "The person is not

23  addicted to the use of alcohol or any controlled

24  substance."  Do you check that?

25  A    Well, that's-- that can sometimes rely on reputation

1  too--

2  Q    Okay.

3  A    -- if...

4  Q    Is there-- is there any way you check that?

5  A    No, unless you have personal knowledge that they are in

6  treatment or going to treatment or-- you know, if you had

7  some personal knowledge.

8  Q    Okay.  And-- and criteria number 4 is, "The person has

9  no history of repeated acts of violence."  How do you check

10  that?

11  A    Well, then again, that's-- it's just if you know that

12  or not.

13  Q    Okay.  Is there any database that would tell you-- give

14  you the answer to that?

15  A    No, not that I'm aware of--

16  Q    Okay.

17  A    -- unless it shows on the criminal history that he had

18  numerous assault charges.

19  Q    And then criteria number 6 says, "The person has never

20  been convicted of any crime defined in Chapter 708 except

21  assault as defined in Section 708.1 and harassment as

22  defined in Section 708.7."  Did I read that accurately?

23  A    Oh, probably.

24  Q    Okay.

25  A    I think you--

```
 1   Q    It's subdivision 6.

 2   A    Okay.  I'll take your word for it.

 3   Q    I want you to read it yourself and make sure that it's

 4   accurate.

 5   A    (Witness complying.)

 6   Q    How do you check that?

 7   A    Well, that would be-- if they were arrested it should

 8   be on their criminal history.

 9   Q    Okay.  Now, it-- it seems-- it says, "The person has

10   never been convicted of any crime defined in 708."  What is

11   708?  Is that the assault statute?

12   A    Yes.

13   Q    Okay.  And-- but then it takes out a couple of

14   sections, 708.1 and 708.7.  Is that your understanding of

15   how that works?

16   A    Well, I would have to look at them, but I think it's

17   for the simple-- simple misdemeanors.

18   Q    Okay.  And harassment under 708.7.  So harassment

19   would-- is excepted out of the crimes in Section 708 that

20   would disqualify someone from getting a permit, correct?

21   A    Correct.

22   Q    In other words, harassment in and of itself isn't--

23   isn't grounds to deny someone a concealed carry permit under

24   the Code, correct?

25   A    In and of itself, correct.
```

1  Q    Okay.  All right.  Now, in-- back to Exhibit 5,

2  Mr. Christians' application.  On page 2, again, you issued--

3  you approved his application, correct?

4  A    Yes.

5  Q    Even though he didn't fill out the Statement of

6  Justification?

7  A    I think that was-- I think this was a renewal.  He's

8  had one for years, and I'm just-- I'd have to look at it.

9  If he came in with his renewal, they'd probably put the same

10  justification down, but...

11  Q    Well, wouldn't-- wouldn't he be obligated to fill out

12  the-- the Statement of Justification even if it's a renewal?

13  A    I don't know if he's obligated, be nice if he would

14  have.

15  Q    Okay.  Well, under where it says, "Statement of

16  Justification," it says, "Type or print in ink - Must be

17  completed by applicant."

18  A    Yeah.

19  Q    Did you exercise your discretion to waive that

20  requirement on this application?

21  A    I don't think I waived it.  I think I just overlooked

22  it, I didn't notice or...

23  Q    Okay.  And moving on to the next application, is that

24  Henry Kruger?

25  A    Yes.

1  Q    And is that your signature approving it on the next

2  page?

3  A    Yes.

4  Q    Now, going up above to block 8 where it says, "Are you

5  addicted to the use of alcohol or any controlled substance,"

6  he didn't fill out that blank, did he?

7  A    No.

8  Q    Did you make any effort to determine whether he passed

9  that criteria or not?

10  A    I know him personally.  He's-- I'd bet my life he

11  isn't, so...

12  Q    Okay.

13  A    But, yeah, I don't know why he left that blank.

14  Q    Okay.  Moving on to the next application, Earl Ellis,

15  is that whose application that is?

16  A    Earl Ellis, yes.

17  Q    And you approved that on page 2?

18  A    Yes.

19  Q    And he again didn't fill out the Statement of

20  Justification section of the application?

21  A    Correct.

22  Q    Is there a reason why you didn't require him to fill

23  out that Statement of Justification section?

24  A    Not that I can recall, no.

25  Q    Okay.  Now, in Paul Dorr's applications he did fill out

1   the Statement of Justifications, correct?

2   A    Yes.

3   Q    And you don't doubt the state-- the reasons why he

4   stated he needed a concealed carry permit, do you?

5   A    Well, I'd have to look at them, see what-- what he all

6   wrote, but I-- I don't think so.

7   Q    Okay.  In moving on to the next application of Debra

8   Kohn, K-o-h-n--

9   A    Uh-huh (yes).

10  Q    -- you signed that approving it on page 2?

11  A    Uh-huh (yes).

12  Q    Is that a yes?

13  A    Sorry.  Yes.

14  Q    And she didn't fill out block number 3 above, did she?

15  A    No.

16  Q    Do you know why you didn't require her to fill out that

17  block?

18  A    No, I don't.

19  Q    Now, moving on to the next application, that of Scott

20  Nasers-- did I say that right?

21  A    We say it Nasers, but--

22  Q    Nasers?

23  A    Yeah.

24  Q    And you signed that application on page 2 approving it,

25  correct?

1  A    Correct.

2  Q    Now, in number 2 at the top of that, which says, "Have

3  you ever been convicted of the misdemeanor crime of domestic

4  abuse assault?" he indicates yes.  Is that true?

5  A    It could very well be.

6  Q    Okay.  But even though he had been convicted of

7  domestic abuse, you approved his application, correct?

8  A    Yes.

9  Q    Is that something that-- is that an answer to the-- on

10  the application that could have led to his being denied his

11  permit?

12  A    It-- it could have, yes.

13  Q    Is there a-- did you perform any investigation of-- of

14  his response to that question?

15  A    No.  That domestic-- this is a federal statute, so I

16  can't-- in other words, if somebody's in possession of a

17  firearm, I can't enforce that.

18  Q    Well, number 2 says, "misdemeanor crime of domestic

19  abuse assault."  Isn't that a-- wouldn't that be a state

20  law?

21  A    That-- that is a state law, so I-- I don't know.  I

22  don't remember.

23  Q    Okay.  The next application is from Dan Grady; is that

24  correct?

25  A    Correct.

1  Q    And you signed it on page 2 approving his application?

2  A    Correct.

3  Q    And he also did not fill out section-- or question 3

4  above, whether he's been convicted of the misdemeanor crime

5  of assault in violation of individual rights, a hate crime?

6  A    Right.

7  Q    But even though he didn't fill out that block, you

8  approved his application?

9  A    Correct.

10  Q    Can you think of any reason why you didn't require him

11  to fill out that block?

12  A    Probably an oversight.

13  Q    Okay.  And the next application is Dean De Weerdt; is

14  that correct?

15  A    Correct.

16  Q    And you approved his application, correct?

17  A    Correct.

18  Q    And he didn't fill out block number 10 which asks,

19  "Have you ever been adjudged mentally incompetent?"

20  A    Correct.

21  Q    And being mentally incompetent would be one of the

22  reasons why you would deny someone an application-- a permit

23  to carry a handgun, correct?

24  A    Correct.  I know Mr. Dean, and he-- I don't know why he

25  didn't mark that.

1    Q    Okay.

2    A    An oversight.

3    Q    The next application is Robert Frey; is that correct?

4    A    Correct.

5    Q    And you approved his application?

6    A    Yes.

7    Q    And he also did not fill out the block number 3 asking

8 whether he'd ever been convicted of the misdemeanor crime of

9 assault in violation of individual rights?

10    A    Correct.

11    Q    Do you know why you didn't require him to fill that

12 out?

13    A    No.

14    Q    And the next one is Duane Schram?

15    A    Correct.

16    Q    You approved his application on page 2?

17    A    Yes.

18    Q    And he didn't fill out question number 8 about-- that

19 says, "Are you addicted to the use of alcohol or any

20 controlled substance?"

21    A    Yes.

22    Q    Do you know why you didn't require him to fill out that

23 block?

24    A    No.

25    Q    Prior to your decision in 2007 to deny Paul Dorr his

1 concealed carry permit did anyone tell you or suggest to you

2 that you should not-- that you should deny Paul Dorr his

3 permit?

4 A    No.

5 Q    Okay.  And did anyone tell you or suggest to you that

6 Alex Dorr should be denied his permit?

7 A    No.

8 Q    Are you familiar with the Osceola County Taxpayers

9 Association?

10 A    Yes.

11 Q    And what-- what do you know about the Osceola County

12 Taxpayers Association?

13 A    It's a watchdog group.  I-- I--

14 Q    Okay.  Do you have any opinion about the Osceola County

15 Taxpayers Association?

16 A    In what regard?

17 Q    Well, in any regard.

18 A    I don't have any adverse feeling towards them, because

19 I gave the president a permit to carry.

20 Q    Who's the president?

21 A    Kevin Wolfswinkel.

22 Q    Okay.  Did the Osceola County Taxpayers Association

23 conclude that you as the sheriff were overpaid?

24 A    Well, they conclude a lot of things.

25 Q    Is that one of the conclusions they made?

```
 1  A    Oh, probably.
 2  Q    Okay.  And did they conclude that-- or did they make
 3  the assertion that the county attorney was overpaid?
 4  A    Oh, sure.
 5  Q    Okay.
 6  A    Yeah.
 7  Q    And did they make these conclusions in around the 2006,
 8  2007 time period?
 9  A    It could have.
10  Q    Okay.  And did you understand that Paul Dorr was
11  working with the Osceola County Taxpayers Association?
12  A    Yes.
13  Q    And did the fact that Paul Dorr was working with the
14  Osceola County Taxpayers Association and that they were--
15  they concluded that you and the county attorney were
16  overpaid, did that factor into your decision to deny Paul
17  Dorr his-- his permit?
18  A    No.  That is a lie that your client told you.
19  Q    I'm just asking you the question.
20  A    I'm just telling you.  Kevin Wolfswinkel's the
21  president.  I don't care for him personally because he's
22  arrogant, pompous, snobbish.  I dislike him.  I don't
23  dislike Mr. Dorr, but I dislike the president, but I did not
24  hear anything on the street about Mr. Wolfswinkel where
25  people are concerned.  They think he's radical.  They think
```

1  he's smart, but very foolish for palling around with

2  Mr. Dorr.  That's what I heard on the street, so I gave him

3  the permit.

4  Q    Okay.

5  A    He's the president.  He directs that organization.  He

6  hired Mr. Dorr to be a consultant or whatever.  I gave him

7  the permit--

8  Q    Okay.

9  A    -- but I don't like him.

10  Q    Okay.

11  A    I want that on the record.  Personally, I don't care

12  for him.

13  Q    Okay.  And you used a word to describe

14  Mr. Wolfswinkel.  You said he was radical.  Is that the

15  word?

16  A    On the street people-- politically radical.

17  Q    Okay.

18  A    His thoughts are radical and people don't like him for

19  that, but I haven't heard where everyone's concerned that he

20  would snap and hurt-- shoot people or-- or, you know, do

21  anything like that.

22  Q    Did-- do they think he's an extremist?

23  A    I haven't heard that word mentioned, no.

24  Q    Okay.  You've heard the word radical?

25  A    Right.

1    Q    Does he have a bad reputation in the community?

2    A    I would say not-- not a bad reputation, no. I think

3 his affiliation with Mr. Dorr hurt him greatly and

4 disappointed a lot of people. And like I said, you know, I

5 think people think he's smart enough and knows-- knows his

6 facts and that but, you know, associating with Mr. Dorr is

7 not a good move.

8    Q    Okay. So that-- that counts against him, in your

9 opinion?

10    A    Against who?

11    Q    Against Mr. Wolfswinkel.

12    A    No. I gave him the permit to carry.

13    Q    So the word on the street is that Mr. Wolfswinkel has

14 radical views?

15    A    Politically--

16    Q    Okay.

17    A    -- yeah.

18    Q    Does he have extreme views politically?

19    A    That I-- I don't know about that.

20    Q    Would it be fair to say, because of Paul Dorr's

21 opinions and his-- his work, that he's made a lot of

22 political enemies in Osceola County?

23    A    It's possible.

24      (Deposition Exhibit No. 6 marked for identification.)

25    Q    Now, Sheriff Weber, I'm showing you what's been marked

1  as Exhibit 6, and it's a-- it's a document that's been filed

2  with the court in-- that's entitled Defendant's Initial

3  Disclosures.  Are you familiar with this document?

4  A     Well, I guess I don't remember it right offhand, but

5  maybe it was sent to me and I...

6  Q     Okay.  Well, I'll represent to you that it's a document

7  signed by your attorney, Douglas Phillips, that was filed

8  with the court.

9  A     Okay.

10  Q     And then it's entitled-- on page 1 about halfway down

11  it says, "Persons with Discoverable Information."  Do you

12  see that?

13  A     Yes.

14  Q     And then it lists your name under number 1, and I'm

15  gonna ask you questions about what your understanding is of

16  the information that the following people would have.

17  A     Okay.

18  Q     Okay?  Dan DeKoter, what information do you think he

19  has relating to this lawsuit?

20  A     Well, Mr. DeKoter told me that he had socialized with

21  Mr. Dorr many years ago, maybe 25 years or so, when he was

22  in the bank, and Mr. Dorr's reputation was good and he was

23  well liked back then.  And Mr. DeKoter related that through

24  the years Paul Dorr has progressively got more extreme and

25  more mentally unstable, unbalanced, and there's concern on

1  his part.

2  Q    When you've used the phrase mentally unstable or

3  mentally unbalanced to describe Paul Dorr in what other

4  people said about him, did you-- did you ever challenge

5  anyone, say, "What do you mean by mentally unstable or

6  mentally unbalanced?"

7  A    Well, I think-- you mean specifically with Mr. DeKoter

8  or-- I mean, some of this is things that I have observed

9  too.  In law enforcement you look at, you know, is this

10 normal.  You know, we look at something that's not normal

11 whether it's an impaired driver, look at their eyes, do they

12 look normal.  You know, if they don't look normal, that's an

13 indicator.  I think if you look at the totality or the big

14 picture here of everything from, you know, 25 years ago or

15 whenever Mr. Dorr was in the bank-- I wasn't familiar with

16 him then, I don't think-- to now, it's not normal.

17 Q    What-- when-- back to my question of your-- your using

18 the phrase mentally unbalanced.  How are you using that

19 phrase?  Are you-- are you using it like a psychiatrist, or

20 what-- what do you mean-- what do you mean by that?

21 A    Well, it-- it could be.  I'm not a-- I'm not a doctor,

22 I'm not a psychologist.  I'm a cop, so all I can say is it

23 doesn't look normal to me.

24 Q    Okay.  And what is-- what behavior have you seen from

25 Paul Dorr to indicate to you that he's mentally unbalanced?

```
 1   A    Well, it just isn't normal to-- the way he treats
 2   people.
 3   Q    Now, again, are you talking about what you've observed
 4   of him in treating people?
 5   A    Well, what's been told to me--
 6   Q    Okay.
 7   A    -- and some-- I've seen some of the fliers and the
 8   mailings and so-- mass mailings and so forth.
 9   Q    And you think that-- and which ones do you believe show
10   that Paul Dorr is mentally unstable or mentally unbalanced?
11   A    Well, I think, many of them.
12   Q    Well, what-- what is it that you recall seeing that
13   demonstrates that Paul Dorr is mentally unstable or mentally
14   unbalanced?
15   A    Well, the first ones were the letters he sent out to
16   all the permit holders attacking me saying I was a coward
17   and that sort of thing.  And I've had people tell me that
18   they didn't know him, but after reading that they thought
19   the guy was-- had some mental issues.
20   Q    When did-- when were these letters written?
21   A    I'm sure you have it there.  I'd have to look at the
22   date.  It wasn't too long after the denial.
23   Q    Okay.  So you-- you're talking-- you're talking about a
24   letter that was written after you denied him his permit?
25   A    Right, yeah.
```

1  Q    Okay.  So that's one of the pieces of evidence that you

2  have seen to make you conclude that Paul is mentally

3  unstable or mentally unbalanced; is that correct?

4  A    Correct.

5  Q    Well, I'm trying-- I'm trying to get at before you made

6  your decision to deny--

7  A    Okay.

8  Q    -- his permit.

9  A    Right.

10 Q    What is the-- what is the evidence that you had-- that

11 Paul is mentally unbalanced that you had prior to your

12 denial of his permit?

13 A    Well, just everything I hear out on the street and,

14 like I said, I hear a lot of things, concerns.  Many years--

15 and I don't know when.  I thought Mr. Dorr was weird, but in

16 and of itself I'm not saying he would be denied just because

17 he's weird.  I don't care about that.  Some of his letters

18 to the paper I didn't read.  Oh, it's Paul Dorr, he's

19 weird.  And then I learned that other people had that same

20 attitude, oh-- they see Paul Dorr-- he's weird.  And then

21 when they concern me I read them but, now, lately if he has

22 sent anything out I usually don't read them.

23 Q    Okay.  So you have read what Paul has written and you

24 think he's weird?

25 A    Well, I thought he was weird in '05 and '06.  I didn't

1  feel comfortable giving him a permit. You know, I just had

2  that gut feeling. I didn't like the guy, I did it anyway.

3  I'm embarrassed about it now. I regret it, just like I'm

4  sure Mr. Huckabee will regret giving clemency to the guy out

5  in Tacoma, Washington who shot the cops. I regret that I

6  did that, but I know more in '07 than I did then. I know

7  more now than I did back then and I'll know more in a year

8  or two from now than I do now.

9  Q    Well, tell me what changed between '07 and '06. '06

10  you granted his application, '07 you denied his

11  application. What changed in that time period?

12  A    Well, you brought up the OCTA, Mr. Dorr's affiliation

13  with that. He started sending out letters to the editor,

14  e-mails, fliers on doors and cars, handing out brochures.

15  People talked about it. See, people don't care about

16  Mr. Dorr. I mean, they're not sitting around, "Oh, boy,

17  what's Mr. Dorr's gonna say today, because we want to learn

18  something." They don't care. I think he's a narcissist.

19  It doesn't matter in and of itself. That's okay. That's

20  okay--

21  Q    Uh-huh (yes).

22  A    -- that Mr. Dorr's a narcissist. I don't care, but he

23  thinks that everybody-- he thinks his reputation is

24  peerless. It's not. I'm sorry, it just isn't. It's

25  lousy. It's lousy in northwest Iowa. Now I forget where I

1  was going with this, but if you put all that together...

2  Q    Okay.

3  A    And so I've been in this business 30 years, and you

4  can't tell a nut they're a nut.  It doesn't work.

5  Q    Okay.

6  A    You can't argue with a drunk.

7  Q    Okay.  So what changed-- now, my question was what

8  changed between '06 and '07.

9  A    Okay.  Okay.

10  Q    And I think what you--

11  A    Now you got me on track.

12  Q    -- what you told me was what-- what changed is that--

13  at least one of the things that changed is he was doing this

14  work with the OCTA, the Osceola County Taxpayers

15  Association, he was sending out letters.

16  A    Okay.  Good.  Thanks.  Now you brought me back to where

17  I tried to start out.  He interjected himself into the

18  public view or conscience or whatever you want to call-- the

19  consciousness, whatever you want to call it.  People started

20  talking about him.  I'm setting there, boy, he's got a

21  permit with my name on it.  You know what, I-- you know, I--

22  I'm concerned about it, because I don't like that.

23        And my cop gut feeling was that, you know, something

24  isn't right here.  If he did do something really weird, I

25  don't want to be responsible and, you know, he's got a

1 permit with my name on it. I'm embarrassed about it. I

2 feel bad about it, but I did what I felt I-- had to be-- had

3 to be done. I was elected sheriff to make a decision, and

4 people voted for me to make decisions concerning public

5 safety issues. If they don't like my decision, they won't

6 vote for me--

7 Q    Uh-huh (yes).

8 A    -- and somebody else will get in, so-- I've been

9 elected twice to make decisions on public safety issues.

10 Q    Okay.

11 A    So to answer your question, that's what's changed, is

12 that he was a lot more active locally. I think a lot of his

13 activities-- I read a newspaper article, "The Gospel

14 According to Paul Dorr," where he does other work in other

15 towns, other states and so forth. So we don't really hear

16 that here, but-- so he was kind of out of the public view,

17 I-- in my opinion.

18 Q    And it was his work with the OCTA that brought him into

19 your public view?

20 A    Correct, and people started talking about it saying

21 things like, "Oh, that guy's a nut job. Oh, that guy's

22 whacko."

23 Q    Okay. Now, I was asking you about Exhibit 6, the

24 persons with discoverable information, and I asked you about

25 Dan DeKoter.

1   A     Yeah.

2   Q     Have you told me all the things you had from Dan

3   DeKoter?

4   A     Right.

5   Q     What about Kevin Hertz?  I think you talked about him

6   this morning.

7   A     Well, Kevin lives in the neighborhood.  He also shared

8   an office with Mr. Dorr.  He's known him many years.  He

9   could-- you know, told me the same thing Mr. DeKoter did.

10  He knew him years ago when he was a good guy, but something

11  happened.  He's gotten more extremist, more concerned.

12  Kevin Hertz, I-- I respect him.  I think he's a prominent

13  businessman, smart guy, just says, "Hey, I agree with your

14  decision.  I'm concerned about him too and everyone in the

15  neighborhood feels safer knowing he doesn't have a gun

16  permit."

17  Q     Everyone?

18  A     That's what he told me.

19  Q     Okay.  And the next person you mention is Arlyn

20  Pedley.  What-- what information does Arlyn Pedley have?

21  A     He just has a-- well, the  Ocheyedan Press.  And

22  they're together, kind of, Lori Wiser and Arlyn Pedley.

23  They have really good memories and they're familiar with

24  with Mr. Dorr through the years, and they probably know

25  things that I don't even know.

1  Q    Have you talked to them about what-- what information
2  they have regarding this lawsuit?
3  A    I've probably-- yes, both of them, and they both
4  indicated that Mr. Dorr is not normal.
5  Q    And what did they tell you about that specifically,
6  that he's not normal?
7  A    They-- they think he's weird, he's--
8  Q    Okay.  Anything else?
9  A    Just bad reputation.
10 Q    What do you mean, bad reputation?
11 A    Just being a local nut, just being weird.
12 Q    Okay.  And what about Adri Ruisch?
13 A    Well, I think, you know, we talked about--
14 Q    We talked about that already?
15 A    Yeah, remember?
16 Q    Is there anything else that you can think of other than
17 what we've talked about this morning?
18 A    No.
19 Q    And Lois Stahl, have we talked about all the things
20 that-- all the information she has about this case?
21 A    You skipped over that <u>Worthington Daily Globe</u>.  Is
22 that--
23 Q    Oh, I'm sorry.
24 A    Is that what you wanted to do or...
25 Q    Well, let's go back.  There wasn't a name there-- there

1  wasn't a specific name there, so I'm--

2  A    Hmm.

3  Q    What-- who there have you talked to about having

4  information relating to this lawsuit?

5  A    Well, I got some e-mails from them wanting to know

6  about the lawsuit and I said I couldn't talk about it and I

7  gave them Mr. Phillips number and that, but her first name

8  is Justine-- and I'm sure you have a copy of that e-mail,

9  but she wrote back that every-- and she works at the Daily

10 Globe, "Everyone here knows he's whacko."

11 Q    She wrote that to you--

12 A    Yes.

13 Q    -- in an e-mail?

14 A    Yes, so...

15 Q    I'd like to get that one too.

16 A    Right.  You'd have to talk to her about that but,

17 anyway, that's why that's on there.

18 Q    And-- and she said that everyone thinks he's whacko, is

19 that what you said?

20 A    In the Daily Globe.  And I didn't-- I didn't canvas the

21 Daily Globe to find out if that was true or not, but that's

22 his reputation, you know.

23 Q    And this is information that you obtained after you

24 denied the application?

25 A    I didn't-- all of these (indicating) have come to me.

1  I didn't-- I didn't go to them.

2  Q    Right, but all-- what I'm trying to get at is, they

3  provided information-- the <u>Worthington Daily Globe</u> people

4  that you were talking about provided information to you

5  after you denied Paul Dorr--

6  A    Yeah.

7  Q    -- his application?

8  A    It was after the lawsuit was-- was filed, because

9  that's why they-- that's why she called or e-mailed.

10  Q    Okay.

11  A    Right.

12  Q    And what about the <u>Northwest Review</u>?

13  A    Well, I just included that because that-- there was a

14  lengthy article there that they published.  And I don't

15  think they wrote it, but it was "The Gospel According to

16  Paul Dorr," was the name of it, and I-- I think you have a

17  copy of that too.

18  Q    And did you talk to someone at the <u>Northwest Review</u>?

19  A    No, no.

20  Q    Okay.  And this is-- the information that you've

21  obtained from the <u>Northwest Review</u>, again, came after your

22  denial of Paul's permit?

23  A    That article?  That was before.  That was in the paper

24  before.

25  Q    In which paper?

```
 1   A      The Northwest Review.

 2   Q      And where's that printed?  Where's that out of?

 3   A      Sheldon.

 4   Q      Okay.

 5   A      I-- I had read it back in '03 or whatever and kept a

 6   copy of it.

 7   Q      Okay.  And so you granted the application several times

 8   after you read that article?

 9   A      Oh, yeah.

10   Q      Okay.

11   A      Yeah.

12   Q      Members of the Public Safety Commission, who there has

13   the information relating to this lawsuit?

14   A      Well, they all have a-- they're part of the public.

15   They have opinions.  I know what-- their towns, their

16   mayors, their supervisors-- I don't-- you know, some of

17   them.  They have opinions about Mr. Dorr also.

18   Q      Well, which-- which members have you talked to about

19   Paul Dorr's-- well, that would be pertinent to this lawsuit?

20   A      Well, Jerry Johnson, Gary Benz, Mike Schulte.

21   Q      Have you talked to each of these people about Paul

22   Dorr's permit application?

23   A      They talked to me.  They come to me.

24   Q      Okay.

25   A      And, you know, that's a interesting thing.  In all
```

1  these letters that Mr. Dorr sent out to all the permit

2  holders he always put my name, phone number, e-mail, you

3  know, "Call Sheriff Weber.  Tell him," to do whatever, "Tell

4  him to give me a permit," da-da-da-da.  I have-- I have not

5  to this date-- it's been over two years.  I have not had one

6  single contact, e-mail, phone, letter, face-to-face, from

7  anyone that says he should have a permit, not a one, but

8  I've had-- I've had a number, number of people approach me

9  and say, "Boy, that's the best thing you ever did.  I feel

10 safer knowing he doesn't have a permit to carry."  And

11 that-- that repeats itself over and over again.

12 Q    Well, let me ask you this.  Have you ever had anyone

13 come to you on behalf of someone who was denied-- who has

14 been denied a permit and say you should issue this permit--

15 this person a permit?  Has that ever happened?

16 A    That I denied?

17 Q    Yes.

18 A    No.

19 Q    Okay.

20 A    But I think they--

21 Q    So of all the people that you've denied, you've never

22 had a situation where someone came to you and said that

23 person should get a permit?

24 A    Well, I don't think they sent out mass letters to over

25 100, 150 people or whatever.

```
 1   Q    Well, can you just answer my question?

 2   A    Sure, sure.  No, I haven't.

 3   Q    Okay..

 4   A    Okay.

 5   Q    Thank you.  Okay.  Back to Adri Ruisch.  You've--

 6   A    Right.

 7   Q    You've told me about--

 8   A    Yeah.

 9   Q    -- the information that she has.  And Lois Stahl,

10   you've told me about the information that she has; is that

11   correct?

12   A    Correct.

13   Q    And what about Don Hibbing, what information does he

14   have?

15   A    Well, he worked in the office with Kevin Hertz and

16   with-- shared an office with Paul Dorr and--

17   Q    Have you talked to him about this lawsuit?

18   A    I haven't talked to him personally, talked to his wife.

19   Q    Okay.  About this lawsuit?

20   A    Uh-huh (yes), yes.

21   Q    Okay.  What does she say?

22   A    She just indicates that she has seen a-- a change in

23   Mr. Dorr through the years and doesn't-- doesn't trust him

24   either.

25   Q    Okay.  And Arlyn Pedley, she was listed above, correct?
```

1    A    Yeah, uh-huh (yes).

2    Q    Al and Judy Bruegemann-- Bruegemann?

3    A    Yes.

4    Q    And did you have a conversation with them about this

5    lawsuit?

6    A    Yes.

7    Q    And what did-- what did they tell you?

8    A    A couple different things. They indicated that they

9    used to socialize with Mr. Dorr years ago. They've seen a

10    change through the years where he's become more extreme,

11    always looking for a fight.

12    Q    When you say, "always looking for a fight," do you mean

13    a physical fight or are you talking about an argument?

14    A    More-- more of an argument.

15    Q    Okay.

16    A    Yeah. Let's see. Well, let's see, they-- I think they

17    adopted a child years ago, and Mr. Dorr was involved in

18    protesting that or doing something that offended them. And

19    I think Al-- the way Al told me is that he pointed a finger

20    at Mr. Dorr and, I think, poked him in the chest.

21    Q    Al poked Mr. Dorr in the chest?

22    A    Yeah. And then-- and Mr. Dorr wanted criminal charges

23    filed, and I-- I don't know that-- I think it could have

24    been in Sioux County. And so right away Mr. Dorr allegedly

25    filed these criminal charges, but I believe they were

1 dropped.

2 Q    Did he file the charges or did he make a complaint to

3 someone?

4 A    I think he made a complaint that he wanted charges

5 filed.  That's my understanding.

6 Q    Okay.  So any physical contact that is involved there

7 was initiated by Mr. Bruegemann against Mr. Dorr--

8 A    Right.

9 Q    -- not the other way around?

10 A    Correct.

11 Q    Okay.  Is there anything else that they have, any other

12 information they have?

13 A    Not that I'm aware of.

14 Q    Okay.  What about Kevin Wolfswinkel?

15 A    Well, we already talked about that.  He's the president

16 of the OCTA.  I issued him a permit.  I do not like him

17 personally.

18 Q    What information does he have about this lawsuit?

19 A    I just want to verify that because-- I believe Mr. Dorr

20 is trying to make this sound like a personal issue, that I

21 denied him because of personal reasons, and that's not

22 true.

23 Q    Okay.  What about Debra Dorr, what information does she

24 have about this lawsuit?

25 A    Same thing.  My personal feeling is that Mr. Dorr sent

1  her in just hoping I would deny her, thinking I would.  I

2  didn't.  I did the same thing with her I-- I would anybody.

3  I-- I don't know her, so I asked some of my staff.  If I was

4  in Ocheyedan, the coffee shop, "Hey, what do you know about

5  Deb Dorr?"  And this is the consensus, "Oh, she's a nice

6  person.  You know, we really like her and we can't figure

7  out why she's married to Paul.  And you know what, we think

8  that she's being abused by Paul," not physically but

9  psychologically, because he doesn't think too much of

10  women.  So I issued her the permit because I didn't hear one

11  bad thing about her.

12  Q    Okay.  You just said something else.  You said Paul

13  doesn't think very highly of women.

14  A    Well, that's-- that is my impression.

15  Q    How have you gotten that impression?

16  A    Well, a few years ago I got an award from the Coalition

17  Against Domestic Abuse for my work on that.  Mr. Dorr sent

18  me a couple letters saying, "Well, I read about you in the

19  paper getting this award."  It's kind of like, "Be careful,

20  Doug.  These women have an agenda.  They-- you know, they--"

21  and I haven't looked at it in a while.  I just-- my

22  recollection is that, you know, "They want to take things

23  over and they--" you know, I-- he thinks that women should

24  be more submissive, is my opinion, and that's the way I took

25  it in the letters.  It's kind of, "Watch out.  Don't-- don't

1  get--"

2  Q    Do you have that letter?

3  A    Yeah.  I think we sent it to you or-- I thought it was

4  in the packet I gave Mr. Phillips.

5  Q    Well, I'll need that too, because I haven't gotten that

6  letter.

7  A    Well, I think he sent me a couple different letters,

8  but it was just kind of a warning to me, "Be careful.  These

9  women have an agenda here that's against men."  Okay.  Well,

10  whatever.

11  Q    Did you interpret-- was he talking about all women or

12  just the women in this particular group or--

13  A    Well, I think women in society.

14  Q    Okay.  That's your-- that's your opinion?

15  A    That was my-- yeah, correct.

16  Q    Okay.  And what about Mrs. Bill Johnson, what

17  information does she have?

18  A    Well, we talked about Bill Johnson earlier, if you

19  remember.  He's the one that lives in Ashton.

20  Q    That you denied his permit?

21  A    Right.  And think when I denied it she called to the

22  office, the sheriff's office, told my dispatcher-- says,

23  "About time you guys denied him that-- denied him that

24  permit to carry."  Well, I'd just became the sheriff and

25  when he renewed it, then I denied it, so...

1 Q    Okay.  What about Dickinson County Sheriff Greg Baloun?

2 A    Well, he called me and said, "Hey, I read about you in

3 the paper with Paul Dorr."  He says, "I wouldn't give that

4 guy a permit either.  He's--" I think he used-- he said,

5 "He's a spook," "He's a spook."

6 Q    Okay.  And what-- what did he mean by that?

7 A    Well, I didn't get into it real detailed with him.  He

8 lives in Lake Park, which isn't too far from Ocheyedan.  I

9 think he just knows of Mr. Dorr's reputation in the area.

10 Q    Okay.  But as the sheriff of this county, wouldn't

11 you-- wouldn't you want to know what-- what his criticism of

12 Paul Dorr is?

13 A    No, I-- that's-- it's Mr. Dorr's reputation.

14 Q    He said this-- the sheriff of Dickinson County said

15 Paul's a spook?

16 A    Right.

17 Q    And you don't-- what do you think he meant by that?

18 A    Probably what I think, he's weird, he's different,

19 he's-- don't trust him.  I don't know what he's capable of.

20 Q    Okay.  And Kossuth County Sheriff Randy Krukow?

21 A    Right.  They-- if I have this right, a few years ago

22 they were in-- at a church, some kind of church function--

23 Q    Who's they?

24 A    I'm sorry, him and-- him and his wife.

25 Q    Who's him?

1  A    Randy Krukow and his wife.

2  Q    Okay.

3  A    They were at some church function in Spencer, Iowa, and

4  allegedly there were some fliers put on some car window--

5  windshields.  And Randy Krukow's wife took one off a window,

6  according to him, to look at it, read it, see what it was

7  or-- and Mr. Dorr wanted to file a complaint, file criminal

8  charges for taking that off a car windshield.  And-- and

9  Randy just thinks the guy is off-- out there too.  He thinks

10  he's--

11  Q    Because of that incident?

12  A    Well, he's heard other things, other different things.

13  He's heard of the reputation and so forth and...

14  Q    Do you know if Sheriff Krukow has any personal

15  information about Paul Dorr that would-- any personal

16  information that would-- that would be relevant to this

17  lawsuit?

18  A    I-- I don't know.  He-- he was the president of the

19  Iowa Sheriffs and Deputies Association for a year a couple

20  years ago, so he-- he knows of Mr. Dorr and Mr. Dorr's

21  reputation.

22  Q    Okay.  Because he's heard it from other people?

23  A    Right, plus he experienced that with his wife at this

24  church situation.

25      (Deposition Exhibit No. 7 marked for identification).

1  Q    Sheriff Weber I'm showing you what's been marked as

2  Exhibit 7, which is the Douglas Weber and Osceola County's

3  Answer to First Amended Complaint and Jury Demand.  Do you

4  see that?

5  A    Yes.

6  Q    And are you familiar with this document?

7  A    Yes.

8  Q    And this is your answer to-- to the complaint of Paul

9  Dorr-- the first amended complaint of Paul Dorr?

10  A    Well, I think Mr. Phillips made these answers on my

11  behalf.

12  Q    Okay.  Now, in paragraph 28 of the First Amended

13  Complaint there's an allegation that-- in paragraph 28, that

14  Dorr has observed at least one website blog which made

15  reference to, quote, "shooting Paul Dorr," end of quote.

16  Are you familiar with that claim?

17  A    Paragraph 28, did you say?

18  Q    Well, let me-- let me--

19       MR. FAHNLANDER:  Let's mark this too, please.

20       (Deposition Exhibit No. 8 marked for identification.)

21  Q    (BY MR. FAHNLANDER)  Paragraph 28 is on page 7.

22  A    Okay.  Yep.

23  Q    Okay.  Had-- had you read that Paul Dorr has observed

24  at least one website blog which made reference to shooting

25  Paul Dorr?  Have you ever read that that is an allegation in

1   this case?

2   A    I think I just read it on here (indicating).

3   Q    Before today?

4   A    Oh, yeah, but--

5   Q    Okay.  So you've read that before?

6   A    In this document.

7   Q    Yes.

8   A    Yeah.

9   Q    That's all my question is, you've read that before?

10  A    Yeah, correct.

11  Q    Okay.  Did you ever investigate that?

12  A    No.

13  Q    Okay.  And in your answer, which is paragraph-- which

14  is Exhibit 7, you state, "Paragraph 28 is denied for lack of

15  sufficient information upon which to form a belief as to the

16  truth of the matters asserted."  Did I read that correct?

17  A    Correct.

18  Q    Okay.  So that's your-- that's your position in this

19  lawsuit, is that you just-- you don't know, you don't have

20  sufficient information?

21  A    Well, I don't recall Mr. Dorr reporting that.

22  Q    Well, if he didn't report it before filing this

23  lawsuit, you've seen it in this lawsuit, correct?

24  A    Correct, right.

25  Q    Okay.  Did you ever look into that during the course of

1  this lawsuit after you--

2  A    Oh.

3  Q    -- learned that that was the allegation?

4  A    No.

5  Q    Okay.  Would-- if someone-- if someone was making

6  threats against a citizen in your county, would you see it

7  as your duty to protect that person?

8  A    Sure.

9  Q    Okay.  And would you-- would part of protecting that

10 person be to at least investigate the nature of the threat

11 against the person in your county?

12 A    Yes.

13 Q    Okay.  But you didn't do that in this case?

14 A    No.

15    (Deposition Exhibit No. 9 marked for identification.)

16 Q    Sheriff Weber, I'm showing you what's been marked as

17 Exhibit 9.

18 A    Yes.

19 Q    This is entitled Transcript of a Conversation Between

20 Paul Dorr and Sheriff Doug Weber August 9, 2007, at

21 approximately 1:15 p.m., correct?

22 A    Correct.

23 Q    Have you seen this transcript before?

24 A    I believe so, yes.

25 Q    Okay.  Now, there are statements on this transcript

1  attributed to PRD, which would be Paul Dorr.  Do you agree

2  with that?

3  A    Yes.

4  Q    And there are statements agree-- attributed to DW.  Do

5  you see that?

6  A    Yes.

7  Q    And do you agree that DW is Douglas Weber, you?

8  A    Correct.

9  Q    Okay.  And have you ever-- well, do you disagree with

10  any of these statements that are attributed to-- to you in

11  this transcript?

12  A    I don't know.  I would have to examine it.  I have a

13  videotape of the-- of the-- of the encounter.  I'd have to

14  look at it with that.

15  Q    Oh, you have a videotape?

16  A    Yes.

17  Q    Okay.  So when Paul Dorr came in to discuss his

18  application with you, you videotaped that?

19  A    Yes.

20  Q    Okay.  And you have your own transcript-- your own

21  recording of that?

22  A    Not a transcript, but a--

23  Q    You have a recording of that?  Could I get a copy of

24  that recording?

25        MR. PHILLIPS:  Are you making a list of all these

1  things?  We had this conversation.

2         MR. FAHNLANDER:  Yeah, I'll be making a list.

3         MR. PHILLIPS:  Good.  For the record, I didn't

4  know there was a videotape.

5  A    I think Mr. Dorr tape recorded it, so...

6  Q    (BY MR. FAHNLANDER)  And you-- you videotaped it?  You

7  videotaped it and he audio recorded it?

8  A    Probably, yeah.

9  Q    And your videotape has an audio recording as well?

10 A    It should, yeah.

11 Q    Okay.  Do you-- do you videotape all the meetings you

12 have with people regarding concealed carry permits?

13 A    No.

14 Q    Is there a reason why you did it in this case?

15 A    Yes.

16 Q    Why is that?

17 A    I don't trust him--

18 Q    Okay.

19 A    -- plain and simple.

20 Q    You don't trust him to what?

21 A    Anything, any-- I won't put anything past him--

22 Q    Okay.

23 A    -- absolutely nothing.

24 Q    And have you ever heard Mr. Dorr say anything about the

25 permit application that isn't documented on your videotape?

1  A     Can you say that again?

2  Q     Sure.  Have you ever-- have you ever seen Mr. Dorr say

3  anything about the meeting the two of you had regarding his

4  permit that wasn't-- that wasn't true?

5  A     Well, there was some-- I don't remember if it was a

6  letter or something he talked about this.  And where I said

7  I didn't want to argue about it, he made it sound like I

8  ended the meeting, but he stood up from the table and ended

9  the meeting, which is a minor thing, but he-- but that

10 wasn't accurate.  He tried to make it sound like, "I'm not

11 gonna argue with you.  Get out of here," and that's not

12 true.  It says-- down at the bottom there where it says,

13 "No, I'm not-- look, I'm not gonna argue with-- with you,"

14 Paul Dorr stood up at that time, which was an indication to

15 me he wanted to end the meeting.

16 Q     Okay.  And what he said after that is, "I'm not

17 either," meaning, "I'm not gonna argue either," and then he

18 says, "If you want to pursue this course, Doug, you go right

19 ahead."  That's what he said?

20 A     Right.  Yeah, that could very well be.

21 Q     And you said, "Okay.  Thank you," correct?

22 A     That's probably--

23 Q     And that's the end of the transcript, correct?

24 A     Yeah.

25 Q     Is that a yes?

1  A    Yes.

2  Q    Now, a few lines down, about the halfway point where--

3  next to where it says, "PRD:" it says, "Did--" Paul Dorr is

4  saying, "Did they give you any-- did they give you specific

5  allegations of things that I did that prompted that fear?"

6  That's his question and your response was, "No."

7  A    Right.

8  Q    Do you agree that that's what you said in the meeting

9  with Paul Dorr?

10 A    That's what I said.

11 Q    And you agree that's true?

12 A    (Pause) Not that there was no-- I'm just not willing to

13 tell him what that was at that time.

14 Q    Well, the question that Paul asked you was, "Did they

15 give you specific allegations of things that I did that

16 prompted that fear?"  Do you agree that your response on

17 that day was, "No"?

18 A    It says that I said, "No," according to this.  I

19 already told you I didn't-- if I'm looking at the right line

20 here.

21 Q    Well, this-- where it says, "DW"--

22 A    Oh, okay.  Sorry.  I was looking down more.

23 Q    Paul Dorr's question to you was, "Did they give you

24 specific allegations of things that I did that prompted that

25 fear?"

1  A    Yeah.

2  Q    Your response was, "No."

3  A    Right.

4  Q    And you agree that that was truthful when you said it?

5  A    I just wasn't-- I didn't want to tell him who said what

6  and where, for one thing.  Like Lois Stahl, I seen on a

7  report-- I put on there-- I wrote on there that she was

8  scared to death of him, and that-- that is a public record.

9  And I probably wouldn't have done that because-- because if

10  Mr. Dorr sees that, he'll harass those people to the end of

11  time, and-- and assassinate their character.

12  Q    And has Paul Dorr harassed any of the people that have

13  been disclosed in this lawsuit?

14  A    Well, not yet.

15  Q    Well, you disclosed-- you disclosed in your answers to

16  interrogatories Lois Stahl and Adri Ruisch, right?

17  A    Well, we're not over with it yet.

18  Q    Yeah.  Well, my question is, do you have any

19  information that he has harassed either of those two people?

20  A    No.

21  Q    And you disclosed this information months and months

22  ago, correct?

23  A    Correct.

24  Q    Did you withhold information in the course of your

25  discovery responses because you didn't want Paul to learn

1  who the people were that made complaints about his-- his

2  character or his reputation?

3  A    No.

4  Q    In this exhibit, Exhibit 6 which has the persons with

5  discoverable information, that was-- that's dated March of

6  2009, correct?

7  A    Correct, sure.

8  Q    And that was-- so that's eight months ago.  Do you have

9  any information that Paul has harassed any of the people

10 listed on that disclosure form?

11 A    They haven't told me that, no.

12 Q    Okay.  And-- and you wanted to-- when you were

13 answering these questions you knew that you were being

14 videotaped, right?

15 A    Right.

16 Q    So you'd want to be truthful and accurate, right?

17 A    Correct.

18 Q    Now, I'd like you to compare Exhibit 8 and Exhibit 7

19 because there are some more paragraphs in the answer that I

20 want to get a little more information about.  I'd like to

21 direct you to paragraph 73 of each of those documents, if I

22 could, please.

23 A    (Witness complying.) Yes.

24 Q    Okay.  Paragraph 73 says, "Under Iowa Code 724.8(3)

25 Dorr is not addicted to the use of alcohol or any controlled

1  substance," and your answer in paragraph 73 is to deny it,

2  correct, on the basis of lack of sufficient information.  Do

3  you see that?

4  A    Yes.

5  Q    What information do you have that leads you to not

6  admit paragraph 73?

7  A    Well, I don't know one way or the other.

8  Q    Okay.  Would that be-- is that your response to

9  paragraph number 74 as well?

10  A    Yes.

11  Q    And paragraph 75 also?

12  A    Correct.

13  Q    And paragraph 76 also?

14  A    Yes.

15  Q    Is-- is there-- can you think of any way that Paul Dorr

16  could have proven to you that he met those criteria--

17  criteria referenced in paragraphs 73 through 76?

18  A    I don't know.  He's pretty resourceful in making things

19  up.  He probably could.

20  Q    So you think he'd have to make something up in order to

21  satisfy you that he met those criteria?

22  A    I-- I don't know.  Like I said, I don't know either

23  way, one way or the other.

24  Q    Okay.  And I'll ask you the same questions regarding

25  paragraph 100 and 101, which relate to what Alex Dorr did.

1 Do you have any information about-- that Alex Dorr is

2 addicted to the use of alcohol or any controlled substance?

3 A    No.

4 Q    And under paragraph 104 the complaint alleges that,

5 "Under Iowa Code Section 724.8(5) the issuing officer has

6 made no reasonable determination that Alexander Dorr

7 constitutes a danger to any person," and that was denied.

8 Do you have any information that Alex Dorr constitutes a

9 danger to any person?

10 A    No.

11 Q    And, again, he was denied the-- his-- his permit

12 application solely on the basis of his age?

13 A    Well, just his-- I'd rephrase that, the immaturity of

14 being 18 at the time of his application--

15 Q    Okay.

16 A    -- which--

17 Q    When you're saying, "immaturity," you're-- are you

18 talking about something other than age?

19 A    No, just age.

20 Q    Okay.

21 A    Age, yes.

22 Q    You're not saying he was physically or psychologically

23 immature?

24 A    No, no.

25 Q    Okay.  Paragraph number 114 of the complaint, I'm gonna

1 read the first part of it. "Sheriff Weber, acting as an

2 agent and on behalf of the defendant Osceola County, within

3 the scope of his employment," and I'll stop there. Do you

4 agree that you were acting as an agent of and on behalf of

5 Osceola County in denying Paul Dorr his permit?

6 A     Well, the county doesn't have anything to say about

7 issuing or not issuing a permit, so it would be-- it's my

8 decision.

9 Q     But-- but you're acting as an agent of the county,

10 aren't you?

11 A     As a sheriff, so-- I guess I don't know how to respond

12 to that.  I mean, it's my-- my responsibility, my decision.

13 Q     Okay.  But in your-- your employment is all as an agent

14 of the county, isn't it?

15        MR. PHILLIPS:  Object to the form of the

16 question.  I don't think it's at all clear that he knows

17 what an agent is.

18 Q     (BY MR. FAHNLANDER)  Do you understand the question?

19 A     I'm an elected official, so I don't-- I mean, I--

20 Q     Okay.  But in your capacity as the sheriff you're

21 acting on behalf of the county, correct?

22 A     As sheriff.

23 Q     Okay.  So are you answering yes?  I'm not trying to

24 trick you.

25 A     Okay.

1  Q    I'm trying to ask a question.

2  A    Well--

3  Q    I'm just trying to get a specific answer.

4  A    I just don't want to--

5  Q    As the sheriff of Osceola County you're just-- your

6  actions as the sheriff are on behalf of the county, correct?

7  A    Yeah.  I just don't want to misspeak.  I think that's

8  fair to say.

9  Q    Okay.  And when you're making these decisions about

10  granting or denying the applications for concealed carry

11  permits, you're acting within the scope of your employment?

12  A    Correct.

13  Q    Okay.  (Pause) Now, I think we already went over this

14  morning the answers to interrogatories, Exhibit 2.  Answer

15  to Interrogatory No. 5, please.

16  A    (Witness complying.)

17  Q    Interrogatory No. 5 asks about persons you expect to

18  call as an expert witness.  Do you know if Osceola County

19  has made any decisions about calling experts?

20  A    No, I don't.

21  Q    And Interrogatory No. 8 asks about policies regarding

22  issuing nonprofessional permits to carry weapons.  And the

23  answer in sentence 2 states, "There were no written policies

24  in place at the time of the denial that gives rise to this

25  lawsuit."  Did I read your answer accurately?

1  A    Correct.

2  Q    And there weren't any written policies before your

3  denial of Paul Dorr's permit and there are no-- there are no

4  written policies since that; is that correct?

5  A    Correct.

6  Q    Okay.  Answer to Interrogatory No. 15 on page 5,

7  please.

8  A    (Witness complying.)

9  Q    Interrogatory No. 15 asks, "Specify in all possible

10  detail the investigation that was performed relating to

11  Alexander Dorr's permit application for the year 2008."  And

12  then your answer states, quote, "Sheriff Weber reviewed the

13  information related to the statutory criteria and confirmed

14  his date of birth," end of quote.  And that's-- that's all

15  that you did as far as investigating Alexander Dorr's permit

16  application?

17  A    Correct.

18  Q    Okay.  Answer to No. 16.  Your answer states, "Citizens

19  made more comments which were of concern to Sheriff Weber,"

20  end quote.  Is there anything in addition to what you've

21  already testified to to add to that answer?

22  A    Not that I can think of.

23  Q    Okay.  In answer to No. 18 the second sentence says,

24  "Paul Dorr makes his living attacking the character of

25  others."  Do you see that?

1  A    Yes.

2  Q    Do you mean that Paul Dorr actually is paid to attack

3  the character of others?  Is that what you're indicating

4  there?

5  A    Yes, sometimes.

6  Q    Okay.  Who pays him to to attack the character of

7  others?

8  A    Well, if it's on the-- that school bond issue, that

9  kind of thing.

10  Q    So you-- so if-- if Paul Dorr's active in a school bond

11  issue, you believe that that is attacking the character of

12  others?

13  A    Oh, sure, because that's what he does.  He's an expert

14  at tearing things down.  He doesn't build anything up, he

15  just tears things down.

16  Q    Okay.

17  A    That's kind of what he's doing with the OCTA.

18  Q    Is attacking the character of people?

19  A    Oh, absolutely, done it to me, Bubba Tjaden, Judge

20  Nancy Whittenburg.  You know, I can give you a whole list of

21  people he's attacked.

22  Q    Is there-- is there anything accurate about any of

23  the-- the work that he does or the-- the opposition that

24  he-- that he writes about?

25  A    Anything accurate?

1  Q    Yes.

2  A    I don't know.  Read the article "The Gospel According

3  to Paul Dorr" and--

4  Q    Okay.

5  A    Just read some of that.

6  Q    Answer to Interrogatory No. 20.

7  A    Okay.

8  Q    That first sentence says, "Citizens made comments to

9  the sheriff that Dorr's behavior was becoming increasingly

10 hostile."  What do you mean by hostile there?

11 A    Well, I-- I think the extremist, not necessarily

12 hostile physically, but certainly--

13 Q    More adversarial?

14 A    That and confrontational and...

15 Q    You're talking about verbally and rhetorically hostile?

16 A    Yes.

17 Q    Okay.  In Answer to Interrogatory No. 26-- or 25,

18 rather, your answer states, "There have been numerous

19 comments from the public over the years and prior to the

20 2007 denial, but the sheriff did not document them and does

21 not recall names."  I read that accurately?

22 A    Right.

23 Q    Now, you've told us about some names today.  Have you

24 told us about all the names that you recall?

25 A    Oh, well, right now, but maybe there's-- there's some

1  that I haven't.

2  Q    Okay.  Is there a reason why, when you were-- when you

3  signed these interrogatory answers in April of '09, that you

4  didn't recall the names of those people, but you recall the

5  names of them now?

6  A    Well, no.  I'd have to talk to Mr. Phillips about it.

7  I-- some of them were after '07-- or after the denial, some

8  were before.

9  Q    Okay.  But you signed this in April, on April 10, 2009,

10  correct?

11  A    Correct.

12  Q    Is there any reason why as of April 10, 2009 you

13  couldn't recall the names of the people that you've been

14  talking about today?

15  A    Like I said, some today was after the-- the '07 denial.

16  Q    Well, I understand that.  Are those people that you've

17  just talked to since April of '09?

18  A    Oh, I see.  Well, I don't know.  I don't know for sure.

19  Q    Okay.

20  A    Depends who it is.

21  Q    Well, I'm just trying to figure out-- on April 10, 2009

22  you answered that you did not recall the names of the people

23  who had made reports of fear and today you've testified to a

24  great number of people.  Why do you remember them today, on

25  November 30, 2009, but you didn't remember them on April 10,

1  2009?

2  A    Well, I think the question asked for prior to '07

3  through the years and, yeah, I hear different things through

4  the years and I didn't document it.

5  Q    Okay.  The fact that you didn't document them-- you

6  didn't document this information, does that indicate to you

7  that the reason you didn't document it was because they

8  weren't serious?  Would that be true?

9  A    In and of itself, probably, correct.

10  Q    Okay.  (Pause) Now, your impression of the discretion

11  that you have under Iowa law allows you to exercise any

12  discretion based on things that you hear and-- and what you

13  believe is the reputation of the applicant; is that correct?

14  A    Yeah.

15  Q    And there really-- there isn't any-- there isn't--

16  there aren't any bounds to the discretion you have, that's

17  your understanding?

18  A    Correct, it's my discretion.

19      (Deposition Exhibit No. 10 marked for identification.)

20  Q    Sheriff Weber, I'm showing you what's been marked as

21  Exhibit 10, and in the bottom, middle column it states,

22  "Commission member Dick Mataloni showed support to Sheriff

23  Doug Weber for denying a concealed weapon permit to Paul

24  Dorr," and then it goes on at the bottom.  It says, "Sheriff

25  Weber has received many calls in support of his decision

1  (See attached letters)."  What is meant by, "See attached

2  letters"?  Were there actually letters that were sent to you

3  supporting your decision to deny Paul Dorr a concealed carry

4  permit?

5  A    I recall one letter, but I don't remember it being

6  attached.

7  Q    Okay.  Who sent that letter?

8  A    Well, there was a Christine Habben and I received

9  another letter, but that was after this, but I don't

10  remember what would be attached unless-- unless there was

11  attached letters that Paul Dorr wrote to the permit holders.

12  Q    Okay.  But you don't know what the attached letters

13  are?

14  A    Well, we could-- we could get the minutes from that

15  date and see if there's anything attached to it.

16  Q    Now, after you denied Paul Dorr his permit he contacted

17  you to attempt to find out what he could do to assuage the

18  fears of those people who supposedly were afraid of him,

19  correct?

20  A    Yes.

21  Q    And you denied him the opportunity to try to assuage

22  those fears; is that correct?

23  A    Well, it would be impossible.  He doesn't realize the

24  scope of what he would have to do.  It took him years to

25  develop that reputation, and I-- I don't know how he's going

1  to do that.

2  Q    And you were gonna make a decision you weren't going to

3  allow him to try to repair that reputation?

4  A    He can repair it all he wants.  I don't have time to do

5  it for him.  He created it.  He's gonna have to deal with

6  it.

7  Q    Was he asking you to repair his reputation?

8  A    He asked me to go with him to a witness-- to go to

9  these people, and it's laughable, but he doesn't understand

10  the scope because he doesn't live in reality.

11  Q    (Pause) Do you recall whether you approved a permit for

12  Emily Dorr?

13  A    I remember the name.  One-- one of those Dorr girls,

14  the daughters, at-- was 18 when they applied and I denied

15  her, and I don't know if they ever came back in or not and

16  I'm not sure how old she is now.

17      (Deposition Exhibit No. 11 marked for identification.)

18  Q    Showing you what's been marked as Exhibit 11, are those

19  more permit applications to the-- for people applying for a

20  concealed carry permit?

21  A    Yes.

22  Q    And the first one in Exhibit 11 is from Aaron Schulte?

23  A    Yes, correct.

24  Q    Are you able to tell whether that was approved or

25  denied?

1  A    It's not marked.  No.

2  Q    Can you tell one way or the other whether it was

3  approved or denied?

4  A    No.  It-- it's not marked.

5  Q    Okay.  Same question for the permit application from

6  Michael Betz.  Are you able to tell whether that was

7  approved or denied?

8  A    No.

9  Q    I'm showing you an application for Emily Dorr.  Are you

10  able to tell whether that was approved or denied?

11  A    No.  I don't think-- I don't remember her coming in.

12  Q    Did you ever-- with respect to one of the-- one of Paul

13  Dorr's daughters, do you recall contacting either of his

14  daughters to tell them that their-- their application was

15  approved and all they had to do was come in and-- and get

16  the application?

17  A    Unless it was that Emily.  I don't remember.

18  Q    I-- I'm sorry.  I said, "come in and get the

19  application."  I meant come in and get the permit.  Do you

20  recall that ever-- that happening?

21  A    No, I don't.

22        MR. FAHNLANDER:  Okay.  Let's mark this as an

23  exhibit also.

24      (Deposition Exhibit No. 12 marked for identification.)

25  Q    (BY MR. FAHNLANDER)  Sheriff, I was asking you

1  questions from-- off of Exhibit 12 regarding Emily Dorr's

2  application for a concealed carry permit, and it's towards

3  the back of that.

4  A   (Witness complying.)

5  Q   And Emily, according to the application, was 19 when

6  she was applying.  I'm sorry.  She was 20 when she was

7  applying.

8  A   Yes.

9  Q   A few follow-up questions.  Has anyone ever filed a

10  report, an incident report or any other kind of a report,

11  with the Osceola County Sheriff that Paul Dorr physically

12  harmed anyone?

13  A   Not that I'm aware of, no.

14  Q   Has anyone ever filed a report that Paul Dorr

15  physically threatened anyone?

16  A   No.

17  Q   (Pause) Do you agree that much of the work that Paul

18  does in writing letters and making fliers and so forth is a

19  protected speech under the First Amendment?

20  A   Yes.

21  Q   Okay.  And would you agree that much of the-- the bad

22  reputation that-- that you say Paul Dorr has accumulated

23  over the years is as a result of his exercise of his First

24  Amendment rights?

25  A   No, I don't agree with that.

1    Q    Okay.  And have you acted on Paul Dorr's 2009 permit

2    application?

3    A    No, I haven't.

4    Q    When do you plan to act on it?

5    A    I suppose I'd have to talk to my attorney about it.

6    Q    But as you sit here today your intent is to deny that

7    application?

8    A    Yes.

9    Q    (Pause) Do you believe that Paul Dorr has attacked your

10   character?

11   A    Yes.

12   Q    Did he do that before or after your denial of his

13   permit?

14   A    After my denial.

15   Q    (Pause) Now, the applications, at the bottom of them,

16   indicate a block for either the sheriff or the Commissioner

17   of the Iowa Department of Public Safety; is that correct?

18   A    Yes.

19   Q    How is it determined whether you sign off on this and

20   approve them or the Commissioner of the Iowa Department of

21   Public Safety does that?

22   A    I don't know for sure.  I-- I will say we've had state

23   troopers living here in the county and I don't recall

24   signing their professional permit, so I--

25   Q    You assume that the Department of Public Safety signs

1  off on theirs?

2  A    Yes, I do.

3  Q    Okay.  And in denying Paul's application you're not--

4  you're not stating that he failed to properly fill it out,

5  are you?

6  A    No.

7  Q    Would you agree that a concealed carry permit is an

8  important permit?

9  A    Important?

10  Q    Yes.

11  A    Yes.

12  Q    And the rights to purchase and carry a handgun are

13  important rights?

14  A    To purchase, yes.

15  Q    And to carry a handgun is an important right?

16  A    Carry-- carry it concealed?

17  Q    Yes.

18  A    I believe it's important, yes.

19  Q    I'd like to take a-- let's see.  Hold on a second.

20  (Pause) Do you recall whether you've turned down other

21  applicants, other than Alex Dorr, who were under age 21?

22  A    Like I said a little earlier, I believe one of

23  Mr. Dorr's daughters, and I don't remember which one that

24  was.

25  Q    Are they the only people who have applied who were

1  under age 21?

2  A    That I can recall.

3  Q    And you know that Alexander Dorr is Paul's son,

4  correct?

5  A    Yes.

6  Q    And you knew it at the time you denied his application

7  for permit-- concealed carry permit, correct?

8  A    Yes.

9  Q    Now, after Paul Dorr filed this lawsuit you did some

10 investigation to-- to bolster your decision to deny his

11 permit, correct?

12 A    No, that's-- that's not true.

13 Q    Well, did you-- you went back and called Adri Ruisch

14 after Paul Dorr filed his lawsuit?

15 A    I did, because Al Bruegemann reminded me of that

16 incident.

17 Q    But that was after Paul Dorr filed this lawsuit,

18 correct?

19 A    Correct.

20 Q    Did you do any other investigation to justify your

21 decision to deny Paul Dorr his permit after the lawsuit was

22 filed?

23 A    To--

24        MR. PHILLIPS:  Object to the form of the

25 question.

```
 1              MR. FAHNLANDER:  Okay.

 2   A    Pardon?

 3   Q    (BY MR. FAHNLANDER)  You can answer the question.

 4   A    To justify my--

 5   Q    Yes.

 6   A    No.  People came to me--

 7   Q    Okay.

 8   A    -- for the most part came to me.

 9   Q    Did you scan any computer records to find additional

10   correspondence or things that-- that supported your

11   decision?

12   A    Scanned any computer records?

13   Q    Or ask for any computer records to-- that supported

14   your decision?

15   A    Would just be these documents that are-- are here,

16   looked through that file.

17              MR. FAHNLANDER:  I'd like to take a five-minute

18   break, and I think we're about done.

19              MR. PHILLIPS:  Before we start with your client's

20   deposition we need to talk about discovery in general.

21   Today's the discovery deadline.  Obviously I'm not gonna get

22   to Alexander today, through no one's fault.  You plan to ask

23   me for more documents.  We need to come up with a plan for

24   how we're gonna accomplish this.  Do you want to extend the

25   discovery deadline by agreement or--
```

1        MR. FAHNLANDER:  Well, I guess I'm-- yeah, I'm

2 agreeable to extending it by agreement because, you know,

3 like you say, we can't get it done by the end of today.

4 There's stuff I want and there's stuff you want, so I'm

5 willing to work with you on that.

6        MR. PHILLIPS:  I'm not willing to just agree with

7 you, because our court frowns on that.  It doesn't have

8 anything to do with you.  If you and I agree, then let's

9 file a joint motion, tell the court how much more time we

10 want, because my experience is that if you and I just agree

11 to go ahead and do it and we get caught, we'll be chastised,

12 and I'm just not up for that.

13        MR. FAHNLANDER:  Okay.  I'm hopeful that we can do

14 this within a couple weeks, hopefully.

15        MR. PHILLIPS:  That's unlikely.  It depends on

16 what goes to trial and what doesn't.

17        MR. FAHNLANDER:  I'm sorry.  What?

18        MR. PHILLIPS:  Depends what goes to trial and what

19 doesn't.  I will be out this week.  I will be in trial next

20 week, so...

21        MR. FAHNLANDER:  Well, what you need from me is to

22 get Alex's deposition.

23        MR. PHILLIPS:  Uh-huh (yes).

24        MR. FAHNLANDER:  And I don't-- I anticipate that

25 it-- you know, that can be done.

1       MR. PHILLIPS:  Yeah.  The other problem--

2       MR. FAHNLANDER:  The flu that's been going through

3  the household is, you know, a one-to-two-day type of deal.

4       MR. PHILLIPS:  -- it's twenty after 3:00 and

5  you're not even done yet, and I don't really want to stay up

6  here all night.  And so if we're going to extend the

7  discovery deadline, I would prefer to start with your client

8  some morning when I haven't been sitting here all day.  If

9  that's not gonna work, then I'll start.

10       MR. FAHNLANDER:  Well, I'd like to get him

11  started, because I-- I think I'm done.

12       MR. PHILLIPS:  Okay.

13       MR. FAHNLANDER:  I just want to take a few minutes

14  to review my notes.

15       MR. PHILLIPS:  Okay.

16     (Off the record from 3:19 to 3:31 p.m.)

17       MR. FAHNLANDER:  Sheriff, thank you for your

18  time.  I don't have any further questions.

19       MR. PHILLIPS:  I don't have any questions.

20     (The deposition concluded at 3:32 p.m.)

21

22

23

24

25

```
1   STATE OF IOWA          )
                           :SS              CERTIFICATE
2   COUNTY OF DICKINSON     )

3       I, Jenna L. Mumm, Certified Shorthand Reporter and
    Notary Public, duly qualified for the State of Iowa, do
4   hereby certify as follows:

5           1.  That the witness, DOUGLAS L. WEBER, was by me
    first duly sworn to tell the truth and that the foregoing
6   transcript, consisting of Pages 1 to 166, inclusive, is a
    true and correct transcript of my shorthand notes made
7   during the time of the taking of the deposition of this
    witness;

8
            2.  That I am not an attorney for, nor related to
9   the parties to this action and that I am in no way
    interested in the outcome of this action;

10
            3.  That the original transcript of this
11  deposition is to be delivered to Mr. Vincent J. Fahnlander;

12          4.  That a copy is to be delivered to Mr. Douglas
    L. Phillips and Mr. Vincent J. Fahnlander;

13
            DATED THIS 10th day of December, 2009.

14

15

16

17

18  Jenna L. Mumm, CSR
    Certified Reporting
19  703 Jackson Avenue
    Spirit Lake, Iowa 51360
20  tel: (712) 336-4125 (800) 551-5027
    fax: (712) 336-6827

21

22

23

24

25
```

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS
### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

☐ Professional Permit (WP1)          ☐ Peace Officer Permit (WP7)
☒ Nonprofessional Permit (WP2)       ☐ Reserve Peace Officer Permit (WP10)
                                      ☐ Correctional Officer Permit (WP9)

☐ New Application
☒ Renewal - Permit Number __18.7534__

Firearms Safety Training Certification Number or Peace Officer Certification Date __31221__

Attach copy of WP0 Firearms Safety Training Program Certificate of Completion (except certified peace officer).

Name __Dorr__ __Paul__ __Robert__  Phone # ( _712_ ) _758_ - _3372_
(last)        (first)        (middle)

Other Names Ever Used (aliases) __N/A__

Residence __579 2nd St.__ __Ocheyedan__ __Iowa__ __51354__
                         (city)              (state)  (zip)

Driver License or Non-Operator ID# __509 WW3353__ County of Residence __Osceola__

Birthdate __5__ / __15__ / __1956__ Age __49__ Sex __M__ Hgt __6'2"__ Wgt __290__ Hair __Br__ Eyes __Br__

### Authorization for Release - Weapon Permit Applications

I, __Paul R. Dorr__, do hereby authorize a review and full disclosure of all records concerning myself, as required by Iowa Code chapter 724, to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court, as necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm, and shall not be disseminated for any other purpose.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry or acquire weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for providing accurate information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

I understand that I may be convicted of a class "D" felony pursuant to Iowa Code section 724.10 if I make a false statement of material fact on this application.

I understand that all information provided on this application is considered public record and may be disclosed upon request.

This "Signature On File" will be valid from this date and shall expire in one year.

Applicant Signature __Paul R Dorr__          Date __June 27, 2005__
WP5  Rev. 02/2003

DEPOSITION EXHIBIT
1
JM  11-30-09

**All of the following questions must be answered:**

Yes No
- [ ] [x] 1. Have you ever been convicted of a felony?
- [ ] [x] 2. Have you ever been convicted of the misdemeanor crime of domestic abuse assault?
- [ ] [x] 3. Have you ever been convicted of the misdemeanor crime of assault in violation of individual rights (hate crime)?
- [ ] [x] 4. Have you ever been convicted of the misdemeanor crime of assault on a peace officer, jailer, correctional officer, fire fighter or health care provider?
- [ ] [x] 5. Have you ever been convicted of the misdemeanor crime of setting a spring gun or trap?
- [ ] [x] 6. Have you ever been convicted of the misdemeanor crime of hazing?
- [ ] [x] 7. Have you ever been convicted of the misdemeanor crime of stalking?
- [ ] [x] 8. Are you addicted to the use of alcohol or any controlled substance?
- [ ] [x] 9. Do you have a history of repeated acts of violence?
- [ ] [x] 10. Have you ever been adjudged mentally incompetent?

If you answered yes to any of the above, please explain: _____

- [x] [ ] 11. Are you a citizen of the United States? If not, provide country of citizenship and alien registration number. Country of citizenship: _____ Alien registration number: _____

## STATEMENT OF JUSTIFICATION
### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

This statement is to contain clear and convincing evidence that this applicant may be required to use deadly force to protect his/her life or the life of another. The issuing officer may accept or reject this application for a permit to carry based on this narrative and other considerations.

For protection on vendor business when temporarily carrying large amounts of cash and general self-defense

Applicant Signature _Paul R Jorp_ Date _June 27, 2005_

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____ Telephone _____

Employer Address _____

Employer Signature _____ Date _____

## ISSUING OFFICER
### MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY

Application: [x] Approved [ ] Disapproved Date _07-21-05_

Reason Disapproved: _____

Signature _Douglas A Weber_ [x] Sheriff of _Osceola_ County, Iowa
[ ] Commissioner of the Iowa Department of Public Safety
[ ] New Fee $ _____ [ ] Renewal Fee $ _____ [ ] Peace Officer/Correctional Officer - No Fee

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS

### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

☐ Professional Permit (WP1)  ☐ Peace Officer Permit (WP7)
☒ Nonprofessional Permit (WP2)  ☐ Reserve Peace Officer Permit (WP10)
☐ Correctional Officer Permit (WP9)

☐ New Application
☒ Renewal - Permit Number  OSPO - 346

Firearms Safety Training Certification Number or Peace Officer Certification Date  31221

Attach copy of WP9 Firearms Safety Training Program Certificate of Completion (except certified peace officer).

Name  Dorr (last)   Paul (first)   Robert (middle)   Phone # (712) 758 - 3372

Other Names Ever Used (aliases)  N/A

Residence  579 2nd Street   Ocheyedan (city)   Iowa (state)   51354 (zip)

Driver License or Non-Operator ID# _____   County of Residence  Osceola

Birthdate  5 / 15 / 1956   Age 50   Sex M   Hgt 6'1½"   Wgt 300   Hair Br   Eyes Br

## Authorization for Release - Weapon Permit Applications

I, Paul R. Dorr, do hereby authorize a review and full disclosure of all records concerning myself, as required by Iowa Code chapter 724, to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court, as necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm, and shall not be disseminated for any other purpose.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry or acquire weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for providing accurate information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

I understand that I may be convicted of a class "D" felony pursuant to Iowa Code section 724.10 if I make a false statement of material fact on this application.

I understand that all information provided on this application is considered public record and may be disclosed upon request.

*This "Signature On File" will be valid from this date and shall expire in one year.*

Applicant Signature  Paul R. Dorr          Date  July 19, 2006
WP5  Rev. 02/2003

**All of the following questions must be answered:**

Yes  No

☐  ☒  1. Have you ever been convicted of a felony?

☐  ☒  2. Have you ever been convicted of the misdemeanor crime of domestic abuse assault?

☐  ☒  3. Have you ever been convicted of the misdemeanor crime of assault in violation of individual rights (hate crime)?

☐  ☒  4. Have you ever been convicted of the misdemeanor crime of assault on a peace officer, jailer, correctional officer, fire fighter or health care provider?

☐  ☒  5. Have you ever been convicted of the misdemeanor crime of setting a spring gun or trap?

☐  ☒  6. Have you ever been convicted of the misdemeanor crime of hazing?

☐  ☒  7. Have you ever been convicted of the misdemeanor crime of stalking?

☐  ☒  8. Are you addicted to the use of alcohol or any controlled substance?

☐  ☒  9. Do you have a history of repeated acts of violence?

☐  ☒  10. Have you ever been adjudged mentally incompetent?

If you answered yes to any of the above, please explain: _____

_____

☒  ☐  11. Are you a citizen of the United States? If not, provide country of citizenship and alien registration number. Country of citizenship: _____ Alien registration number: _____

## STATEMENT OF JUSTIFICATION

**TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT**

This statement is to contain clear and convincing evidence that this applicant may be required to use deadly force to protect his/her life or the life of another. The issuing officer may accept or reject this application for a permit to carry based on this narrative and other considerations.

*Carry large amounts of cash on occasion + Self Defense.*

Applicant Signature _*Paul R. Dore*_    Date _July 19, 2006_

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____    Telephone _____

Employer Address _____

Employer Signature _____    Date _____

## ISSUING OFFICER

**MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY**

Application: ☒ Approved  ☐ Disapproved    Date _02-20-06_

Reason Disapproved: _____

Signature _*Doyle Queler*_  ☒ Sheriff of _O'Cook_ County, Iowa
☐ Commissioner of the Iowa Department of Public Safety
☐ New Fee $ _____  ☐ Renewal Fee $ _____  ☐ Peace Officer/Correctional Officer - No Fee

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS

### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

- [ ] Professional Permit (WP1)
- [x] Nonprofessional Permit (WP2)
- [ ] Peace Officer Permit (WP7)
- [ ] Reserve Peace Officer Permit (WP10)
- [ ] Correctional Officer Permit (WP9)

- [x] New Application
- [ ] Renewal - Permit Number _____

Firearms Safety Training Certification Number or Peace Officer Certification Date _____

Attach copy of WP0 Firearms Safety Training Program Certificate of Completion (except certified peace officer)

Name __Dorr__ (last)   __Paul__ (first)   __Robert__ (middle)   Phone # (_712_) _758_ - _3372_

Other Names Ever Used (aliases) _____

Residence __579 2nd St. PO Box 99__ (street)   __Ocheyedan__ (city)   __Iowa__ (state)   __51354__ (zip)

Social Security No. (optional) or DL # __509 WW 3353__   County of Residence __Osceola__

Birthdate _5_ / _15_ / _56_   Age __44__   Sex __M__   Hgt __6'1"__   Wgt __290__   Hair __Br__   Eyes __Br__

### Authorization for Release - Weapon Permit Applications

I, __Paul R. Dorr__, do hereby authorize a review and full disclosure of all records concerning myself, as required by Iowa Code chapter 724, to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court, as necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm, and shall not be disseminated for any other purpose.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry or acquire weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for providing accurate information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

I understand that I may be convicted of a class "D" felony pursuant to Iowa Code section 724.10 if I make a false statement of material fact on this application.

I understand the issuing officer is permitted to request my social security number (SSN) on this permit application pursuant to Iowa Code section 724.10 for permits to carry. I further understand that I am not required to provide it. The SSN, if provided voluntarily, may be used in the background investigation to assist in accurate identification. The permit application forms and the permits are public records, and if I provide my SSN, it will become part of that public record and may be disclosed upon request. I will be required to provide my driver license (DL) or Iowa ID number if I do not provide my SSN.

I understand that all information provided on this application is considered public record and may be disclosed upon request.

_This "Signature On File" will be valid from this date and shall expire in one year._

Applicant Signature __Paul R. Dorr__          Date _3/30/2001_

WP5  Rev. 01/2001

**All of the following questions must be answered:**

Yes No
- [ ] [✓] 1. Have you ever been convicted of a felony?
- [ ] [✓] 2. Have you ever been convicted of the misdemeanor crime of domestic abuse assault?
- [ ] [✓] 3. Have you ever been convicted of the misdemeanor crime of assault in violation of individual rights (hate crime)?
- [ ] [✓] 4. Have you ever been convicted of the misdemeanor crime of assault on a peace officer, fire fighter or health care provider?
- [ ] [✓] 5. Have you ever been convicted of the misdemeanor crime of setting a spring gun or trap?
- [ ] [✓] 6. Have you ever been convicted of the misdemeanor crime of hazing?
- [ ] [✓] 7. Have you ever been convicted of the misdemeanor crime of stalking?
- [ ] [✓] 8. Are you addicted to the use of alcohol or any controlled substance?
- [ ] [✓] 9. Do you have a history of repeated acts of violence?
- [ ] [✓] 10. Have you ever been adjudged mentally incompetent?

If you answered yes to any of the above, please explain: _____

_____

- [✓] [ ] 11. Are you a citizen of the United States? If not, provide country of birth and alien registration number:

Country of birth: _____  Alien registration number: _____

## STATEMENT OF JUSTIFICATION
**TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT**

This statement is to contain clear and convincing evidence that this applicant may be required to use deadly force to protect his/her life or the life of another. The issuing officer may accept or reject this application for a permit to carry based on this narrative and other considerations.

*Increasing violence in society, even in rural areas, compels me to secure this permit so as to protect my wife, childrens and self.*

Applicant Signature *Paul R. Vorr*  Date 3/30/2001

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____  Telephone _____

Employer Address _____

Employer Signature _____  Date _____

## ISSUING OFFICER
**MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY**

Application: [ ] Approved  [ ] Disapproved  Date _____

Reason Disapproved: _____

_____

Signature _____  [ ] Sheriff of _____ County, Iowa
 [ ] Commissioner of the Iowa Department of Public Safety
[ ] New Fee $ _____  [ ] Renewal Fee $ _____  [ ] Peace Officer/Correctional Officer - No Fee

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS

### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

☐ Professional Permit (WP1)  
☑ Nonprofessional Permit (WP2)

☐ Peace Officer Permit (WP7)  
☐ Reserve Peace Officer Permit (WP10)  
☐ Correctional Officer Permit (WP9).

☐ New Application  
☑ Renewal - Permit Number _____

Firearms Safety Training Certification Number or Peace Officer Certification Date __31221__

**Attach copy of WP0 Firearms Safety Training Program Certificate of Completion (except certified peace officer)**

Name __Dorr__ (last)  __Paul__ (first)  __Robert__ (middle)  Phone # (_712_) _758_ - _3372_

Other Names Ever Used (aliases) __N/A__

Residence __579 2nd St,__  __Ocheyedan__ (city)  __Iowa__ (state)  __51354__ (zip)

Social Security No. (optional) or DL # __509 WW 3358__  County of Residence __Osceola__

Birthdate __5 / 15 / 56__  Age __45__  Sex __M__  Hgt __6'2"__  Wgt __285__  Hair __Br__  Eyes __Br__

### Authorization for Release - Weapon Permit Applications

I, __Paul R. Dorr__, do hereby authorize a review and full disclosure of all records concerning myself, as required by Iowa Code chapter 724, to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court, as necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm, and shall not be disseminated for any other purpose.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry or acquire weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for providing accurate information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

I understand that I may be convicted of a class "D" felony pursuant to Iowa Code section 724.10 if I make a false statement of material fact on this application.

I understand the issuing officer is permitted to request my social security number (SSN) on this permit application pursuant to Iowa Code section 724.10 for permits to carry. I further understand that I am not required to provide it. The SSN, if provided voluntarily, may be used in the background investigation to assist in accurate identification. The permit application forms and the permits are public records, and if I provide my SSN, it will become part of that public record and may be disclosed upon request. I will be required to provide my driver license (DL) or Iowa ID number if I do not provide my SSN.

I understand that all information provided on this application is considered public record and may be disclosed upon request.

*This "Signature On File" will be valid from this date and shall expire in one year.*

Applicant Signature __Paul R. Dorr /OSF__     Date __4/6/2002__  
WP5   Rev. 06/2001

**All of the following questions must be answered:**

Yes No

☐ ☑ 1. Have you ever been convicted of a felony?
☐ ☑ 2. Have you ever been convicted of the misdemeanor crime of domestic abuse assault?
☐ ☑ 3. Have you ever been convicted of the misdemeanor crime of assault in violation of individual rights (hate crime)?
☐ ☑ 4. Have you ever been convicted of the misdemeanor crime of assault on a peace officer, fire fighter or health care provider?
☐ ☑ 5. Have you ever been convicted of the misdemeanor crime of setting a spring gun or trap?
☐ ☑ 6. Have you ever been convicted of the misdemeanor crime of hazing?
☐ ☑ 7. Have you ever been convicted of the misdemeanor crime of stalking?
☐ ☑ 8. Are you addicted to the use of alcohol or any controlled substance?
☐ ☑ 9. Do you have a history of repeated acts of violence?
☐ ☑ 10. Have you ever been adjudged mentally incompetent?

If you answered yes to any of the above, please explain: _____

_____

☑ ☐ 11. Are you a citizen of the United States? If not, provide country of birth and alien registration number:

Country of birth: _____ Alien registration number: _____

## STATEMENT OF JUSTIFICATION
### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

This statement is to contain clear and convincing evidence that this applicant may be required to use deadly force to protect his/her life or the life of another. The issuing officer may accept or reject this application for a permit to carry based on this narrative and other considerations.

Self Defense

Applicant Signature _Paul R Doe_        Date _4/6/2002_

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____ Telephone _____

Employer Address _____

Employer Signature _____ Date _____

## ISSUING OFFICER
### MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY

NICS Transaction Number (NTN) _____ Date NTN Received _____

Application: ☐ Approved  ☐ Disapproved   Date of Approval/Disapproval _____

Reason Disapproved: _____

Signature _S.E. Hawkey_        ☐ Sheriff of _____ County, Iowa
                               ☐ Commissioner of the Iowa Department of Public Safety
☐ New Fee $ _____  ☐ Renewal Fee $ _____  ☐ Peace Officer/Correctional Officer - No Fee

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS
### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

☐ Professional Permit (WP1)      ☐ Peace Officer Permit (WP7)
☑ Nonprofessional Permit (WP2)      ☐ Reserve Peace Officer Permit (WP10)
                               ☐ Correctional Officer Permit (WP9)

☐ New Application
☑ Renewal - Permit Number **160982**

Firearms Safety Training Certification Number or Peace Officer Certification Date **31221**

Attach copy of WP0 Firearms Safety Training Program Certificate of Completion (except certified peace officer)

Name **Dorr**      **Paul**      **Robert**   Phone # ( **712** ) **758-3372**
      (last)           (first)         (middle)

Other Names Ever Used (aliases) **NA**

Residence **579 2nd St.**     **Ocheyedan**     **Iowa**     **51354**
                              (city)             (state)     (zip)

Social Security No. (optional) or DL # **509 WW 3353** County of Residence **Osceola**

Birthdate **5 / 15 / 56** Age **47** Sex **M** Hgt **6'2"** Wgt **300** Hair **Br** Eyes **Br**

### Authorization for Release - Weapon Permit Applications

I, **Paul R. Dorr**, do hereby authorize a review and full disclosure of all records concerning myself, as required by Iowa Code chapter 724, to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court, as necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm, and shall not be disseminated for any other purpose.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry or acquire weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for providing accurate information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

I understand that I may be convicted of a class "D" felony pursuant to Iowa Code section 724.10 if I make a false statement of material fact on this application.

I understand the issuing officer is permitted to request my social security number (SSN) on this permit application pursuant to Iowa Code section 724.10 for permits to carry. I further understand that I am not required to provide it. The SSN, if provided voluntarily, may be used in the background investigation to assist in accurate identification. The permit application forms and the permits are public records, and if I provide my SSN, it will become part of that public record and may be disclosed upon request. I will be required to provide my driver license (DL) or Iowa ID number if I do not provide my SSN.

I understand that all information provided on this application is considered public record and may be disclosed upon request.

*This "Signature On File" will be valid from this date and shall expire in one year.*

Applicant Signature **Paul R. Dorr**             Date **May 28, 2003**
WP5 Rev. 12/2001

**All of the following questions must be answered:**

Yes No
- ☐ ☑ 1. Have you ever been convicted of a felony?
- ☐ ☑ 2. Have you ever been convicted of the misdemeanor crime of domestic abuse assault?
- ☐ ☑ 3. Have you ever been convicted of the misdemeanor crime of assault in violation of individual rights (hate crime)?
- ☐ ☑ 4. Have you ever been convicted of the misdemeanor crime of assault on a peace officer, fire fighter or health care provider?
- ☐ ☑ 5. Have you ever been convicted of the misdemeanor crime of setting a spring gun or trap?
- ☐ ☑ 6. Have you ever been convicted of the misdemeanor crime of hazing?
- ☐ ☑ 7. Have you ever been convicted of the misdemeanor crime of stalking?
- ☐ ☑ 8. Are you addicted to the use of alcohol or any controlled substance?
- ☐ ☑ 9. Do you have a history of repeated acts of violence?
- ☐ ☑ 10. Have you ever been adjudged mentally incompetent?

If you answered yes to any of the above, please explain: _____

_____

- ☑ ☐ 11. Are you a citizen of the United States? If not, provide country of birth and alien registration number:

Country of birth: _____ Alien registration number: _____

## STATEMENT OF JUSTIFICATION
### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

This statement is to contain clear and convincing evidence that this applicant may be required to use deadly force to protect his/her life or the life of another. The issuing officer may accept or reject this application for a permit to carry based on this narrative and other considerations.

Self-Defense

Applicant Signature _Paul F. Yopp_ Date _May 28, 2003_

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____ Telephone _____

Employer Address _____

Employer Signature _____ Date _____

## ISSUING OFFICER
### MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY

Application: ☐ Approved ☐ Disapproved Date _____

Reason Disapproved: _____

Signature _Ed Mauchley_ ☐ Sheriff of _____ County, Iowa
☐ Commissioner of the Iowa Department of Public Safety
☐ New Fee $ _____ ☐ Renewal Fee $ _____ ☐ Peace Officer/Correctional Officer - No Fee

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS

TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

☐ Professional Permit (WP1)  ☐ Peace Officer Permit (WP7)
☒ Nonprofessional Permit (WP2)  ☐ Reserve Peace Officer Permit (WP10)
☐ Correctional Officer Permit (WP9)

☐ New Application
☒ Renewal - Permit Number _178684_

Firearms Safety Training Certification Number or Peace Officer Certification Date _See your file_

**Attach copy of WP0 Firearms Safety Training Program Certificate of Completion (except certified peace officer)**

Name _Dorr_ (last)   _Paul_ (first)   _Robert_ (middle)   Phone # _(712) 758 - 3372_

Other Names Ever Used (aliases) _None_

Residence _579 2nd St._   _Ocheyedan_ (city)   _Iowa_ (state)   _51354_ (zip)

Social Security No. (optional) or DL # _509 WW 3353_   County of Residence _Osceola_

Birthdate _5 / 15 / 1956_   Age _48_   Sex _M_   Hgt _6'2"_   Wgt _300_   Hair _Br_   Eyes _Br_

### Authorization for Release - Weapon Permit Applications

I, _Paul R Dorr_, do hereby authorize a review and full disclosure of all records concerning myself, as required by Iowa Code chapter 724, to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court, as necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm, and shall not be disseminated for any other purpose.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry or acquire weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for providing accurate information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

I understand that I may be convicted of a class "D" felony pursuant to Iowa Code section 724.10 if I make a false statement of material fact on this application.

I understand the issuing officer is permitted to request my social security number (SSN) on this permit application pursuant to Iowa Code section 724.10 for permits to carry. I further understand that I am not required to provide it. The SSN, if provided voluntarily, may be used in the background investigation to assist in accurate identification. The permit application forms and the permits are public records, and if I provide my SSN, it will become part of that public record and may be disclosed upon request. I will be required to provide my driver license (DL) or Iowa ID number if I do not provide my SSN.

I understand that all information provided on this application is considered public record and may be disclosed upon request.

This "Signature On File" will be valid from this date and shall expire in one year.

Applicant Signature _Paul R Dorr_   Date _June 29 2004_
WP5  Rev. 12/2001

**All of the following questions must be answered:**

Yes No

☐ ☑ 1. Have you ever been convicted of a felony?

☐ ☑ 2. Have you ever been convicted of the misdemeanor crime of domestic abuse assault?

☐ ☑ 3. Have you ever been convicted of the misdemeanor crime of assault in violation of individual rights (hate crime)?

☐ ☑ 4. Have you ever been convicted of the misdemeanor crime of assault on a peace officer, fire fighter or health care provider?

☐ ☑ 5. Have you ever been convicted of the misdemeanor crime of setting a spring gun or trap?

☐ ☑ 6. Have you ever been convicted of the misdemeanor crime of hazing?

☐ ☑ 7. Have you ever been convicted of the misdemeanor crime of stalking?

☐ ☑ 8. Are you addicted to the use of alcohol or any controlled substance?

☐ ☑ 9. Do you have a history of repeated acts of violence?

☐ ☑ 10. Have you ever been adjudged mentally incompetent?

If you answered yes to any of the above, please explain: _____

_____

_____

☑ ☐ 11. Are you a citizen of the United States? If not, provide country of birth and alien registration number:

Country of birth: _____ Alien registration number: _____

## STATEMENT OF JUSTIFICATION
### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

This statement is to contain clear and convincing evidence that this applicant may be required to use deadly force to protect his/her life or the life of another. The issuing officer may accept or reject this application for a permit to carry based on this narrative and other considerations.

*Self-Defense*

_____

_____

_____

Applicant Signature _Paul R Jone_____ Date _June 29, 2004_

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____ Telephone _____

Employer Address _____

Employer Signature _____ Date _____

## ISSUING OFFICER
### MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY

Application: ☐ Approved ☐ Disapproved Date _____

Reason Disapproved: _____

_____

Signature _____ ☐ Sheriff of _____ County, Iowa

☐ New Fee $ _____ ☐ Renewal Fee $ _____ 
☐ Commissioner of the Iowa Department of Public Safety
☐ Peace Officer/Correctional Officer - No Fee

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS

### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

☐ Professional Permit (WP1)  ☐ Peace Officer Permit (WP7)
☒ Nonprofessional Permit (WP2)  ☐ Reserve Peace Officer Permit (WP10)
  ☐ Correctional Officer Permit (WP9)

☒ New Application
☐ Renewal – Permit Number _____

Firearms Safety Training Certification Number or Peace Officer Certification Date _____

**Attach copy of WP0 Firearms Safety Training Program Certificate of Completion (except certified peace officer)**

Name _Dorr_ _Paul_ _Robert_  Phone # (_712_) _758_ - _3372_
　　(last)　　　　(first)　　　　(middle)

Other Names Ever Used (aliases) _____

Residence _579 2nd St._ _Ocheyedan_ _Iowa_ _51354_
　　　　(street)　　　　(city)　　　　(state)　　(zip)

Social Security No. _482_ - _76_ - _4042_  County of Residence _Osceola_

Birthdate _5_ / _15_ / _56_  Age _41_  Sex _M_  Hgt _6'2"_  Wgt _290_  Hair _Br_  Eyes _Br_

### Authorization for Release - Weapon Permit Applications

I, _Paul R. Dorr_ _____, do hereby authorize a review and full disclosure of all records concerning myself to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of medical and psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court; criminal court actions; and any other records necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for giving this information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that a person who gives a false name or presents false identification, or otherwise knowingly gives false material information to one from whom the person seeks to acquire a pistol or revolver, commits a class "D" felony. (724.21)

I understand that a person who knowingly makes false statement of material fact on an application for permit to carry weapons commits a class "D" felony. (724.10)

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

Applicant Signature _Paul R. Dorr_  Date _2/1/98_
CFN 595-1162  WP5  Rev. 12/97

**All of the following questions must be answered:**

Yes No
1. Have you ever been convicted of a felony? [ ] [x]
2. Have you ever been convicted of an assault? [ ] [x]
3. Are you addicted to the use of alcohol or any controlled substance? [ ] [x]
4. Do you have a history of repeated acts of violence? [ ] [x]
5. Have you ever been adjudged mentally incompetent? [ ] [x]
6. Do you have a history of mental illness? [ ] [x]
7. Have you ever been convicted of a crime involving the use of a weapon? [ ] [x]
8. Have you ever been convicted of terrorism, harassment or stalking? [ ] [x]
9. Have you ever had a permit to carry or a permit to acquire weapons denied or revoked? [ ] [x]
10. Have you ever been convicted of a misdemeanor crime of domestic violence? . [ ] [x]
11. Are you currently the subject of a court restraining order? [ ] [x]
12. Have you ever had a permit to carry or a permit to acquire weapons denied or revoked? [x] [ ]
13. Are you a citizen of the United States? [x] [ ]
14. Have you been dishonorably discharged from the Armed Forces? [ ] [x]
15. Do you have any criminal charges pending against you? [ ] [x]

*my life and that of my family and that of my neighbors as well.*

## STATEMENT OF JUSTIFICATION
### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

This statement is to contain clear and convincing evidence that this applicant may be required to use deadly force to protect his/her life or the life of another. The issuing officer may accept or reject this application for a permit to carry or a permit to carry based on this narrative and other considerations.

As a nation turns from God and His Law (10 Commandments) and does more and more, "that which is right in their own eyes" respect for authority is lessened and the volume of criminal disregard for property and life increases. The level of violence against persons has reached a level that I believe it now necessary to carry a weapon to protect

Applicant Signature _Paul K Dorr_     Date _2/1/98_

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____ Telephone _____

Employer Address _____

Employer Signature _____ Date _____

## ISSUING OFFICER
### MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY

Application: [ ] Approved    [ ] Disapproved    Date _____

Reason Disapproved: _____

Signature _E O Hartman X_ _____
[ ] Sheriff of _____ County, Iowa
[ ] Commissioner of the Iowa Department of Public Safety
[ ] New Fee $ _____ [ ] Renewal Fee $ _____ [ ] Peace Officer/Correctional Officer - No Fee

APP 181

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS

TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

- [ ] Professional Permit (WP1)
- [x] Nonprofessional Permit (WP2)
- [ ] Peace Officer Permit (WP7)
- [ ] Reserve Peace Officer Permit (WP10)
- [ ] Correctional Officer Permit (WP9)

- [ ] New Application
- [x] Renewal - Permit Number _OSPO-3H6 (2006)_

Firearms Safety Training Certification Number or Peace Officer Certification Date _____

**Attach copy of WP0 Firearms Safety Training Program Certificate of Completion (except certified peace officer)**

Name _Dorr_ (last) _Paul_ (first) _Robert_ (middle)    Phone # ( _712_ ) _758_ - _3372_

Other Names Ever Used (aliases) _None_

Residence _579 2nd Street_ _Ocheyedan_ (city) _Iowa_ (state) _51354_ (zip)

Driver License or Non-Operator ID# _509 WW3353_ County of Residence _Osceola_

Birthdate _5 / 15 / 1956_ Age _51_ Sex _M_ Hgt _6'1½"_ Wgt _320_ Hair _Br_ Eyes _Br_

### Authorization for Release - Weapon Permit Applications

I, _Paul R. Dorr_, do hereby authorize a review and full disclosure of all records concerning myself, as required by Iowa Code chapter 724, to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court, as necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm, and shall not be disseminated for any other purpose.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry or acquire weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for providing accurate information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

I understand that I may be convicted of a class "D" felony pursuant to Iowa Code section 724.10 if I make a false statement of material fact on this application.

I understand that all information provided on this application is considered public record and may be disclosed upon request.

_This "Signature On File" will be valid from this date and shall expire in one year._

Applicant Signature _Paul R Dorr_     Date _July 7, 2007_
WP5 Rev. 09/2005

APP 182

**All of the following questions must be answered:**

Yes No
- [ ] [x] 1. Have you ever been convicted of a felony?
- [ ] [x] 2. Have you ever been convicted of the misdemeanor crime of domestic abuse assault?
- [ ] [x] 3. Have you ever been convicted of the misdemeanor crime of assault in violation of individual rights (hate crime)?
- [ ] [x] 4. Have you ever been convicted of the misdemeanor crime of assault on a peace officer, jailer, correctional officer, fire fighter or health care provider?
- [ ] [x] 5. Have you ever been convicted of the misdemeanor crime of setting a spring gun or trap?
- [ ] [x] 6. Have you ever been convicted of the misdemeanor crime of hazing?
- [ ] [x] 7. Have you ever been convicted of the misdemeanor crime of stalking?
- [ ] [x] 8. Are you addicted to the use of alcohol or any controlled substance?
- [ ] [x] 9. Do you have a history of repeated acts of violence?
- [ ] [x] 10. Have you ever been adjudged mentally incompetent?

If you answered yes to any of the above, please explain: _____

- [x] [ ] 11. Are you a citizen of the United States? If not, provide country of citizenship and alien registration number (ARN):

Country of citizenship: _____ Alien registration number: _____

## STATEMENT OF JUSTIFICATION
**TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT**

_Occasionally carry large amounts of cash. Self-defense_

Applicant Signature _Paul R Jorr II_    Date _July 7, 2007_

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____ Telephone _____

Employer Address _____

Employer Signature _____ Date _____

## ISSUING OFFICER
**MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY**

Application: [ ] Approved [x] Disapproved   Date _08-09-07_

Reason Disapproved: _Concerns from Public. Don't trust Remi._

APP 183

*taking class at will*
*— will call w/ date*

# STATE OF IOWA

## APPLICATION FOR PERMIT TO CARRY WEAPONS

### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

- [ ] Professional Permit (WP1)
- [x] Nonprofessional Permit (WP2)
- [ ] Peace Officer Permit (WP7)
- [ ] Reserve Peace Officer Permit (WP10)
- [ ] Correctional Officer Permit (WP9)

- [x] New Application
- [ ] Renewal - Permit Number _____

Firearms Safety Training Certification Number or Peace Officer Certification Date _____

**Attach copy of WP0 Firearms Safety Training Program Certificate of Completion (except certified peace officer)**

Name _Parr_ (last)  _Alexander_ (first)  _Lee_ (middle)  Phone # _(712) 758-3372_

Other Names Ever Used (aliases) _____

Residence _579 2nd St_  _Ocheyedan_ (city)  _IA_ (state)  _51354_ (zip)

Driver License or Non-Operator ID# _851 AA5772_  County of Residence _Osceola_

Birthdate _01 / 10 / 90_  Age _17_  Sex _M_  Hgt _6'2"_  Wgt _215_  Hair _Blk_  Eyes _Green_

### Authorization for Release - Weapon Permit Applications

I, _Alexander Lee Parr_, do hereby authorize a review and full disclosure of all records concerning myself, as required by Iowa Code chapter 724, to any duly authorized agent of an Iowa sheriff or the Commissioner of the Iowa Department of Public Safety, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of psychiatric treatment, substance abuse treatment, consultation and/or court ordered involuntary hospitalization including hospitals, clinics, private practitioners, the U.S. Veteran's Administration and clerks of court, as necessary to verify that I meet the requirements of the state of Iowa and the United States for the acquisition and possession of a firearm, and shall not be disseminated for any other purpose.

I understand that any information obtained which is developed directly or indirectly, in whole or part, upon this release authorization will be considered in determining my suitability for obtaining a permit to carry or acquire weapons in the state of Iowa. I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for providing accurate information, and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information.

I understand that the information contained in these records will be used for no purpose other than those stated above, and will be kept strictly confidential by the office of the issuing official.

I understand that I may be convicted of a class "D" felony pursuant to Iowa Code section 724.10 if I make a false statement of material fact on this application.

I understand that all information provided on this application is considered public record and may be disclosed upon request.

*This "Signature On File" will be valid from this date and shall expire in one year.*

Applicant Signature _Alex Parr_    Date _12/06/07_
WP5  Rev. 02/2003

3

APP 184

**All of the following questions must be answered:**

| Yes | No | |
|---|---|---|
| ☐ | ☒ | 1. Have you ever been convicted of a felony? |
| ☐ | ☒ | 2. Have you ever been convicted of the misdemeanor crime of domestic abuse assault? |
| ☐ | ☒ | 3. Have you ever been convicted of the misdemeanor crime of assault in violation of individual rights (hate crime)? |
| ☐ | ☒ | 4. Have you ever been convicted of the misdemeanor crime of assault on a peace officer, jailer, correctional officer, fire fighter or health care provider? |
| ☐ | ☒ | 5. Have you ever been convicted of the misdemeanor crime of setting a spring gun or trap? |
| ☐ | ☒ | 6. Have you ever been convicted of the misdemeanor crime of hazing? |
| ☐ | ☒ | 7. Have you ever been convicted of the misdemeanor crime of stalking? |
| ☐ | ☒ | 8. Are you addicted to the use of alcohol or any controlled substance? |
| ☐ | ☒ | 9. Do you have a history of repeated acts of violence? |
| ☐ | ☒ | 10. Have you ever been adjudged mentally incompetent? |

If you answered yes to any of the above, please explain: _____

_____

_____

| ☒ | ☐ | 11. Are you a citizen of the United States? If not, provide country of citizenship and alien registration number: Country of citizenship: _____ Alien registration number: _____ |

## STATEMENT OF JUSTIFICATION
### TYPE OR PRINT IN INK - MUST BE COMPLETED BY APPLICANT

This statement is to contain clear and convincing evidence that this applicant may be required to use deadly force to protect his/her life or the life of another. The issuing officer may accept or reject this application for a permit to carry based on this narrative and other considerations.

_I carry large amounts of cash and there have been death threats to our household. I also wish to use this for hunting. Also to use for all legal purposes._

Applicant Signature _Alf Dank_          Date _12/06/07_

## EMPLOYER AUTHORIZATION

This section is to be completed by the employer of an applicant for a professional permit to carry weapons. This authorization affirms the above described justification for issuance as being an employment requirement.

Employer Name _____          Telephone _____

Employer Address _____

Employer Signature _____          Date _____

## ISSUING OFFICER
### MUST BE COMPLETED BY SHERIFF OR COMMISSIONER OF PUBLIC SAFETY

Application: ☐ Approved  ☒ Disapproved          Date _02-24-08_

Reason Disapproved: _Subject under 21 years of age_

Signature _Dr. As R Weber_   ☒ Sheriff of _Blank_ County, Iowa
                             ☐ Commissioner of the Iowa Department of Public Safety
☐ New Fee $ _____   ☐ Renewal Fee $ _____   ☐ Peace Officer/Correctional Officer - No Fee

APP 185