```
                    📄 COPY                                    1

 1         IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF IOWA
 2                   WESTERN DIVISION

 3      PAUL DORR and              )       No.
        ALEXANDER DORR,            )   5:08-cv-040903-MWB
 4      Individually and On        )
        Behalf of All Other        )
 5      Persons Similarly          )
        Situated,                  )
 6                                 )
              Plaintiffs,          )
 7                                 )
        vs.                        )
 8                                 )
        DOUGLAS L. WEBER,          )
 9      Individually and In        )
        His Capacity as            )
10      Sheriff, and His           )
        Successors, THE            )
11      OSCEOLA COUNTY             )
        SHERIFFS DEPARTMENT,       )
12      IOWA, and OSCEOLA          )
        COUNTY, IOWA,              )
13                                 )
              Defendants.          )
14                    *   *   *   *

15      Telephonic Deposition of PAUL DORR, the
        deponent herein, taken on behalf of the
16      defendants herein, at 4280 Sergeant Road, Suite
        290, Sioux City, Iowa, on Wednesday, January
17      13, 2010 at 10:03 a.m., before Norine F.
        Kennedy, Certified Shorthand Reporter in and
18      for the State of Iowa, of Kennedy & Kennedy,
        Certified Court Reporters, 308 24th Street,
19      Sioux City, Iowa.

20      APPEARANCES:

21      MR. VINCENT J. FAHNLANDER
        Attorney at Law, of
22      Mohrman & Kaardal P.A.
        33 South Sixth Street
23      Suite 4100
        Minneapolis, Minnesota   55402
24
              Appearing on behalf of the Plaintiffs;
25
```

```
 1   APPEARANCES:  (Continued)

 2   MR. DOUGLAS PHILLIPS
     Attorney At Law, of
 3   Klass Law Firm
     4280 Sergeant Road
 4   Suite 290
     Sioux City, Iowa 51106
 5
          Appearing on behalf of the Defendants.
 6
                    *    *    *    *
 7   Also Present:  Alexander Dorr
                    *    *    *    *
 8   Reported by Norine F. Kennedy, CSR, CP, RPR
                    *    *    *    *
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X
 2
     Caption of Case------------------------------ 1
 3
     Appearances--------------------------------- 1
 4
     Index--------------------------------------- 3
 5
     Stipulation--------------------------------- 5
 6
     TESTIMONY
 7
     PAUL DORR
 8
     Examination by Mr. Phillips---------------  7
 9
     End of Deposition at 10:47 a.m., 1-13-10-- 35
10
     Certificate of Reporter-------------------- 36
11
                     *     *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

MR. FAHNLANDER: This is Vince Fahnlander.

MR. PHILLIPS: Hi, Vince. Doug Phillips.

MR. FAHNLANDER: Hi, Doug.

PAUL DORR: And this is Paul, I'm here, and Alex must have hit the wrong pin number. He's dialing again right now.

MR. FAHNLANDER: Say Doug?

MR. PHILLIPS: Yes.

MR. FAHNLANDER: We had talked about a stipulation to extend the scheduling order dates and especially discovery.

MR. PHILLIPS: Yeah. I will get you something this afternoon.

MR. FAHNLANDER: And I haven't seen anything like that. Have you prepared it?

MR. PHILLIPS: No. I will get you something this afternoon.

MR. FAHNLANDER: Okay. Do you have any concerns about going forward with the depositions without that?

MR. PHILLIPS: Not as long as you and I agree that we can.

MR. FAHNLANDER: Okay.

**Page 5**

MR. PHILLIPS: Do you agree?

MR. FAHNLANDER: Yeah. Yeah, I guess. I had thought that you were quite concerned with the dates, you know, or with having the stipulation or a motion in place before we do any more discovery.

MR. PHILLIPS: I was, but I had trials at the end of December and the beginning of January and as a result couldn't get the stipulation done and to you for review.

MR. FAHNLANDER: Okay. All right. Well, you know, that's fine. I'm willing to go ahead.

MR. PHILLIPS: I appreciate that. Will you also stipulate that for purposes of these two depositions, the continuation of Paul Dorr's deposition and the deposition of Alexander Dorr that our court reporter can be here in Sioux City with me and can still swear the witness in who is somewhere else?

MR. FAHNLANDER: That's fine.

MR. PHILLIPS: Thank you.

MR. FAHNLANDER: I assume you don't have any objection to both Paul and Alex being in the room since they are both parties to

**Page 6**

the -- to this lawsuit?

MR. PHILLIPS: I have no objection. I believe since they are parties that they have a right to attend one another's depositions.

MR. FAHNLANDER: Okay.

MR. PHILLIPS: Just so we're clear, where are the plaintiffs?

PAUL DORR: We're -- We are both -- Alex, you're on now; correct?

ALEXANDER DORR: I am.

PAUL DORR: Okay. We are both in Ocheyedan, Iowa.

MR. PHILLIPS: In different places?

PAUL DORR: No. We're in the same room -- in the same -- my office.

MR. PHILLIPS: Okay. What is that address?

PAUL DORR: 632 Poplar Street.

MR. PHILLIPS: And Vince, you're in Minneapolis in your office?

MR. FAHNLANDER: Yes, 33 South Sixth Street, Suite 4100, Minneapolis 55402.

MR. PHILLIPS: Okay. And this is Doug Phillips, and I'm in my office in Sioux City, 4280 Sergeant Road, Suite 290. So now we

**Page 7**

know where everybody's at. Unless someone has a different idea, I thought I would reconvene the Paul Dorr deposition. I expect that to be a very short deposition, and then we can move to Alexander Dorr. Is that okay?

MR. FAHNLANDER: Yeah, that's fine. We may want to take a, you know, a five minute break between the two depositions or something, but other than that, that's fine.

MR. PHILLIPS: Okay. We'll take as much of a break as anybody wants to take. At this time I will ask our reporter Norine Kennedy to swear in Mr. Paul Dorr.

PAUL DORR
being first duly sworn, testified as follows:

E X A M I N A T I O N

BY MR. PHILLIPS:

Q. Mr. Dorr, this is Doug Phillips. Obviously we're doing this by telephone, and so I want to repeat some of the things that I told you during your first deposition just to emphasize them. It's very important since we're on the phone to make sure that I'm finished before you start, and conversely for me to make sure you're finished before I start.

**Page 8**

1 If at any time you don't hear me or don't
2 understand me, please speak up and say so and
3 let's just try to go slow and we'll get through
4 this okay. Is that all right?
5   A. That's fine. If I'm not understanding,
6 am I free to interrupt you and tell you that or
7 should I wait until you're done?
8   Q. It would be better to wait until I'm
9 done because at least I'm using a speaker
10 phone, and if you interrupt me, I'm not sure
11 what will happen. I think what will happen is
12 you won't hear me and I won't hear you, so --
13   A. That makes sense. All right.
14   Q. Yeah, the best -- the best plan might be
15 to just wait till I'm finished and then tell
16 me, I don't have any idea what you're talking
17 about. Could you repeat that?
18   A. Okay. Sounds fine.
19   Q. All right. Would you state your name
20 for the record again.
21   A. Paul Robert Dorr.
22   Q. And Mr. Dorr, the reason we are
23 reconvening your deposition is because you have
24 amended your complaint to state a claim under
25 the First Amendment. My questions for you

**Page 9**

1 today will relate to that claim.
2   A. Okay.
3   Q. Are you familiar with that claim?
4   A. Yes.
5   Q. To your knowledge, how long has the
6 Osceola County -- is it Taxpayers Association?
7   A. That is correct.
8   Q. If I call it OCTA, will you know what
9 I'm talking about?
10   A. That will be the Osceola County
11 Taxpayers Association, correct.
12   Q. How long has OCTA existed, to your
13 knowledge?
14   A. To my knowledge, I -- I really don't
15 have knowledge of it. I'm thinking it's
16 sometime back in the 1980s that it was formed.
17   Q. Let me ask you this. To your knowledge
18 how long has it been active in Osceola County?
19   A. It's been active kind of cyclically.
20 Sometimes in the '80s and '90s it was; then
21 sometimes it kind of goes -- it went silent for
22 a few years, and then it kind of -- it picked
23 it up again. But at least once a year, to my
24 knowledge, members of it would testify in front
25 of the Public Safety Commission or the

**Page 10**

1 supervisors regarding -- raising questions
2 regarding the size of the budgets and the
3 taxations and so forth.
4   Q. What is the last issue you recall them
5 being involved in in a public forum?
6   A. Most recently in -- Last being prior
7 to -- to the injury done to me or just most
8 recently?
9   Q. Most recently, meaning when's the last
10 time they were getting any press?
11   A. Okay. They were -- The president Kevin
12 Wolfswinkel made a public statement at a rather
13 crowded room of the Osceola County Compensation
14 Board. I believe that was toward the last week
15 in November of 2009.
16   Q. What was the nature of Mr. Wolfswinkel's
17 comment?
18   A. At that time as I recall he read a
19 statement that in light of the declining
20 economy, in light of the Compensation Board and
21 the supervisors ignoring the OCTA's advice from
22 a year ago to freeze the county wages, he said
23 in light of the massive layoffs going on around
24 our county that he asked the -- the Osceola
25 taxpayers -- excuse me -- the Compensation

**Page 11**

1 Board, the Osceola County Compensation Board to
2 make recommendations to the supervisors to
3 reduce some of the -- the salaries of the
4 elected officials. That was -- That was the --
5 the summary of it. There was more context to
6 it, but his primary issue was asking them to
7 now reduce the elected officials' wages.
8   Q. Has the Osceola County Compensation
9 Board made its recommendation yet for the
10 upcoming fiscal year?
11   A. My understanding from the press accounts
12 is that they have.
13   Q. Do you know what that recommendation is?
14   A. The recommendation was basically what
15 OCTA suggested last year, and that was to
16 freeze all the elected salaries save one, and
17 that was the sheriff's. And that was -- From
18 press accounts that was raised I believe by
19 three and a quarter percent. And that
20 recommendation was made to the supervisors and
21 according to press accounts the supervisors did
22 approve it.
23   Q. Were those recommendations by the
24 Compensation Board controversial?
25   A. Yes.

**Page 12**

1  Q. Describe the discussion at the
2  compensation board meeting. Were you there?
3  A. Yes, I was.
4  Q. Describe the discussion from your
5  perspective.
6  A. What I witnessed was statements made by
7  Mr. Wolfswinkel questioning the -- the County's
8  decisions from the year before. There was also
9  Sheriff Weber challenged Mr. Wolfswinkel, but
10 he didn't have his data accurate. And then
11 later amongst the board members of the
12 compensation board there was some question
13 discussed amongst them regarding the -- let me
14 see, try to -- the -- the County's contract,
15 employment contract with the sheriff's -- the
16 deputies, and how it would drive the sheriff's
17 pay raise or not. That was a vigorous
18 discussion amongst several of the compensation
19 board members themselves.
20 Q. All right. There's a collective
21 bargaining agreement for the deputies?
22 A. That's the word I'm looking for, thank
23 you. Yes.
24 Q. Was the concern that -- Well, let me ask
25 you this. To your knowledge is that collective

**Page 13**

1  bargaining agreement a multi-year agreement?
2  A. To my knowledge. I haven't read it, but
3  I've -- I -- I've looked at excerpts of it, but
4  I assume that it is, based on press accounts.
5  Q. All right. As far as you know, are the
6  deputies in line for a raise?
7  A. As far as I know, yes.
8  Q. Was the concern that if they get a raise
9  it would narrow the gap between what deputies
10 make and what a sheriff makes?
11 A. Right.
12 Q. And was that debated or controversial?
13 A. Yes.
14 Q. Do you know who the current officers of
15 OCTA are? You told me Mr. Wolfswinkel was
16 president.
17 A. Yeah. I think we reviewed them at the
18 last depositions. They would be, Ed Wheeler is
19 the -- is the treasurer. The secretary is
20 Rochelle Buckman, Carl Berkenpas, George
21 Braaksma, and I may be missing one, and then
22 Kevin Wolfswinkel.
23 Q. What was George's last name?
24 A. Braaksma.
25 Q. Any idea how to spell that?

**Page 14**

1  A. B-r-a-a-k-s-m-a.
2  Q. Thank you. Do you know, other than
3  these people whose names you've just given me,
4  other -- others who are members of OCTA?
5  A. I'm not an officer or a director of, so
6  I don't have access to the membership roles.
7  Q. Are you a member? You may have just
8  told me that.
9  A. No, I'm not officially. I'm just a
10 hired employee and researcher for them.
11 Q. Have you ever been a member?
12 A. No.
13 Q. Do you know if any officer, director or
14 member of OCTA has ever been denied a concealed
15 carry permit?
16 A. I have no knowledge if anyone has been
17 denied, no.
18 Q. Can you give me the name of any officer,
19 director or member of OCTA that's ever applied
20 for a concealed carry permit?
21 A. I understand that the president Kevin
22 Wolfswinkel has.
23 Q. Do you know the outcome of that
24 application?
25 A. Based on Sheriff Weber's testimony at

**Page 15**

1  the last deposition, he granted it to him.
2  Q. Has your relationship with OCTA always
3  been through Copperhead?
4  A. Yes.
5  Q. When did Copperhead first enter into a
6  consulting relationship with OCTA?
7  A. February of 2007. It may have been the
8  last week in January, but sometime end of
9  January, first of February of 2007.
10 Q. Are there any documents that memorialize
11 that relationship?
12 A. I believe the secretary may have kept
13 minutes of them agreeing to employ me, but
14 they -- they moved on it, and -- and acted, you
15 know, to do that. Many of my contracts are
16 just oral.
17 Q. So in your relationship --
18 A. In this case there was no -- there was
19 no written employment agreement but it was when
20 I met with them, they asked what services I
21 could provide. I spelled it out, we agreed on
22 a fee, and then they discussed amongst
23 themselves and voted to go ahead and retain me.
24 Q. And has that retainer continued up to
25 today?

**Page 16**

1  A.  It continues in bits and pieces.
2  They'll do project pricing. They'll say, We
3  want to do this or that, or can you cover this
4  or that, and we'll agree on a fee and then
5  they'll then compensate me.
6  Q.  Has there ever been a written contract
7  or a letter of understanding since you first
8  started working with them in January or
9  February of 2007?
10  A.  No.
11  Q.  What services have you provided for
12  them? And I understand that it's consulting
13  services, but I'm looking for the specifics.
14  A.  Yes. I've researched county budgets,
15  I've researched comparative salaries, I've
16  written -- did analysis of counties -- of
17  budgets from various perspectives, compared to
18  other counties, compared to per capita and so
19  forth. I have written political tracts for
20  them, I've written brochures, membership
21  recruitment pamphlets where they would spell
22  out the concerns they had and encourage people
23  to join them. I'm trying to try -- Oh, they've
24  asked me to -- to maintain their web site
25  subject to their -- their approval. I'm sure

**Page 17**

1  I'm not recalling everything, but that's the
2  general nature.
3  Q.  How much do you charge them for your
4  services?
5  A.  Oh, initially I think it was 2,500, and
6  then since then it's -- it's in two and five
7  hundred dollar segments. I would have to look
8  at my records to see what the total has been.
9  I would imagine it hasn't been over 4,000, but
10  again I'd have to -- I'd have to go back to my
11  records and confirm that.
12  Q.  Do you have copies of the things that
13  you just described that you have done for them
14  since 2007?
15  A.  I should have most of them, yes.
16  Q.  Are there any documents that show when
17  you provided these services?
18  A.  I -- Really I guess the -- No. I don't
19  know. I mean, we could go back and kind of
20  figure when the issue was being debated and
21  discussed and so forth, but I can't -- I
22  could -- Some of the documents by inference may
23  tie back to an event that they were -- that
24  they were publicly active in. I could probably
25  kind rebuild it and figure out what it was.

**Page 18**

1  Q.  Can you tell me from your memory what
2  issues you addressed or what events you were
3  involved in?
4  A.  Well, the various compensation board
5  meetings, researching comparable salaries of
6  various counties and so forth -- various
7  counties and so forth for them, as far as total
8  budgets, et cetera. We did an initial brochure
9  comparing the county's expenditures compared to
10  other counties in a per capita basis and then
11  we helped distribute that around the county. I
12  asked and had some of my sons including Alex
13  that would hand leaflets outside of the factory
14  and different places around the county. So we
15  distributed a pamphlet kind of introducing the
16  county to the scope of the problem that we have
17  in county government here.
18  Q.  Let me interrupt you. What is the
19  problem?
20  A.  Well, I'll speak from what I've seen. I
21  won't speak officially from the OCTA
22  perspective. But from what I'm seen is we're
23  too small of a county and they -- they think
24  they can spend like a big county, and they
25  don't -- they don't look for areas to

**Page 19**

1  streamline efficiencies and keep our county
2  spending in proportion to our tiny size. One
3  illustration would be the county attorney which
4  is his salary as a full time county attorney in
5  one of the six smallest counties of the state,
6  and as we compared to a whole bracket of
7  counties our size, we found none of them had a
8  full time county attorney. And then when we
9  were made aware that the county supervisors
10  initially told the county attorney not to enter
11  into an agreement to also work in O'Brien
12  County while he had a full time status here in
13  Osceola County, getting a full time salary, and
14  he ignored them and went ahead and did that.
15  That was one of the first areas the OCTA asked
16  me to investigate and research was to -- to see
17  how the county attorney's overall compensation
18  between the two counties compares to other
19  county attorneys. I did do an active research
20  and survey of 11 county attorneys in Iowa, and
21  we came up with some data showing that in our
22  small county he's significantly overpaid.
23       And so the -- the problem is from
24  my perspective that the -- again the county is
25  too small to be spending at the levels that

**Page 20**

they are, presuming that -- and they're not looking for any ways to streamline efficiency.

Q. When is the last time there was an election that included county officials in Osceola?

A. I would assume November of 2008.

Q. Did the county attorney -- Who is the county attorney?

A. Bob Hansen.

Q. Did Mr. Hansen run for re-election in '08?

A. You know, honestly I don't recall. If he did, it was -- it was uncontested.

Q. What about the -- the supervisors, were they on the ballot in '08?

A. Some of them were.

Q. To your recollection, were any of them who sought re-election defeated?

A. Some who sought re-election were defeated in the primaries, but in the general election all those who won their primaries in the Republican party won their seats.

Q. Has this issue of being a little county but spending like a big one, has that been controversial in Osceola County?

**Page 21**

A. Well, you know, I don't know how to answer that question. It's controversial in many people's minds.

Q. What other -- What -- In what forums has this issue been discussed?

A. Before I was employed, the OCTA was raising several questions that the county sheriff -- the Public Safety Committee was overseeing the budget for the sheriff's office. And I was watching that in the paper for two or three, four years before I was ever hired.

Q. Tell me about that issue.

A. Well, I -- I wasn't a party to it, but what I recall from the media was that the OCTA was raising questions about the compensation, the salaries, so forth of the sheriff's department in light of our small size.

One of the projects I did do partially but they didn't have enough funds to complete it was a couple years ago we did a salaries survey of deputies in counties in northwest Iowa and with probably two or three counties that we didn't get in touch with and we never published it, but we did find at the time that their employment contract had our

**Page 22**

chief deputies' base pay higher than all the rest of the chief deputies in northwest Iowa. That -- That research hadn't been completed and therefore it was never published. But what the OCTA was suspicioning from the initial research was demonstrated to be true, looking at the base salary and compensation packages of most of the northwest Iowa counties.

Q. Do you know what union the deputies belong to?

A. I think it's the Iowa Affiliated American -- What is it? AFSCME, Federal, State, Municipal -- Community, Municipal Employees Union.

Q. Do you know who bargained -- excuse me -- who bargained that contract for the county?

A. I -- I -- I understood who was going to. If he actually sought through or not, I don't know. I assume he did, but Preston DeBoer.

Q. He would have been for the union; right?

A. Excuse me, yes. Maybe I misunderstood your question.

Q. Who was on the other side of the table?

A. Oh, I would assume that the county

**Page 23**

supervisors' representative in that would be Bob Hansen, the county attorney. Who actually did it, I honestly don't know.

Q. Okay. So you've talked about discussions regarding salaries or wages in the sheriff's department, you've talked about this notion of a little county acting like it's a big county when it comes to spending money. Are there other controversial issues in which Copperhead has been involved?

A. Some of the research that they had me do a year ago was that -- was kind of an evolving project, but they started looking and realizing that in fact we had -- the supervisors themselves were overpaid, and we did some active research on that and looked at the salaries of comparable counties and the number of supervisors that comparable counties had. And we found that almost all of the counties in the 7,500 population, five counties above that in size and five counties below that in size, that I think all of them maybe save one had only had three supervisors, and then also a county had five, and that their wages were very competitive with -- with some of the most

**Page 24**

1 highest ranking ones who had three supervisors.
2 So the questions began to raise a year, year
3 and a half ago is -- Well, the one, that the
4 supervisors can't control the budget because
5 they're some of the ones that are the most
6 overpaid of all. So it has been a very strong
7 point of contention by the OCTA in the last
8 year, year and a half.
9  Q.  What other similar issues has OCTA been
10 involved with where you have consulted?
11  A.  I'm just -- I'm trying to go back in
12 memory for the last couple two, three years,
13 and right now that's all I can recall.
14  Q.  Is it your contention that Sheriff Weber
15 denied your concealed carry permit at least in
16 part because of your affiliation with OCTA?
17  A.  Yes.
18  Q.  Why do you think that?
19  A.  Because there had been no incident, no
20 activity, nothing relative to the use of a
21 firearm any time prior to this. He had -- He
22 had issued me permits previously. And then in
23 '07 when I started working for the OCTA, I
24 started receiving letters and communications
25 from Dan DeKoter defending the sheriff's budget

**Page 25**

1 and the county attorney's budget and basically
2 legally threatening me and my client.
3 Initially Mr. DeKoter thought my client was a
4 member or two of the board of supervisors. And
5 I didn't reveal to him because I had no duty to
6 do that. He was just a private citizen. But
7 Mr. DeKoter rapidly made the whole issue rather
8 contentious within the community and then
9 started going into the newspapers attacking me.
10 So this is all stirring through 2007. And so
11 then from the time, the end of July, early
12 August 2007 when my permit was up for renewal
13 and I called the sheriff and he said, I want to
14 talk to you about it this time, you need to
15 stop in, I strongly suspicioned -- Because
16 there was no -- nothing else that had changed,
17 I strongly suspicioned that -- that my working
18 for the OCTA was -- was driving this meeting to
19 come in there. And it's why in fact I carried
20 my digital recorder into the meeting. And
21 later now in depositions he's kind of affirmed
22 what I suspicioned. And in that meeting, if
23 you've had a chance to look at his video, I
24 asked him if he had any evidence of anything
25 that I said that may have prompted this false

**Page 26**

1 accusation of fear, and he said no. So in my
2 mind I'm sitting here thinking, He's got
3 unnamed accusers and they have -- by his own
4 admission they have no evidence. And at that
5 point I asked him, Is this personal? And he
6 naturally denied it. But I -- I had reached
7 the conclusion in my mind then he's punishing
8 me for simply helping the OCTA exercise their
9 free speech.
10  Q.  Did he say anything -- I'm sorry. Go
11 ahead.
12  A.  And -- and my own free speech. At some
13 point -- I'll have to go back to the '07
14 letters to the editor, but at some point
15 Mr. DeKoter started attacking me personally in
16 the papers for my involvement with them, and so
17 I had to, you know, defend my character and
18 reputation. So then I went in the papers and
19 defended myself and made most of Mr. DeKoter's
20 arguments look, I believe, rather foolish. But
21 it was at that moment that -- in the midst of
22 that controversy that I was then denied my
23 permit.
24  Q.  Is there some connection between
25 DeKoter's letters and the denial of your permit

**Page 27**

1 application?
2  A.  We don't know -- I don't know what the
3 connection was. He just seemed to have privy
4 to a lot of the stuff that I was doing for OCTA
5 and the county, and that was one of the
6 questions that always was listed with the OCTA.
7 He's not the county's attorney, he's not
8 retained by the Public Safety Commission to
9 represent them. Why -- How is he getting all
10 this knowledge about what we're doing, and why
11 is he sticking his nose into this relationship?
12 So you know, what connection there is -- Well,
13 I think it's illustrated by July of 2008 where
14 Mr. DeKoter is sending me a letter stating he
15 represents the Public Safety Commission when in
16 fact he did not.
17  Q.  Were you ever able to answer those
18 questions raised by OCTA, namely, where's
19 DeKoter getting his information and why is he
20 involved in this?
21  A.  I did e-mail Mr. DeKoter at one time and
22 asked him a simple question, Are you the one
23 that went to Sheriff Weber and told him you
24 were afraid of me? He sent me a single line
25 response back stating, Please stop harassing

## Page 28

me. The implied assumption was that I had -- there's been a pattern of some sort of harassment. But I believe in Mr. DeKoter's mind that anybody questioning him in the paper and challenging his deceptions, to his mind that was harassment.

There had been no other communication with Mr. DeKoter on any of these issues in the county for 20 years or ever that I know of. And so when I asked him if he was the one that went to Sheriff Weber, he didn't answer the question. He just -- just implied that I was harassing him.

So no, we don't know of a connection, but his involvement in July of 2008 with his letters gave me strong suspicion that he was in fact having some ongoing communication with the sheriff.

Q. Did Sheriff Weber say anything in his conversation with you in his office that led you to believe he was denying your application because of your relationship with OCTA?

A. No, he did not.

Q. Did he -- What is it that he said in his deposition that makes you think this was a

## Page 29

factor in the decision to deny your application?

A. His response to my attorney's questions about OCT, my OCT involvement that summer, and he said yes, writing letters and putting pamphlets on cars and distributing handbills and so forth. I don't have the exact quote in front of me, but it was -- it was that and I think he had kind of affirmed it again a little bit later.

Q. In your first deposition you and I spent quite a bit of time on the question of how have you been harmed by all of this, what are your damages. I don't expect you to have memorized our discussion, but do you generally remember that we talked about that?

A. Yes.

Q. My question for you today is this, is there some separate item of damage or additional harm that we haven't already discussed that arises out of your belief that the denial was premised at least in part on your association with OCTA?

A. Yes. Until I sought legal counsel and sought redress of my grievance against the

## Page 30

sheriff, until -- and until the lawsuit was filed which I assume then that you would counsel him to not continue abridging my free speech rights, before that period from the time he denied me until that period, I was questioning much of what I was doing and assuming and looking at what else is he going to do to harm me if I write this or publish this or state that. So there was -- there was -- And I'd have to go back and look at some of the material, but I -- I -- as memory serves, there was some material that didn't get distributed because I was now frightful.

He then went on in April of 2008 when my wife applied, and she waited a couple weeks, and he said -- She called him up and he said, I would like to -- I'm not sure yet. I need a -- I need to contemplate on this. Give me 30 days. And my wife reported to me that she said to him, Well, is there something you're going to discover or understand or know in 30 days that you don't know now? Is there any questions I can answer for you that will help you make this decision? And he said, No. He said, I just need to -- I think the word was

## Page 31

meditate on this for 30 days.

And at that point she came to me and said, What's going on? I looked at the calender and I realized his primary election was up in 30 days. So I strongly suspicion then that he was punishing my wife and trying to silence me by dangling her permit out there until he got re-elected. I can't -- I don't know if that happened, but he had -- he had no reason, he gave her no reason, he wasn't doing any further investigation, he had no questions for her, nothing more than I just need 30 days to meditate on this. Normally my family gets those -- With me in the past, in a week's time it's done. He's done his background research and the permit is issued. So by April of 2008 we began to really suspicion that if I spoke out he was going to look for some kind of way to punish me.

Q. Your wife got her permit?

A. Yes, after some -- some communication back and forth. She withdrew her permit -- the application at that time because she was not going to be part of his gamesmanship, and then later reapplied in July of '08 and that's then

**32**

1  what elicited Mr. DeKoter's letter indicating
2  that all permits are going to be frozen --
3  suspended rather for a certain length of time
4  and that he would issue new criteria and so
5  forth. And then we questioned that and
6  challenged that and Mr. DeKoter responded. My
7  wife filed the application for a permit and the
8  first and only response we get is not from
9  Sheriff Weber but from Mr. DeKoter who is not
10 employed by the county in any capacity.
11       And then I exchanged letters with
12 Mr. Weber and a courtesy copy to Mr. DeKoter
13 through the month of July of '08, I believe it
14 was. And at that time Sheriff Weber realized
15 he really don't have -- Well, I don't know what
16 he realized. But at that time he then issued
17 my wife's permit.
18    Q. To use your word, has the sheriff
19 punished you in any way other than the timing
20 of issuing your wife's permit since that time?
21    A. Nothing that I recall at this time.
22    Q. Do you have copies of these documents
23 that were not published because of your concern
24 for what might happen if you did publish them?
25    A. I'll have to go back in the file and see

**33**

1  if I printed them and stuck them in there. I
2  know that several times there were letters to
3  the editor that I wanted to publish that I may
4  have drafted and then hit the delete key. I
5  don't know that I do, but I know that at the
6  time there was several things that I felt
7  needed a response but did not do. But I can
8  look through the file and see if I did print
9  and keep any of them, but it's doubtful.
10    Q. You referred to the file. What is the
11 file?
12    A. It's what I mentioned last time. I have
13 a Doug Weber file. It's just basically the
14 correspondence and the communication that have
15 existed in this matter. There's some letters
16 to the editor relative to this issue that were
17 stuck in there, but I know not near all of them
18 are in there.
19    Q. I asked you a few moments ago what made
20 you think Sheriff Weber considered your
21 association with OCTA in deciding to deny your
22 permit application. You've answered the
23 question. I want to make sure that there is
24 nothing else that you believe supports that
25 contention.

**34**

1  A. Well, it -- His affirmation in the
2  depositions, the prior depositions, is -- is
3  what is the additional, I guess, item that --
4  that I -- that I can recall at this time. And
5  you know, I -- I'd have to rethink, not -- not
6  having time to ponder on this question. As far
7  as I know at this time that's all that I can
8  recall, but I would -- I would -- again, his
9  affirmation during the deposition seemed to
10 confirm it in my mind.
11    Q. Okay. Let me state it one more way just
12 to make sure that we're communicating. Have
13 you told me everything you can remember as you
14 sit here today about why you think your
15 association with OCTA was a factor in the
16 decision to deny the permit?
17    A. Yes, sir.
18       MR. PHILLIPS: I don't think I have
19 any other questions for you.
20       THE WITNESS: Okay.
21       MR. PHILLIPS: Vince, do you want
22 to take a short break?
23       MR. FAHNLANDER: Yeah, let's take a
24 little break.
25       MR. PHILLIPS: How do we do this?

**35**

1  Do I just leave the phone connection open or do
2  I call in in a few minutes?
3        MR. FAHNLANDER: I think we can
4  call -- we can all call back in a few minutes
5  and re-enter the pin number and just get back
6  onto it.
7        MR. PHILLIPS: Okay.
8        MR. FAHNLANDER: How about ten
9  minutes?
10       MR. PHILLIPS: Yeah. My clock says
11 10:47. I'll replace my call at 11 o'clock.
12       MR. FAHNLANDER: Sounds good.
13       MR. PHILLIPS: Thank you everyone.
14           *   *   *
15 END OF DEPOSITION AT 10:47 A.M., 01/13/2010
16           *   *   *

```
 1              CERTIFICATE OF REPORTER
 2              I, Norine F. Kennedy, Certified
    Shorthand Reporter in and for the State of
    Iowa, do hereby certify as follows:
 5              1. That the deponent aforenamed was
 6  duly sworn prior to the taking of this
 7  deposition.
 8              2. That I took down in shorthand,
 9  correctly, the testimony of said deponent and
10  have caused the same to be transcribed, and
11  that this deposition is a true and correct
12  record of the testimony given by said deponent
13  at the time I affix my signature to this
14  certificate. The witness did not request the
15  opportunity to read and sign the deposition.
16              3. That the cost for reporting and
17  transcribing this deposition is in the sum of
18  $____, said sum to be advanced and paid to
19  Kennedy & Kennedy, Certified Court Reporters,
20  308 24th Street, Sioux City, Iowa 51104, prior
21  to the use of said deposition at trial, by
22  Mr. Douglas Phillips, Attorney of Sioux City,
23  Iowa.
24              4. That the original transcript of
    this deposition is to be filed with Mr. Douglas
```

37

```
 1  Phillips.
 2              5. That a copy is to be delivered
 3  to Mr. Douglas Phillips and Mr. Vincent
 4  Fahnlander.
 5              6. I further certify that I am not
 6  related by consanguinity or affinity within the
 7  fourth degree to any party, his attorney, or
 8  any employee of any of them; that I am not
 9  financially interested in this action, and that
10  I am not the attorney or employee of any party.
11              7. No exhibits were marked in this
12  deposition.
13              To all of which I have verily
14  affixed my signature this 18th day of January,
15  2010.
16
17              _____
                NORINE F. KENNEDY, CSR-RPR
18              Kennedy & Kennedy
                Certified Court Reporters
19              308 24th Street
                Sioux City, Iowa 51104
20              (712) 252-1405

23
24
25
```

```
 1      CASE NAME: DORR vs. WEBER et al
 2
                        ADDENDUM TO DEPOSITION
 3      EXAMPLE
        Page         Line        Change and Reason
 4
         3            2          Smith to Schmitz (Correction)
 5                               Misspelling
        28           11          $144 to $175 (Correction)
 6                               Refreshed memory from files
                                 after deposition was taken.
 7      ----------------------------------------------------
         12           9          The word "that" should replace the last
 8                               word "but".

 9
         13          20          Buckman to Buchman - misspelling
10
11
12
13
14
15      To all of which I affix my signature this 11th
        day of February, 2010, at the city of Ocheyedan
16      , state of Iowa.
        Osceola County
17
                                         Paul R Dorr
18                                       PAUL DORR

19                                                      11th
        I did witness the above signature on the
20      day of February, 2010, in the city of Ocheyedan
        , state of Iowa.
21
                                    Delores Stahl
22
                                    NOTARY PUBLIC
23
                          DELORES STAHL
24                        Commission Number 169259
                          My Commission Expires
25                        April 27, 20 11
```

```
 1    CASE NAME: DORR vs. WEBER et al

 2
                    CERTIFICATE OF DEPONENT
 3
              I, the undersigned deponent, do hereby
 4    certify under oath that I did read the
      foregoing pages of transcript and that any
 5    corrections I want to make to the foregoing
      pages of transcript have been set out on the
 6    foregoing Addendum, and that I have indicated
      the correction itself, the page and line number
 7    of the correction, and the reason for the
      correction, if any.
 8            In witness whereof, I have hereunto
      affixed my signature on this  11th  day of
 9     February , 2010, before the undersigned Notary
      Public.
10

11
                                    _____
12                                        PAUL DORR

13

14         I hereby certify I did witness the above
      signature on this the  11th  day of  February ,
15    20 09/10, in the City of  Ocheyedan , County of
       Osceola , State of  Iowa .
16

17

18    DELORES STAHL
      Commission Number 169259         _____
19    My Commission Expires                   NOTARY PUBLIC
      April 27, 20 11

20

21    My commission expires: 4-27-2011 .

22

23

24

25
```