

```
 1                UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF IOWA

 3    * * * * * * * * * * * * * * * *

 4   PAUL DORR and ALEXANDER DORR,        *   File No. 5:08-CV-04093
     individually and on behalf of all
 5   other persons similarly situated,    *

 6              Plaintiffs,               *

 7   vs.                                  *   DEPOSITION OF

 8   DOUGLAS L. WEBER, individually and   *   PAUL R. DORR
     in his capacity as Sheriff, and his
 9   successors, the OSCEOLA COUNTY       *
     SHERRIF'S DEPARTMENT, IOWA, and
10   OSCEOLA COUNTY, IOWA,                *

11              Defendants.               *
     * * * * * * * * * * * * * * *

12

13   The deposition of Paul R. Dorr was taken on behalf of the

14   Defendants at the Osceola County Courthouse in Sibley, Iowa

15   on Monday, November 30, 2009 commencing at 3:35 p.m.

16                        APPEARANCES

17   For the Plaintiffs:    MR. VINCENT J. FAHNLANDER
                            Attorney at Law
18                          33 South Sixth Street, Suite 4100
                            Minneapolis, Minnesota 55402
19
     For the Defendants:    MR. DOUGLAS L. PHILLIPS
20                          Attorney at Law
                            4280 Sergeant Road, Suite 290
21                          Sioux City, Iowa 51106

22   Other Appearances:     Douglas L. Weber

23

24   Reported By:  Jenna L. Mumm, CSR
                   703 Jackson Avenue, Spirit Lake, Iowa 51360
25                 (712) 336-4125   (800) 551-5027
```

5:08-cv-04093-MWB/ Plt. Ex. 14/ (1)

Jenna L. Mumm, CSR  
(800) 551-5027

Multi-Page™

Deposition of Paul R. Dorr  
11/30/09

## Page 2

INDEX

| | Examination | Page |
|---|---|---|
| Direct | By Mr. Phillips | 3 |
| | Certificate of Reporter | 49 |

SEPARATE INDEX TO EXHIBITS

| No. | Description | Pages Referred To |
|---|---|---|
| 8 | Class Action First Amended Complaint | 11, 33, 44 |
| 9 | Transcript of Conversation Between Paul Dorr and Sheriff Doug Weber dated 8/9/07 | 22 |

STIPULATION

IT IS STIPULATED and agreed by and between the parties hereto by their respective counsel of record, whose appearances have been hereinbefore noted, that the deposition of PAUL R. DORR may be taken at the Osceola County Courthouse on November 30, 2009 before Jenna L. Mumm, Certified Shorthand Reporter for the State of Iowa;

That said deposition is taken for the purpose of discovery or for such use at trial as permitted under the Federal Rules of Civil Procedure or for each of said purposes;

That all objections may be reserved until the time of trial except objections relating to the form of the question and the responsiveness of the answer.

## Page 3

PROCEEDINGS

PAUL R. DORR

having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PHILLIPS:

Q Please tell me your name.
A Paul Robert Dorr.
Q You ever given a deposition before?
A No, sir, I haven't.
Q How old are you?
A 53.
Q When were you born?
A ...
Q What is your residential address?
A
Q Is that in Osceola County?
A Correct.
Q How long have you lived at that address?
A Since 1980.
Q Who currently lives there with you?
A My wife, Debra, and my daughter Emily, my sons Alexander, Benjamin and          my daughters
...

## Page 4

son.
A Matthew.
Q How old is          ?
A 16.
Q How old is Benjamin?
A 18. I'm foggy, but somewhere, yes. With that many it's hard to keep track.
Q How old is Alexander?
A He's 19.
Q How old is Emily?
A 21.
Q How old is
A 11, I'm estimating.
Q How old is          ?
A 9.
Q How old is          ?
A 8— 8 or 7. I think she's 8.
Q Did I miss any of your kids?
A
Q You're married to Debra?
A Correct.
Q Is that your only marriage?
A Yes.
Q How long have you and Debra been married?
A Since 1975, which makes it 34 years.

## Page 5

Q Are any of your children married?
A Yes.
Q Which ones?
A Aaron, Christopher and Julia.
Q What is Aaron's married name?
A Aaron Dorr.
Q She kept her maiden name?
A I didn't understand the question.
Q She kept her maiden name?
   MR. FAHNLANDER: He's a boy, I think.
Q (BY MR. PHILLIPS) Oh, I'm sorry.
A Aaron's a male, A-a-r-o-n.
Q My mistake. Where does Aaron live?
A In Allendorf, Iowa in Osceola County.
Q What's his wife's name?
A Kristin.
Q Where does Christopher live?
A In May City, Iowa.
Q His wife's name?
A Lydia.
Q Where does Julia live?
A In Wellsburg, Iowa.
Q Where is that?
A Grundy County, west of Waterloo.
Q What's her husband's name?

Paul R. Dorr, et al  
v. Douglas L. Weber, et al

Page 2 - Page 5

5:08-cv-04093-MWB/ Plt. Ex. 14/ (2)

Case 5:08-cv-04093-MWB   Document 55-9   Filed 06/21/10   Page 3 of 13
Case 5:08-cv-04093-MWB   Document 54-14   Filed 06/17/10   Page 3 of 13

Jenna L. Mumm, CSR　　　　Multi-Page™　　　　Deposition of Paul R. Dorr
(800) 551-5027　　　　　　　　　　　　　　　　　　　　　　　11/30/09

### Page 6

1  A  Edwin Sents, S-e-n-t-s.
2  Q  Are those all of your children?
3  A  If there's 11 there, yeah.
4  Q  I come up with 11. Do you have-- other than-- than the
5  children you just identified and wife, do you have adult
6  relatives in northwest Iowa?
7  A  Adult relatives in northwest Iowa. On my side I have a
8  brother, John Dorr, who lives in Marcus.
9  Q  Any others on your side?
10 A  I have some cousins.
11 Q  Are their names Dorr?
12 A  Yes.
13 Q  Any adult relatives on your side who are not named
14 Dorr?
15 A  I lost track of some of my cousins. There may be some
16 females that are married that I don't know now, but I-- I
17 don't believe there are.
18 Q  Is Debra from northwest Iowa?
19 A  Yes.
20 Q  What's her maiden name?
21 A  Altena, A-l-t-e-n-a.
22 Q  Does she have family in northwest Iowa--
23 A  Yes.
24 Q  -- other than by the name of Altena?
25 A  She has two married sisters living in Sioux County.

### Page 7

1  Q  What are their married names?
2  A  Carey DeBoer, C-a-r-e-y D-e-B-o-e-r, and LeAnn Franken.
3  Q  Any other family on your wife's side in northwest Iowa
4  that you can recall?
5  A  That's all of her immediate siblings, and their parents
6  live in-- in-- Leroy Altena lives in Maurice, Iowa, but
7  other than that-- she has cousins, but...
8  Q  Where did you go to high school?
9  A  Unity Christian High School in Orange City.
10 Q  When did you graduate?
11 A  1974.
12 Q  Any formal education after that?
13 A  Two years at Dordt College in Sioux Center, and then
14 transferred in the summer of '75-- summer of '75-- '76,
15 summer of '76, to Iowa State University where we then
16 graduated in the fall of '78. Iowa State was on a quarter
17 system back then, so we could finish right around Christmas.
18 Q  Any formal education after you finished at Iowa State?
19 A  No.
20 Q  Other than in this case have you ever sued anyone
21 before?
22 A  No.
23 Q  Have you ever been sued before?
24 A  Not that I can recall, no.
25 Q  Where are you employed?

### Page 8

1  A  I'm self-employed.
2  Q  Doing what?
3  A  I need to back up back-- I didn't personally sue
4  anybody, but as an officer of the bank in Ocheyedan we had
5  to sue for foreclosures and so forth, but not personally.
6  Q  I understand. Self-employed doing what?
7  A  Political consultant-- political campaign consultant,
8  to be precise.
9  Q  What does a political campaign consultant do?
10 A  He gets hired when ballot issues are put on the ballot
11 primarily to represent one side of the question and help
12 them do the research, develop their message, get it out to
13 the voters. That's my primary task, but I also get hired
14 sometimes unilaterally just to do tax research, financial
15 research on government bodies. Then I've also been-- for
16 about nine months I was a state field director for a
17 presidential campaign.
18 Q  What campaign?
19 A  The Ron Paul presidential campaign in 2007/08 here in
20 Iowa, and in other states I was employed by them.
21 Q  How long have you been a political campaign consultant?
22 A  I would think going on close to nine to ten years.
23 Somewhere in '99-- 2000, I think, I started it up full-time.
24 Q  Do you provide your consultation in the form of some
25 business?

### Page 9

1  A  Yes.
2  Q  What is the name of that business?
3  A  Copperhead Consulting Services.
4  Q  Does Copperhead Consulting Services offer services
5  other than the type that you just described?
6  A  That's generally it. I can't think of anything else
7  I've done.
8  Q  What individuals, groups or associations has it
9  supported in the last ten years?
10 A  Supported--
11 Q  Yes.
12 A  -- or employed by?
13 Q  Consulted for.
14 A  Like 60 different campaign committees throughout the
15 upper midwest. I couldn't recall them all now, but various
16 local ballot committees in six states.
17 Q  What states?
18 A  Iowa, Minnesota, South Dakota, Nebraska, Missouri and
19 Texas. Is that six?
20     MR. FAHNLANDER: Uh-huh (yes).
21 Q  (BY MR. PHILLIPS) Is Copperhead incorporated?
22 A  No.
23 Q  What form does it take?
24 A  That's just a trade name for Paul Dorr doing business
25 as.

Paul R. Dorr, et al　　　　　　　　　　　　　　　　　　Page 6 - Page 9
v. Douglas L. Weber, et al
5:08-cv-04093-MWB/ Plt. Ex. 14/ (3)

Case 5:08-cv-04093-MWB   Document 54-46   Filed 06/17/10   Page 3 of 13

Jenna L. Mumm, CSR  Multi-Page™  Deposition of Paul R. Dorr
(800) 551-5027                                                    11/30/09

Page 10

1  Q  Does Copperhead have employees?
2  A  No, not full— not full-time. On occasion I'll hire my
3     kids to do, you know, little independent projects here and
4     there, but no full or even part-time employees.
5  Q  What did you do before you started Copperhead?
6  A  I was the head of a pro-life ministry called Rescue the
7     Perishing from about 1988 to 2000 supported by donors across
8     the midwest.
9  Q  Was Rescue the Perishing incorporated?
10 A  No.
11 Q  Was it a d/b/a for someone?
12 A  Yes, myself.
13 Q  What did you do before Rescue the Perishing?
14 A  I was the owner of a private corporation called Bank
15    Loan Management and I provided bank consulting services for
16    four or five years to bankers and law firms in Iowa and
17    Nebraska that were having troubled banks or bank stock
18    acquisitions, those sort of things.
19 Q  What is your degree at Iowa State?
20 A  Ag business.
21 Q  What did you do before Bank Loan Management?
22 A  Vice president of the Ocheyedan Savings Bank in
23    Ocheyedan.
24 Q  How long were you the vice president of that bank?
25 A  For four years.

Page 11

1  Q  What years are we talking about?
2  A  1980 to '84.
3  Q  Why did you leave the bank?
4  A  I had sold my half of the interest— I had bought a
5     half-interest in the bank, and the partner and I decided it
6     was time to— we had different management goals and he
7     agreed to buy me out.
8  Q  Who was your partner?
9  A  Steve Spengler. I— to clarify that, he and I had a
10    contract to purchase the bank from his father, Charles
11    Spengler, and when Steve and I decided that the partnership
12    wasn't going to work and we couldn't keep paying out his
13    father, then we decided to accelerate the contract and his
14    father sold as well, and then Steve borrowed the money and
15    paid us both out.
16 Q  Are you a community activist?
17 A  Better clarify.
18 Q  I'd better or you'd better?
19 A  Community activist has certain connotations to it in
20    Chicago versus out here in— am I— am I active in political
21    and economic and those sort of events, yes.
22 Q  I'm gonna hand you what was previously marked in the
23    Weber deposition as Exhibit 8 and refer you to paragraph 23
24    on page 6.
25 A  Which— which exhibit?

Page 12

1  Q  8?
2  A  8, paragraph what?
3  Q  23 on page 6.
4  A  "Dorr is a community activist engaged in public
5     discourse regarding issues some citizens would characterize
6     as controversial."
7  Q  Don't read quite so fast, because if you do—
8  A  I'm sorry.
9  Q  — she can't take it down.
10 A  I'm sorry.
11 Q  Tell me what you meant when you allege that you were a
12    community activist?
13 A  That I get involved in issues within communities that
14    most often affect the political and economic direction of
15    those communities.
16 Q  Give me an example.
17 A  The OCTA, working for them to do the research and so
18    forth, all the bond fights that I've been involved in,
19    again, behind the scenes. I don't— I don't actively go out
20    and put myself into the campaign, but I do the— the
21    research and help develop the message for my client
22    committees, but at the same time I have been very much a
23    community activist over the years on moral issues, pro-life
24    issues, those sort of matters.
25 Q  Is there some kind of a template that you follow in

Page 13

1  developing and communicating a message for a particular
2  committee, some method?
3  A  No, there really isn't. What I start with is public
4  records requests and start doing research, and from there I
5  help them develop the message.
6  Q  In that same paragraph 23 you say that you're engaged
7  in public discourse. What does that mean?
8  A  Letters to editors, some situations I do town hall
9  speaking. I've been— done interviews with media. Even
10 with the Ron Paul campaign I was authorized to do media
11 interviews to a limited extent.
12 Q  The presidential campaign to which you refer in
13 paragraph 26 of your amended complaint, that's the Paul
14 campaign?
15 A  Correct.
16 Q  In paragraph 27 on page 7 you refer to public debates
17 and meetings that you have attended where citizens have
18 threatened you with physical harm. How many times has that
19 happened?
20 A  Twice, once in Storm Lake, Iowa and then— well, prior
21 to the incident was just once. Since then I've had one
22 recently where I was assaulted in— in Ord, Nebraska.
23 Q  Prior to the incident, what do you mean?
24 A  Prior to the— excuse me, the refusal to issue the
25 permit.

Paul R. Dorr, et al                                 Page 10 - Page 13
v. Douglas L. Weber, et al

5:08-cv-04093-MWB/ Plt. Ex. 14/ (4)

Jenna L. Mumm, CSR  Multi-Page™  Deposition of Paul R. Dorr
(800) 551-5027  11/30/09

Page 14

1 Q So one time before the denial and one time since?
2 A Right. And there's-- there's been one registered blog
3 stating, after my client defeated a bond, that someone
4 should put a bullet in Paul Dorr's head.
5 Q What website did you see that on?
6 A Des Moines Register, a copy of which was mailed to the
7 sheriff.
8 Q Why?
9 A Because I was concerned. I wanted to-- wanted to know
10 what to do and if he would investigate it.
11 Q What did you expect him to do?
12 A Find out who was threatening my life implicitly or
13 explicitly.
14 Q What do you mean, implicitly or explicitly?
15 A "Someone should put a bullet in Paul Dorr's head." He
16 didn't say, "I'm gonna put a bullet in Paul Dorr's head,"
17 but-- so it was more of a-- I thought-- I didn't know what
18 his intentions were, if it was explicit.
19 Q Do you know where this someone lived, what community?
20 A No. It was a blog post.
21 Q Do you know what part of the state he was from?
22 A That-- no. I-- I don't have the capacity to do that.
23 I assumed the sheriff would.
24 Q Did you go to the sheriff and file a formal complaint
25 with respect to this blog incident?

Page 15

1 A Sent him a copy of it and of the-- and asked him if
2 he'd look into it. I never heard back.
3 Q Did you ever talk to him about it?
4 A Not that I recall.
5 Q When was the incident in Storm Lake?
6 A Would have to be somewhere, probably, in 2005 or '6.
7 Q What happened?
8 A Basically, a school district got word that I was
9 organizing-- was gonna meet one evening to talk about
10 organizing a campaign to oppose their proposed school bond.
11 Someone, we found out later, illegally used the school's
12 e-mail system and told the whole school district. And so
13 that night at our by-invitation-only meeting, initially
14 three or four school employees came and kind of crashed our
15 meeting. They got pretty upset with us and we asked them to
16 leave, "This is by invite only." They finally did leave.
17 It was before the days of cell phones-- I had a cell phone.
18 Then they went outside in the parking lot.
19     And before it was done I posted my 14-year-old son at
20 the door and he kind of cleared who was coming in, because I
21 didn't-- we didn't expect this at all. Normally these
22 meetings are very quiet and peaceful amongst like-minded
23 people who may want to organize a ballot. And they started
24 working the telephones and my son insisted he saw alcohol.
25 There were 20 to 25 people out there cursing, swearing at my

Page 16

1 son, making alarming statements. I don't remember what they
2 were at the time. He was-- he was frightened.
3     But we did notice that they took the car around the BV
4 Mutual Business-- a couple cars they were driving-- it's in
5 the center of a strip mall parking lot, and they started
6 driving around the building honking their horns and-- and
7 cursing at us. I-- I-- at that time I-- the sheriff did
8 (inaudible). It was never an issue that never came about,
9 but--
10 Q I'm sorry. I didn't understand what you just said.
11 The sheriff had what?
12 A At that time the sheriff had issued me the permit. And
13 I normally would just carry it along in the state of Iowa at
14 the bottom of a briefcase, just left it there. It was along
15 that night, but there was no need to-- nothing went any
16 further than a small crowd developing right outside our
17 building.
18 Q Did you call the Storm Lake Police?
19 A As I said, I didn't have a cell phone then and no one
20 else there did.
21 Q I thought you said that you were making calls that
22 night.
23 A No. Excuse me. They were out in the parking lot on
24 their cell phones. My son was watching them saying, "We're
25 down here at BV Mutual. Come on down. This is where the

Page 17

1 meeting is at." Their-- their crowd grew as they kept
2 working the phones.
3 Q There were no phones in the building where you were?
4 A No.
5 Q You told me, but I didn't understand what you said.
6 How did these people-- how do you believe these people found
7 out you were meeting?
8 A We did a public records request and got a copy of the
9 e-mail that one of the staff members had illegally used, and
10 the e-mail went out across the whole district to all the
11 district employee e-mail boxes. And how-- we think we know
12 how it got to her, but as far as the large group all knowing
13 about it, it was-- and I think I still have the file that
14 has an e-mail distributed by the Storm Lake School District
15 server.
16 Q Why do you say that something was illegally used? I
17 still don't understand.
18 A Because political activity of that nature-- the
19 Attorney General's Office confirmed for us and as did-- the
20 superintendent later put out a-- an apology and reminder not
21 to use it anymore. But they're not to use--
22 Q Use what?
23 A -- use the internet-- the e-mail server system for
24 political activity, the school district's. No county
25 government is supposed to-- or, excuse me, no Iowa

Paul R. Dorr, et al  Page 14 - Page 17
v. Douglas L. Weber, et al

Jenna L. Mumm, CSR  Multi-Page™  Deposition of Paul R. Dorr
(800) 551-5027  11/30/09

Page 18

1 government body is supposed to use their community
2 property-- I mean, their-- their-- their jurisdiction's
3 property to advance political activity. In this case they
4 were putting out an alert that the political committee was
5 getting organized.
6 Q So someone who worked for the school used the school's
7 e-mail system to alert other school employees about what you
8 were doing?
9 A Correct.
10 Q But how did they find out what you were doing?
11 A We-- we found out who initiated the e-mail, and when I
12 contacted her later her husband was less than cooperative in
13 explaining how she found out. He admitted she did it
14 because we had the e-mail. It was her name on it. But how
15 she found out, we never did hear exactly how.
16 Q And where was this meeting?
17 A Our meeting was being held in the BV Mutual community
18 room in the insurance office building in Storm Lake.
19 Q And there was a second incident in Ord, Nebraska. When
20 was that?
21 A That was just a couple months ago, October 22 or 23. I
22 had a less than cordial-- well, I'll let you guys question
23 me.
24 Q What happened?
25 A A radio talk show host was sitting at a table during

Page 19

1 our community town hall presentation. People later
2 witnessed him-- or told us later they-- about an hour and a
3 half they listened to him get angrier and angrier with me.
4 Afterwards he sought me out, wanted to insist I submit to an
5 interview and I said, "No. I don't-- generally I don't do
6 the interviews without the clients there. This is their
7 campaign, their community. This isn't about me."
8     He kept pressing for an interview and I finally said,
9 you know, "Who are you with?" and he wouldn't identify
10 himself and what media outlet he was there with. I was
11 running a digital recorder, which in those situations I--
12 it's turned out to be a safety factor. We had the whole
13 thing on record. And he then-- I finally said, "I suspect
14 you're--" I forget the gentleman's name with the radio
15 station. And I said, "If that's the case, I don't want to
16 do this interview without the clients here and because I
17 have a suspicion you're biased."
18     And at that point he reached out and hit my hand so
19 hard that he knocked the recorder out of my hand to the
20 floor, grabbed the recorder and headed for the door, then he
21 threw it in the wastebasket and left. But it's-- I mean,
22 it-- it's-- it was intended to knock the recorder out of my
23 hand. He hit me hard. I didn't go into the hospital, but
24 it stung for three or four hours.
25 Q Are those the only two meetings at which people have

Page 20

1 threatened you with physical harm?
2 A At meetings, yes.
3 Q Have you been threatened by physical-- threatened with
4 physical harm outside the context of meetings?
5 A I would have to go back through the file. There's been
6 lots of anonymous mail over the years.
7 Q What file?
8 A I have a correspondence file from my Rescue the
9 Perishing ministry. But as-- as I recall sitting here, most
10 of them have just been telling me what they think of me, but
11 there hasn't been any physical threats.
12 Q Had you been issued a permit to carry a concealed
13 weapon in 2007 and had it been renewed up to now, is it your
14 belief that you could have carried a concealed weapon in
15 Ord, Nebraska?
16 A It is my belief because, as I've heard just recently,
17 Nebraska has just granted reciprocity with Iowa sometime
18 earlier this year prior to that meeting Ord.
19 Q How many firearms do you own?
20     MR. FAHNLANDER: I'm gonna object. It's not
21 relevant.
22 Q (BY MR. PHILLIPS) How many firearms do you own?
23 A One shotgun, one rifle and-- two rifles and then, let's
24 see, one, two-- I think-- I think, three handguns right now.
25 Q What kind of handguns?

Page 21

1 A Glocks.
2 Q How long has it been the case that you've owned three
3 handguns?
4 A I-- I don't recall. I-- I've-- I've bought more guns
5 than that over the years, a couple more. I gift them to my
6 sons when they become of age for their successful training
7 and so forth.
8 Q For their what?
9 A For their-- as their dad I satisfy they've been
10 successfully trained out on the range. And when they become
11 21, then I give them to them as a gift.
12 Q When you said, "when they become of age," you meant 21?
13 A Correct.
14 Q It's my understanding that you had a nonprofessional
15 permit to carry a concealed weapon from 2001 to 2006; is
16 that correct?
17 A That's my memory, but I'm hearing today that it may
18 have gone a little bit further back than that. I don't-- I
19 haven't kept all the permits. I don't know exactly.
20 Q All of those would have been issued in Osceola County?
21 A Correct.
22 Q But you don't know if you had a permit prior to 2001?
23 A I don't recall.
24 Q Have you been denied a permit at any time after the
25 denial in 2007?

Paul R. Dorr, et al  Page 18 - Page 21
v. Douglas L. Weber, et al

5:08-cv-04093-MWB/ Plt. Ex. 14/ (6)

Case 5:08-cv-04093-MWB   Document 55-9   Filed 06/21/10   Page 7 of 13
Case 5:08-cv-04093-MWB   Document 54-14   Filed 06/17/10   Page 7 of 13

Jenna L. Mumm, CSR  Multi-Page™  Deposition of Paul R. Dorr
(800) 551-5027  11/30/09

### Page 22

1 A  Sheriff Weber in 2008 in the written letter that was in
2  evidence here today.
3 Q  Had you filled out an application in '08?
4 A  I don't recall if I wrote him a letter and asked or if
5  I filled out an application. I'd have to check the record.
6 Q  What records would you check?
7 A  If there was any letters sent to him or if there was an
8  application. I generally would keep a copy of my
9  applications, so I'd have to look and see if there's a copy
10  of an application or just a letter. I think it was an
11  application that went in the same time or around the 1st of
12  July of 2008.
13 Q  It's my understanding that you met with the sheriff to
14  discuss your 2007 application on August 9th of '07.
15 A  Sounds right.
16 Q  How is it that that meeting came to be held?
17 A  I'm not sure who initiated the call, if he called me or
18  I called him and asked if he had acted on my permit. And,
19  again, I don't recall who initiated it, but his
20  communication to me was, "I want you to come in and talk
21  about-- visit about this application," so we agreed upon a
22  time and I arrived.
23 Q  Look at Exhibit 9, please--
24 A  (Witness complying.) Yes.
25 Q  -- the first page. Have you had an opportunity to

### Page 23

1  review that?
2 A  Yes.
3 Q  As far as you're concerned, is that an accurate
4  transcript of the discussion that took place between the two
5  of you?
6 A  I've not been trained in-- I'm not trying to be smart.
7  As far as I know it's accurate, but I don't know exactly
8  what all goes in the transcript, but as far as I know it's
9  accurate.
10 Q  Well, you were there. Do you remember it any different
11  than the way it's typed out here?
12 A  No.
13 Q  Who typed this up?
14 A  I did.
15 Q  Do you still have the original recording?
16 A  Yes.
17 Q  Is that the only time you've ever taped a discussion
18  with Sheriff Weber?
19 A  I've been hired by the OCTA to videotape him at various
20  public meetings and events. I'm trying to recall. I
21  think-- I think that's it as far as I can recollect.
22 Q  This recorder that you used to tape the August 9th,
23  2007 meeting, was that something you put on his desk or was
24  it concealed in your pocket?
25 A  It was-- it was in my pocket.

### Page 24

1 Q  Do you know if he knew that you were taping him?
2 A  I do not know.
3 Q  Did you tell him you were taping him?
4 A  No, I did not.
5 Q  Why not?
6 A  I had no duty to do it.
7 Q  Why did you tape the conversation in the first place?
8 A  Because there was tension from the previous six months
9  with my involvement with the OCTA. And this is the first
10  time that he had ever said, "Come on in. I want to talk to
11  you about your-- your application," so I had suspicion that
12  maybe something more was coming than just a-- the routine,
13  "Here's your permit."
14 Q  Tension between whom?
15 A  My involvement with the OCTA, that there had been lots
16  of letters to the editor that Mr. DeKoter initiated, I would
17  respond to. And I was receiving threats from Mr. DeKoter
18  and I knew-- legal threats from Mr. DeKoter, and I assumed
19  that the historic relationship with that office and the
20  sheriff's office was still there and so I-- I just-- I
21  presumed that Mr. DeKoter was probably having his-- his
22  involvement with all this was probably laying a scenario
23  that wasn't gonna be productive for me.
24 Q  Wasn't going to be what?
25 A  Productive for me, like when I went to meet with him.

### Page 25

1 Q  Have you ever met with Dan DeKoter?
2 A  Not in 20 years.
3 Q  Ever talked to him on the phone?
4 A  I did in a campaign we were doing in Lyon County three
5  or four years ago.
6 Q  Have you ever taped a conversation with Mr. DeKoter?
7 A  None that I can recall. There was just that one
8  conversation back when the George school bond vote was going
9  on.
10 Q  What was that discussion about?
11 A  He was counsel for the City of George, and the City of
12  George was having expressly advocating statements on their
13  city website, "Vote yes." And we were trying to get to the
14  bottom of the-- I know from working with the State
15  Ombudsman's Office that they can't do that, so I was trying
16  to relay to him-- some of the city people-- the mayor was
17  resisting us, and I was trying to relay to him if he'd pass
18  on to them the law that city governments can't expressly
19  advocate on their website.
20 Q  You knew from working in whose office?
21 A  From working with the State Ombudsman's Office in Des
22  Moines we-- local governments routinely violate the-- the
23  law on express advocacy and I end up filing complaints just
24  so that everybody plays fair.
25 Q  How many complaints have you filed with the Ombudsman?

Jenna L. Mumm, CSR  Multi-Page™  Deposition of Paul R. Dorr
(800) 551-5027  11/30/09

Page 26

1  A  I would say half a dozen.
2  Q  On what subjects?
3  A  Mostly that, express advocacy and certain government
4  bodies refusing to-- to disclose public records.
5  Q  Have you ever filed a complaint against a governmental
6  body in this county?
7  A  Yes, we did, with the Public Safety Commission.
8  Q  When was that?
9  A  That would have been in '08, I believe.
10 Q  What was the nature of that dispute?
11 A  The agenda versus the-- the minutes later. Some issues
12 indicating they're retaining counsel, Dan DeKoter, to set up
13 these standards was in the minutes, but it was never in the
14 agenda in advance. And our complaint was that these-- some
15 of these items were taking place without adequate public
16 notice that there were gonna be issues discussed of that
17 importance.
18 Q  Some of what items?
19 A  Items like-- like acting on retaining Mr. DeKoter.
20 Q  How was that issue ultimately resolved?
21 A  State Ombudsman interviewed all parties, and when they
22 were done they directed the Public Safety Commission to
23 issue a letter of apology to me.
24 Q  They directed them?
25 A  That's what-- that's what she said and that's what I

Page 27

1  received from them.
2  Q  Sent a letter to apologize if there was any
3  misunderstanding?
4  A  I'd have to see the letter to know what's all in it.
5  Q  Do you think that people in this county are afraid of
6  you?
7     MR. FAHNLANDER: Object, vague. Which people?
8  A  I don't know what you mean by afraid of me. I-- are
9  there people afraid of my conviction-- are there people
10 afraid of me physically, no.
11 Q  (BY MR. PHILLIPS) In some other way?
12 A  Of the strength of my convictions. They'd rather not
13 hear from me.
14    MR. FAHNLANDER: I'll object-- it calls for
15 speculation as to the state of mind of someone else-- and
16 ask that the objection precede the answer.
17    MR. PHILLIPS: Okay. Will you take this
18 deposition by the Federal Rules?
19    MR. FAHNLANDER: Certainly.
20    MR. PHILLIPS: Good.
21 Q  (BY MR. PHILLIPS) What reasons did Sheriff Weber give
22 you for denying your 2007 application?
23 A  He's heard different things from me, from some of the
24 citizens and there's some fear out there of-- you know,
25 "Some are scared to death of you," he was not comfortable

Page 28

1  issuing the permit and that it was his discretion.
2  Q  Have you discussed this denial or any other issue
3  related to the permit with Sheriff Weber at any time since
4  August 9th of 2007?
5  A  Discussed in what-- in what medium?
6  Q  Well, let's start with talking to him.
7  A  Not that I recall.
8  Q  What other media are there?
9  A  I wrote a letter. I wrote a letter and asked him-- I
10 appealed to him to, you know, be a peacemaker. If there are
11 people out there-- that we need to get to the foundation of
12 these fears, if people are making it up, it's not true. I
13 asked him to invite them into his office with me and that we
14 could hear what they have to say; and if I had done
15 something I forgot, I'd be glad to apologize and-- and live
16 those consequences at that time.
17 Q  Did he respond to that letter?
18 A  No.
19 Q  Did you discuss these issues with him in any other
20 media?
21 A  I-- I think I-- well, I submitted an application in
22 '08, but as far as this denial, none that I can recall.
23 Q  You applied in '08 and he wrote you a letter saying no?
24 A  Right.
25 Q  Other than your-- that 2008 application and the letter

Page 29

1  in which he said no, have you discussed these issues with
2  him in any other medium?
3  A  Discussed it with him, no. I've written about his
4  actions to parties in the county and in letters to the
5  editor.
6  Q  Why?
7  A  Because I thought that his discretion was improper and
8  I suspicioned it was politically motivated.
9  Q  Why do you think his exercise was improperly-- or his
10 discretion was improperly exercised?
11 A  Because he admitted he had no evidence. I asked him if
12 he had any evidence and he said, "No." Then when-- later
13 when he started to indicate that he wasn't gonna tell me I--
14 after quite a pause I asked him if it was personal, and he
15 was strongly objecting to that, but then he-- he stated--
16 then he said that he's not gonna say what they did say.
17 Q  Why do you think it was politically motivated?
18 A  For the reasons just discussed previously. I was
19 working with the OCTA, and they're convinced that he and the
20 county attorney are overpaid. And they've been around for
21 years but, now, when they hired me we started doing some
22 basically research, and that's when the threatening e-mails
23 and stuff started coming through Mr. DeKoter, just in the
24 early stages of doing research. And then-- then Mr. DeKoter
25 started maligning me in the letters to the editor in the

Paul R. Dorr, et al  Page 26 - Page 29
v. Douglas L. Weber, et al

5:08-cv-04093-MWB/ Plt. Ex. 14/ (8)

Jenna L. Mumm, CSR
(800) 551-5027
Multi-Page™
Deposition of Paul R. Dorr
11/30/09

**Page 30**

1 paper.
2 Q What paper?
3 A Generally the Sibley-- Osceola County Gazette & Tribune
4 and then other times the Ocheyedan Press news.
5 Q Do you have copies of these threatening e-mails from
6 DeKoter?
7 A Yes. In fact, you can see most of them posted on the
8 OCTA's website.
9 Q Do you have copies of the maligning letters to the
10 editor from-- that Mr. DeKoter wrote?
11 A I'd probably have to-- like anybody, I'd have to go
12 back to the library and pull up back issues. I-- I have
13 some, not others. I didn't keep all of it. It just got
14 weary after awhile.
15 Q Any other reason why you think the 2007 denial was
16 politically motivated?
17 A I'm trying to remember the history of what was going on
18 about that time. At this time I can't think of any other
19 reason. I, you know, may want to visit with some of the
20 OCTA members and see what-- you know, what we were doing at
21 that time and what all was going on, but at this time I
22 don't recall anything else.
23 Q Who with OCTA would you talk to?
24 A The board members are the president, Kevin Hertz.
25 Other board members are George Braaksma, Rochelle Buchman,

**Page 31**

1 Carl Berkenpas, Ed Wheeler. That's the ones I can recall
2 now.
3 Q Your wife applied for a permit in 2008?
4 A Uh-huh (yes).
5 Q Did that ap-- yes?
6 A Excuse me. Yes, she did.
7 Q That application was approved?
8 A Eventually.
9 Q Eventually. Was there some delay?
10 A Yeah. It was applied for in April of 2008.
11 Q Okay.
12 A And Sheriff Weber's response after a week or-- I think
13 it was a couple weeks. The response was, "I have-- I want
14 to think about this one. Give me 30 days," or something.
15 And my wife reported to me that-- she said, "Well, why do
16 you-- is there something you're gonna learn in 30 days, I
17 mean, something I can answer for you or an issue that you're
18 considering during this time?" and he said, "No. I just
19 want to think about it." At least, this is what my wife
20 reported to me. She came to me and said, "What-- what's 30
21 days from now? Why can't he make his mind up now? He's had
22 it for a couple weeks."
23     I looked at the calendar and I realized it was a few
24 days after his election, so I said, "He's probably wanting
25 to make sure I be quiet, and use it as a tool over me." The

**Page 32**

1 only-- and we didn't-- this was no test run. It was if we
2 can't-- if I can't be able to protect my family, then my
3 wife wanted to have the ability to-- to carry something
4 along in my absence if we were-- if we were traveling in
5 Iowa and so forth. At that point she talked about, "I don't
6 like being manipulated and a tool like this. Either act on
7 it or don't." And the more we visited, she decided to go in
8 and withdraw the application. She did. The election was
9 held sometime the first part of July. She filed again and--
10 Q July of '08?
11 A Yes. -- and then Mr. DeKoter's letters ensued.
12 There's two of them, I believe. And then after that
13 Mr. Weber issued the permit.
14 Q Say that last thing over again.
15 A And then after-- after she filed and Mr. DeKoter's
16 letters went back and forth-- she filed with-- with him.
17 I-- in fact, I wrote him and asked him-- now it's coming
18 back to me. I wrote him and asked him about my own and he--
19 he then-- instead of getting a response from him I got a
20 response from Dan DeKoter, which didn't make any sense to
21 me. And so I continued to correspond with the sheriff and I
22 got a second response back from Mr. DeKoter. I'm saying he
23 doesn't issue these permits, the sheriff does. Then after--
24 I think, after the second one-- the chronology is not
25 precise, but it's-- it's close to this. I'd have to look at

**Page 33**

1 them again, but sometime around that-- in the middle of that
2 correspondence the sheriff did then issue my wife's permit.
3 Q Did she renew it this year?
4 A As far as I know, yes.
5 Q In paragraphs 48 through 50 of your amended complaint
6 you said that Copperhead had engaged in political challenges
7 with the sheriff and county attorney. Who was the county
8 attorney to whom you refer?
9 A Exhibit number again?
10 Q Exhibit 8.
11 A 8, paragraph what?
12 Q Paragraphs 48 through 50.
13 A (Pause) I was doing the work for the OCTA, but then
14 Mr. DeKoter started attacking me personally in letters to
15 the editor and the OCTA. So I would-- you know, I
16 couldn't-- there were a series of false statements being
17 made. I wasn't gonna stand back and let it stand as the
18 record, so then I would respond. Because I was personally
19 drug into it I'd respond, and it would often-- I don't--
20 well, I don't recall exactly, you know. I think mostly I
21 was responding to DeKoter's false accusations as far as
22 the-- working the political challenges that I was doing
23 through the OCTA. I-- I was an employee of theirs. I never
24 spoke on their behalf and they-- I would do the background
25 research and help them create messages and so forth, but the

Paul R. Dorr, et al
v. Douglas L. Weber, et al
Page 30 - Page 33

Jenna L. Mumm, CSR　　　　　Multi-Page™　　　　　Deposition of Paul R. Dorr
(800) 551-5027　　　　　　　　　　　　　　　　　　　　　　11/30/09

**Page 34**

1  OCTA board reviewed it all and approved everything.
2  Q  So DeKoter is the Osceola County Attorney's Office that
3  you're referring to in paragraph 48?
4  A  No. That was-- that-- that, again, was the OCTA's
5  challenge of their budgets, the sheriff's office and the
6  county attorney's pay.
7  Q  My question is, who was the county attorney?
8  A  Bob Hansen, Robert Hansen.
9  Q  What was the issue with Mr. Hansen's pay?
10 A  At the time-- at that time it kind of boiled down to,
11 with his arrangement with O'Brien County, that between the
12 two counties he was the fourth highest paid county attorney
13 in the state of Iowa and we're the sixth smallest county.
14 And, more narrowly, the OCTA is-- when they compared other
15 small counties of this size, Mr. Hansen is found to be way
16 overpaid.
17    And I was employed at the time to do a survey of county
18 attorneys. I did survey 11 county attorneys across the
19 state and looked at their rough workload and did a
20 population comparison and found that which several county
21 attorneys indicated was probably true; that, based upon the
22 survey of other county attorneys, you got about two or two
23 and a half days of work to do in Osceola County and, thus,
24 he committed 20 hours a week to O'Brien County. So the OCTA
25 was concerned-- they weren't opposed that he worked in

**Page 35**

1  O'Brien County. They were concerned he was being paid a
2  full-time salary while he's also getting another salary down
3  there.
4  Q  What did OCTA do to get that message out?
5  A  Direct mail, they made presentations to the county
6  supervisors, may have done some hand billing, leaflets and
7  so forth.
8  Q  As nearly as you can tell, did those efforts have any
9  impact?
10 A  On the county attorney's salary and the sheriff's
11 salary, no.
12 Q  Do you have a theory on why that is?
13 A  I don't want to conjecture.
14 Q  What's your conjecture?
15 A  I said I don't want to conjecture. I-- I don't know.
16 Who knows what motivates supervisors?
17 Q  Who's the consulting business client to whom you refer
18 in paragraph 49 of your amended complaint?
19 A  The OCTA.
20 Q  Are you claiming in this lawsuit that the Second
21 Amendment gives you the right to have a nonprofessional
22 permit to carry a concealed weapon?
23 A  State the question again.
24    MR. PHILLIPS: Would you read it back, please.
25    (The last question was read back.)

**Page 36**

1  A  Exclusively-- well, I know that some states-- that they
2  have no permit system at all so, in a better world, yes. In
3  this lawsuit my claim is subject to the state code that is--
4  that is before us, and under the State Code I think it's--
5  my Second Amendment right's been infringed.
6  Q  Well, help me with what your Second Amendment right--
7  what you think your Second Amendment right is.
8  A  To keep and bear arms.
9  Q  Okay. Does that include the right to have a
10 nonprofessional permit to carry?
11 A  Yes, because I can't-- I can't bear arms in a manner
12 that would protect my safety and that of my family.
13 Q  You're also claiming that your due process rights were
14 violated?
15 A  He wouldn't give me no reason. He would give me just--
16 I mean, other than it's his discretionary authority, I
17 didn't see a process by which there was an objective
18 standard that I could meet or qualify for, and I know other
19 people in the county are getting permits and I'm not. I--
20 he didn't-- he didn't-- I wrote him and asked to-- you know,
21 "Let's do something to try to, you know, be at-- get to the
22 bottom of these reputation accusations. They could all be
23 false." I just-- I saw no actions on his part to-- to try
24 to employ those provisions of that-- that Code on the-- on
25 the reasonableness standard to-- so that I could qualify.

**Page 37**

1  Q  And you're claiming that the denial was due at least in
2  part to your political-- your political activities?
3  A  Yes.
4  Q  You said that was because you were working with OCTA
5  and at the time the issue was whether the sheriff and the
6  county were overpaid. That's when you started getting
7  threatening e-mails from DeKoter and DeKoter started
8  maligning you in the newspaper, is that--
9  A  Correct.
10 Q  That's the factual basis for your belief that this
11 denial was politically motivated?
12 A  In addition to the lack of-- his admission to the lack
13 of evidence these people have for the basis for their
14 fears-- at that point I said, "Well, he's admitted he has no
15 basis, no evidence of anything I did"-- and then lining up
16 these other factors that I'd just recently been involved in
17 and these e-mails from DeKoter and so forth.
18 Q  Has any elected official in this county ever admitted
19 to you that this was political?
20 A  No.
21 Q  Why do you think this decision was arbitrary?
22 A  Again, the lack of evidence-- his admission to a lack
23 of evidence and that he had given it to me the two prior
24 years.
25 Q  Why do you think it was unreasonable?

Paul R. Dorr, et al　　　　　　　　　　　　　　　　　　　　Page 34 - Page 37
v. Douglas L. Weber, et al

Case 5:08-cv-04093-MWB   Document 55-9   Filed 06/21/10   Page 11 of 13
Case 5:08-cv-04093-MWB   Document 54-14   Filed 06/17/10   Page 11 of 13

Jenna L. Mumm, CSR　　　　　Multi-Page™　　　　　Deposition of Paul R. Dorr
(800) 551-5027　　　　　　　　　　　　　　　　　　　　　　　11/30/09

### Page 38

1　A　Because there was no evidence and I had no ability to
2　defend myself even when I followed up with a request to do
3　it.
4　Q　And why do you think it was contrary to law?
5　A　Which law?
6　Q　I don't know. I'm taking this out of your complaint.
7　A　Yeah. I think it's contrary to the-- the-- I don't
8　want to say more of the spirit in the Second Amendment, but
9　its primary-- it's the primary goal our founders had to the
10　Second Amendment, is to allow citizens to bear arms. And I
11　was not being allowed to bear arms in a fashion that would
12　best protect myself and my family.
13　Q　How have you been harmed by the fact that your permit
14　has been denied?
15　A　I've don't have the-- the safety of having it with me
16　if, in fact, other parties would go beyond reasonableness
17　and decide to lose their control. I think I'm at-- I'm at
18　risk now. I think my-- my reputation has been harmed by the
19　sheriff's public statements not trusting me. He needs to
20　talk to the other neighbors. He needs to understand the
21　context of the neighbors he's talked to. He's selected
22　partial statements from partial parties to establish a
23　reputation, and I think he's injured my reputation.
24　Q　Who could I talk to to find out what your reputation
25　really is?

### Page 39

1　A　Well, I'll-- I'll offer context, first of all, to the
2　ones that-- that he has mentioned, but as well you could
3　talk to Dale Block's wife.
4　Q　What's her name?
5　A　Lives across the street and just left of me. Barb,
6　Barb Lock.
7　Q　Who else?
8　A　Could talk to Gert Turner, lives immediately next door
9　to us. You could talk to Lois Stahl in other contexts.
10　Q　What other context?
11　A　My-- the way we train our children-- the way I've
12　primarily been involved with training our children along
13　with my wife such that when she's locked out of her house
14　they're the first ones over there helping her. She sent us
15　a very kind note of thanking the Dorr children, because it
16　was a cold night and her and her daughter were locked out of
17　their own house and they authorized my children to crawl in
18　a window and get them back in the home.
19　　　There was just various acts of kindness that have gone
20　on over the years with Mrs. Stahl and other neighbors.
21　Well, the one that used to live close to us, a De Bondt, a
22　young man by the name of De Bondt-- he's not immediate-- not
23　a neighbor now. He lives in Melvin, but he's very
24　supportive of us as-- as neighbors and of this lawsuit. I
25　don't know his first name. I'm not uptown as much.

### Page 40

1　　　My daughter Emily works uptown at the local grocery
2　store, and she gets lots of people coming in saying, "Good
3　luck to your dad. This has gone on too long. Keep up the
4　fight." These aren't the people that are gonna call up the
5　sheriff. You know, they're just-- they're intimidated by
6　the power of the sheriff's office and so they-- they don't
7　run to the sheriff. But I hear indirectly from a lot of
8　people in the community that they're supporting us in this--
9　in this challenge.
10　Q　So the people on your list are intimidated by him and
11　the people on his list are intimidated by you, is that what
12　you're telling me?
13　A　Yeah, pretty much.
14　Q　Has anyone-- other than the recent incident in Ord has
15　anyone attacked you physically since the permit was denied
16　in '07?
17　A　No.
18　Q　Has anyone tried to rob you?
19　A　No, but I was super-- supervising our children have a
20　vendor business in the summers along the parade routes, and
21　at the end of the parade they have a lot of cash on them.
22　And in Worthington, Minnesota recently, just in September,
23　my one son Matthew was challenged by two
24　less-than-desirables in Worthington, people that looked like
25　they were gang members, that threatened to take his-- his

### Page 41

1　money and-- and demanded he hand it over to them. Did they
2　display any violent-- any use of force? They threatened
3　force, but they didn't do it. I was a block or two down the
4　street and I kind of overseen-- I was with another group of
5　our kids, but it's happened to our family.
6　Q　Does Minnesota have reciprocity?
7　A　Well, no. They have-- and I've-- I've qualified for
8　the training. I'll be getting my permit there shortly, but
9　they have-- it's a-- they issue (inaudible)--
10　Q　What's that?
11　A　-- so that I can get a Minnesota permit. It wouldn't--
12　the Iowa permit wouldn't have any impact on-- on the
13　Minnesota permit.
14　Q　So you would not have been able to carry a concealed
15　weapon in Minnesota at the time of this vendor incident
16　anyway, is that what you're telling me?
17　A　Under the Minnesota law I-- I could have, yes.
18　Q　I thought you said they didn't have reciprocity.
19　A　It's-- they issue to out-of-staters.
20　Q　Okay. But you've got to get a Minnesota permit--
21　A　Right.
22　Q　-- from a Minnesota agency?
23　A　Right.
24　Q　Why haven't you done that?
25　A　Honestly, I'm too poor. I don't have a hundred bucks

| Jenna L. Mumm, CSR | Multi-Page™ | Deposition of Paul R. Dorr |
| (800) 551-5027 | | 11/30/09 |

### Page 42

1 right now. And my wife wants to get one as well, so I'm
2 kind of wanting her to get it first.
3 Q  Does your business still conduct campaign contribution
4 and collection activities?
5 A  Not recently, not since the spring of '08.
6 Q  In the spring of '08 was there any adverse impact on
7 your ability to conduct those activities because you didn't
8 have a permit to carry a concealed weapon?
9 A  No.
10 Q  How has your son been harmed by the denial of a permit
11 to carry a concealed weapon?
12 A  I'd just maybe ask you to ask him.
13 Q  I want to know if you think he's been harmed.
14 A  If I think he's been harmed?
15 Q  Yes.
16 A  Yeah, his--
17      MR. FAHNLANDER: I'll object, speculation.
18 Q  (BY MR. PHILLIPS) How do you think he's been harmed?
19 A  His-- his-- this office previously issued them to his
20 older brothers. In the case of Julia, the daughter he
21 couldn't remember her name, he had called her and asked her
22 to come in, he wanted to visit with her first. A couple
23 months later she got married and moved over to Grundy
24 County, where she received her permit there. Later she--
25 well, before that, before she got her permit, she called

### Page 43

1 back to get the training certificate from his office.
2 Q  Whose office?
3 A  From Sheriff Weber's office, that she completed all the
4 course work and training requirements. And the gal who
5 talked to her over the phone said, "Well, once you stop in,
6 we have your permit waiting here for you," and she said,
7 "Well, I've left the state-- I've left the county. I'm no
8 longer a resident of the county." So we were told at the
9 time he was willing to issue it to her, and she was 18 or
10 19. It never was issued because she moved out of the
11 county. So Alex has observed his older siblings either get
12 it or have a willingness from the sheriff's office to issue
13 it.
14      And it came for him right on the heels of my denial and
15 he thinks his Second Amendment right has been harmed, that
16 he too should be able to bear under my direct oversight.
17 The reason we do this when they're younger is I've started
18 off-- or I think it's-- the Code says-- back when they were
19 14 I spent a lot of time on the range with them so that I
20 could develop good habits with them, you know, training them
21 in the proper ways how to de-escalate things if you ever
22 find yourself in such a situation. But, at the same time,
23 the-- the bigger issue is proper use and handling and so
24 forth.
25      And so, you know, with-- that's the only time, from 18

### Page 44

1 to 21, that he's-- he's allowed to carry concealed is under
2 my direct supervision at the-- at the range and so forth,
3 but I want him to get some practice at it too. I want him
4 to-- to understand what it feels like, what it's-- you know,
5 what he's-- and all that's been denied for his future use.
6 Q  Are you claiming that you have been treated differently
7 than similarly situated individuals?
8 A  I don't know similarly situated who-- I'm claiming
9 that-- that people, you know, in Osceola County, some of
10 which have better reputations than I do and some have worse
11 reputations-- I guess that's it, theoretically. I haven't
12 gone through the list, but my reputation is a subjective
13 matter, and that-- that certain-- that I have been-- not
14 been granted the equal treatment that-- that the citizens of
15 the county have.
16 Q  Who? Who are we talking about?
17 A  Well, the 150 or so that-- that he does issue them to.
18 Q  Are they all similarly situated to you?
19 A  Well, it goes back to the premise of your question.
20 I'm not sure how can I compare-- what's similarly situated?
21 Q  Well, look at paragraph 147 on page 21 of Exhibit 8.
22 A  Page 21, paragraph 147?
23 Q  Yes.
24 A  (Witness complying.)
25 Q  What do you mean by the phrase unequal treatment under

### Page 45

1 the law?
2 A  That under 724.8 others in Osceola County have been
3 given the permits, and with his lack of evidence I didn't
4 think he had a reasonable basis by which to make the-- his
5 decision so that I was denied the-- that equal protection of
6 the law.
7 Q  What is the Oregon Firearms Education Foundation?
8 A  What is it?
9 Q  Yes.
10 A  It's a Second Amendment foundation tied to a Second
11 Amendment organization out there that does fund-raising for
12 and helps defend parties' Second Amendment rights in court
13 who are infringed.
14 Q  Has it done fund-raising in your case?
15 A  No.
16 Q  Has it paid any of the fees or expenses for this
17 litigation?
18 A  The-- not from their-- well, donations from across Iowa
19 have been sent to them and they turn around and pay the
20 fees.
21 Q  How much have they paid on behalf of these donors for
22 this case?
23 A  I-- I don't have records in front of me. I-- it's
24 gonna be somewhere around 15, 20 thousand.
25 Q  What records do you have? You said you don't have the

Paul R. Dorr, et al                                   Page 42 - Page 45
v. Douglas L. Weber, et al

Case 5:08-cv-04093-MWB   Document 55-9   Filed 06/21/10   Page 13 of 13
Case 5:08-cv-04093-MWB   Document 54-14   Filed 06/17/10   Page 13 of 13

Jenna L. Mumm, CSR  
(800) 551-5027

Multi-Page™

Deposition of Paul R. Dorr  
11/30/09

### Page 46

1 records in front of you.
2 A The billing statements from the law firm.
3 Q During any of the years when you were allowed to carry
4 a concealed weapon was there ever a time when you thought
5 you might need to use it?
6 A We had an incident once-- I don't remember what year it
7 was, 2002, 2003-- where we-- we filed a-- I think, a couple
8 of complaints at the sheriff's office that-- we had people
9 on a ladder one night in the middle of the night trying to
10 look in our girls' bedroom window. I think Preston DeBoer
11 was a deputy sometime at one point back there where we asked
12 him to investigate people banging on the back of the house.
13     Then one night we had someone that was coming in the
14 back door late at night. I kind of-- without knocking or
15 anything. And Alex was the younger boy at that time, and we
16 heard sound back there. He cried-- he was in the kitchen.
17 He cried out and the door quickly slammed and they took
18 off. We never did find out who it was. So if that was a
19 direct threat or not, I-- I can't say, but there was enough
20 direct harassment of that type that started to alarm us.
21     Because I'm very, very active on pro-life issues and so
22 forth and I've had a lot of-- there were several hate phone
23 calls and stuff in the middle of the night so, you know,
24 that was starting to escalate. And then the situation in
25 Storm Lake where-- I didn't-- no, it didn't escalate to the

### Page 47

1 point that I felt I needed to-- to have it, but I'm looking
2 at 25 people out there a little bit inebriated and getting
3 themselves all wound up and I've got 15 farmers and older
4 people and no one has cell phones, so I-- I was just-- it
5 never came out. No one ever knew I had it, but-- it was
6 never an issue, but I was nervous.
7 Q Any other times when you had a permit and you thought
8 you might have to use your weapon?
9 A None that I can recall.
10     MR. PHILLIPS: I have to take a break and talk to
11 the sheriff for a minute.
12     (Off the record from 4:48 to 4:55 p.m.)
13 Q (BY MR. PHILLIPS) After the permit was denied in 2007
14 did you circulate a petition asking people to sign in order
15 to get a list of folks that you could use to help the
16 sheriff change his mind?
17 A I don't recall a petition. I sent a letter out asking
18 people to do that, but there wasn't an actual-- a formal
19 petition form that I-- that I can recall.
20 Q Do you-- did you hear that anyone else was circulating
21 a petition on your behalf?
22 A No.
23 Q Do you have copies of the letter that you sent to
24 people?
25 A I could go back and-- and secure it, yeah.

### Page 48

1 Q Where would you look?
2 A In my physical file that I-- I kept these
3 correspondence in.
4 Q What's that file called?
5 A I think it's called Doug Weber.
6 Q Doug Weber file. Do you have a Dan DeKoter file?
7 A I don't think so. I think everything under Dan DeKoter
8 goes in the Doug Weber file.
9 Q Do you have a-- a Hansen file? I don't remember the
10 name of the county attorney.
11 A Robert Hansen?
12 Q A Robert Hansen file?
13 A No.
14     MR. PHILLIPS: Those are all the questions I
15 have. Thank you.
16     MR. FAHNLANDER: We'll read and sign.
17     (The deposition concluded at 4:56 p.m.)

### Page 49

STATE OF IOWA )
             :SS   CERTIFICATE
COUNTY OF DICKINSON )

I, Jenna L. Mumm, Certified Shorthand Reporter and Notary Public, duly qualified for the State of Iowa, do hereby certify as follows:

1. That the witness, DIANA DIRKS, was by me first duly sworn to tell the truth and that the foregoing transcript, consisting of Pages 1 to 48, inclusive, is a true and correct transcript of my shorthand notes made during the time of the taking of the deposition of this witness;

2. That I am not an attorney for, nor related to the parties to this action and that I am in no way interested in the outcome of this action;

3. That the original transcript of this deposition is to be delivered to Mr. Douglas L. Phillips;

4. That a copy is to be delivered to Mr. Vincent J. Fahnlander and Mr. Douglas L. Phillips;

DATED THIS 10th day of December, 2009.

Jenna L. Mumm, CSR  
Certified Reporting  
703 Jackson Avenue  
Spirit Lake, Iowa 51360  
Tel: (712) 336/4125 (800) 551-5027  
Fax: (712) 336-6827