**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

PAUL DORR and ALEXANDER
DORR, individually, and on behalf of all
other persons similarly situated,

        Plaintiffs,

vs.

DOUGLAS L. WEBER, individually,
and in his capacity as Sheriff of Osceola
County,

        Defendant.

No. C 08-4093-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING BENCH
TRIAL ON THE MERITS**

---

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*II.  FINDINGS OF FACT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.  CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*IV.  REMEDIES* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*V.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## I.  INTRODUCTION

After a one day bench trial, the court is called upon to decide whether Defendant

Sheriff Weber's decision to deny Plaintiffs—father and son—Paul and Alexander Dorr's

applications for concealed weapons permits was in retaliation for exercising their First Amendment rights.[1]   Paul Dorr, and to a lesser extent Alexander Dorr, engaged in extensive First Amendment activity like protesting, passing out leaflets, and writing letters to the editor.  Although determining what went on in a decision-maker's mind is almost always a daunting challenge, the sheriff's honest, credible, forthright, truthful, and consistent testimony makes this task unusually simple.  The court finds a tsunami, a maelstrom, an avalanche, of direct, uncontroverted evidence in Sheriff Weber's own testimony to conclude beyond all doubt that he unquestionably violated the First Amendment rights of at least Paul Dorr.[2]

## II.  FINDINGS OF FACT [3]

Plaintiff Paul Dorr is a husband of 34 years and a father to eleven.  He, along with his wife Debra, have provided a stable home, and classroom, to their eleven home-schooled children.  The family's residence has long been in Osceola County, Iowa, and, more specifically, the town of Ocheyedan.

---

[1]   At the trial, the Dorrs were represented by William Mohrman and Vincent Fahnlander of Mohrman & Kaardal, PA, with offices in Minneapolis and Saint Paul, Minnesota.  Sheriff Weber was represented by Douglas Phillips, of the Klass Law Firm, L.L.P., of Sioux City, Iowa.  The parties were well prepared for trial and efficiently presented the evidence to this court.

[2]   For a more detailed account of the procedural history in this case, see this court's Memorandum Opinion and Order Regarding Cross Motions for Summary Judgment (docket no. 40; *Dorr v. Weber*, 2010 WL 1976743 (N.D. Iowa 2010)).

[3]   Following a bench trial, Federal Rule of Civil Procedure 52 directs a district court to articulate its findings of fact and conclusions of law separately.  *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.")

Paul's decision to settle in Ocheyedan was, at least in part, a result of his decision to apply his Iowa State University degree in Agriculture Business and Economics to providing agricultural loans to farmers at a local bank. While employed at the bank, Paul earned the trust of the elderly gentleman who owned the bank and was able to acquire an interest in it. Although he and the owner shared similarly conservative views concerning the amount of debt farmers should shoulder, the owner's son had also acquired an interest in the bank and did not share those views. As a result, Paul sold his interest in the bank to the owner's son, and Paul began a career in bank consulting.

Paul's new consulting business provided him with the ability to help banks review their asset quality through a computerized credit analysis program, but he eventually came to the realization that there were others who were in greater need of his help. Paul believed that the debt load he had witnessed in the banking business was putting a strain on families, driving mothers into the workforce, and preventing women from having children. After closing his bank consulting business, Paul refocused his efforts toward protesting the laws that legalize abortion as the head of a pro-life ministry called Rescue the Perishing.[4]

---

[4] Paul was the head of Rescue the Perishing from about 1988 to 2000. Rescue the Perishing is the name of a hymn written by Fanny J. Crosby (pictured at right), with music by William H. Doane. Crosby, blinded at six weeks of age, wrote more than 8,000 gospel hymns. The story of the hymn's creation, a n d   i t s   t e x t ,   a r e   a v a i l a b l e   a t http://joyfulministry.com/rescuet.htm.



For the first few years of this effort, Paul's protests amounted to bake sales, letters to the editor, and addresses to church congregations. However, Paul eventually stepped up his efforts and began nonviolent protests in front of abortion clinics, which involved blocking doors, praying, and other nonviolent activities. His activities with Rescue the Perishing spanned the nation, as Paul traveled near and far, from Sioux Falls, South Dakota, Omaha, Nebraska, and Minneapolis, Minnesota to Atlanta, Georgia, and Wakefield, Virginia.[5] As a result of these activities, Paul has been arrested and convicted multiple times for a variety of non-violent offenses, has served jail time, and even received death threats. It is Paul's belief that he contributed to raising the debate on abortion laws to a national level. Paul also started to believe that abortions were, at least in part, the result of the way children were being taught in public schools.

Paul disagreed with the content that was taught in public schools and the inefficient manner in which the content was being taught. Because of these beliefs, Paul began to fight levies and bonds to fund schools, and other activities of the local government, by informing voters of his views on the excess spending by local governments. With time, Paul would, once again, put his entrepreneurial spirit to use by providing these services to groups seeking to defeat levies, bonds, and other spending proposals. His services included distributing flyers, writing letters to the local newspapers, and other consulting support. Although Paul had been providing his opinions through these means as far back as 1990, about abortion and other issues, by 2001, he was getting paid for his advocacy.

---

[5]   Following a Wakefield, Virginia, protest, Paul was labeled as "something of a political consultant and far-right activist, who from the small town of Ocheyedan rails against abortion, homosexuality and even school bond referenda." Shad Planking: The Future Really is Now: Update, http://hotlineoncall.nationaljournal.com/archives/2006/04/shad_planking_t.php.

Following an advertisement in a magazine explaining the services he could provide, his business took off.  Paul named his consulting business Copperhead Consulting Services.[6]

Paul provided his advocacy services for pay, but he also supplemented his income by selling balloons along the Rivercade Parade route.  This business required Paul, and family members who helped him—including his son, Plaintiff Alexander Dorr—to carry large amounts of cash in fanny packs.  As much as $1,500.00 might be in his or a family member's fanny pack during Rivercade.

Because of Paul's controversial advocacy and occasional possession of large amounts of cash, he decided to apply for a nonprofessional permit to carry a weapon, which under Iowa law amounts to a permit to carry a concealed weapon.  From at least the late 1990's to 2005, Paul applied for—and was granted—a concealed weapons permit. However, Paul's July 7, 2007, application for a permit was denied.  Defendant Sheriff

---

[6]   At trial, Paul explained that he named Copperhead Consulting Services after a faction of the Democratic Party, most popular during the American Civil War, that was known as the Copperheads.  Originally known as Peace Democrats, the Copperheads were labeled as such, initially, by Republicans.  Republicans chose the name in order to liken them to the poisonous snake with the same name.  However, the Copperheads eventually accepted the label, as symbolic of Liberty on the copper penny—some Copperheads wore pennies as badges.  The Copperheads generally opposed the Civil War and demanded peace with the Confederacy—the Copperheads were very critical of President Abraham Lincoln, who would eventually appear on the penny.

The court accepts Paul's claim that he admired the Copperheads due to their alleged support of free speech rights and opposition to bonds, not due to their allegedly favorable view toward slavery, which he disputes.  The court finds Paul Dorr to be a much more effective right wing gadfly than an accurate historian.  Various perspectives on the history and beliefs of the Copperheads is available online.  *See, e.g.*, http://civilwar.bluegrass.net/HomeFront/copperheads.html; http://www.freerepublic.com/focus/f-news/1473270/posts; http://www.civilwarhome.com/copperheads.htm.

Weber wrote on Paul's application, as the reason for disapproving the application: "Concern from Public.  Don't trust him."  *See* Trial Exhibit 1.  The following year, Sheriff Weber denied Alexander's application for a permit and informed Paul that he would deny any further applications from him.  *See* Trial Exhibit 3.

Alexander applied for a permit for generally the same reasons as his father, Paul. He believed that he needed to carry a firearm for his protection, due to past death threats to the family in connection with its pro-life advocacy, and due to the large amounts of cash he carried in relation to the balloon business.  Both Alexander and Paul Dorr believed that the denials of their applications for concealed weapons permits, by Sheriff Weber, were the result of their advocacy against county spending.

Sheriff Weber was, in fact, aware of the Dorrs' advocacy in the community and previous convictions and arrests.[7]  Since 1979, Sheriff Weber has been in the Osceola County Sheriff's Office, as either a deputy or sheriff.[8]  He had met Paul and crossed paths with him occasionally during his time as a deputy.  Sheriff Weber stated that he had received some complaints related to Paul—there was no evidence presented at trial that the complaints had merit or that any charges were filed.  Through the years, Sheriff Weber heard comments about Paul, which related to him being "weird."  Sheriff Weber also read a couple of Paul's letters in the paper, but he eventually quit reading them, finding that they were a waste of time to read.  The letters were weird, according to Sheriff Weber, because of the words Paul used.  Sheriff Weber also believed that many people in the

---

[7]  Although Sheriff Weber knew about these arrests, the trial record is clear that the arrests and convictions had no impact on Sheriff Weber's decision to deny the concealed weapons permit.

[8]  Given Sheriff Weber's honesty and forthrightness demonstrated at trial, it is no wonder he has been elected and re-elected as sheriff.

community believed Paul was weird, because of his letters and other political activities in the community.  Despite Sheriff Weber's belief that Paul was weird, Sheriff Weber granted him a concealed weapons permit, after he had become sheriff, in 2005 and 2006.

Sheriff Weber had also crossed paths with Alexander prior to denying his application for a permit, but only once.  In 2006 or 2007, Alexander was handing out flyers for his father, Paul, outside of a manufacturing plant in Sibley.  The plant manager had confronted Alexander, asked him to leave, and may have called the Sheriff's office. Sheriff Weber and a deputy eventually arrived on the scene, probably as a result of a call from the plant manager.  Alexander explained that Sheriff Weber approached him, recognized that he was not violating any laws, and stated that he would tell the plant manager that he was allowed to hand out flyers as he had been doing.  Alexander provided Sheriff Weber with a flyer as he was leaving.

The distributed flyers were part of a broader effort by the Osceola County Taxpayers Association ("OCTA") to inform the public of their goals.  The OCTA had engaged Paul, in February of 2007, to provide consulting services in connection with the group's belief that the county budget was too large for such a small rural county.  In particular, Paul was to investigate expenditures in relation to the public safety commission and county attorney's office.  Paul began his investigation by seeking public records from the O'Brien County Auditor—Paul sent a letter to the auditor's office requesting documents relating to the compensation in the county attorney's office.  Although Paul requested that the letter be kept confidential, the contents of the letter were communicated outside of the office.

Paul made a similar request for records from Sheriff Weber, in the spring of 2007, when he requested the compensation and duties of the deputies in the Osceola County Sheriff's Office.  Paul was specifically directed, by the OCTA, to look into the 85 percent

7

rule, which Paul believed requires the chief deputy to make 85 percent of the sheriff's salary.  Because of this rule, Paul believed that the increased salaries provided to the deputies, as a result of the union contracts, were providing Sheriff Weber with an increased salary.  Paul eventually received the sheriff's office's policy and procedure manual, but he was also provided with a large bill for the copies.  Paul testified that he was billed for 90 minutes of photocopying, plus ten cents per page, for the manual.  Sheriff Weber testified that the manual was over 200 pages and included many tabs that made copying time consuming.

Paul wrote a letter to Sheriff Weber in response to the copying bill.  Paul explained that OCTA was his client and was forced to pay the cost of the bill.  Although Paul did not dispute the ten cent per page charge, he was critical of the 90 minutes that it took to make the copies, especially considering his knowledge of a $5,000 copier and fax unit that the sheriff's office had purchased in 2005.  In addition to criticizing the efficiency of the sheriff's office, he offered to provide his services to the office in order to help it become more efficient—he claimed that his skills as a bank consultant would be helpful in assisting the sheriff's office to become more efficient.  Paul ended the letter by writing:

> Taking 4 1/2 times as long as a private company would need to make a simple copy indicates you have some staff that need to be inspired.  Clearly, you have not [been] able to do that and the taxpayers across the county can see this more and more.  Maybe I could be of some help.

Trial Exhibit 29.

Sheriff Weber, in discussing the offer in this letter with his staff, found that his staff would walk out of the sheriff's office if Sheriff Weber were to let Paul enter the office to do an audit.  Sheriff Weber explained that Paul was considered a "nut job" in the sheriff's office.  According to Sheriff Weber, the individuals in the sheriff's office thought that he

was weird for the same reasons that gave him a reputation for being weird in Osceola County, all of which related to his advocacy.  Actually, Sheriff Weber thought that Paul was getting weirder through the years.  Sheriff Weber has heard people refer to Paul as a whacko, delusional, a nut job, a spook, and narcissist.  Regardless of the adjective used to describe Paul, however, Sheriff Weber stated that Paul's "lousy" reputation was due to his political activities of writing letters to the editor and distributing flyers.

Sheriff Weber held these beliefs about Paul's activities and reputation when he approved, as Osceola County Sheriff, Paul's applications for concealed weapons permits in 2005 and 2006.  Sheriff Weber also knew, in the spring of 2007, that Paul was assisting the OCTA, that the group was challenging the county budget, believed the county was spending too much, was seeking information specifically in relation to the sheriff's office, and wanted the sheriff's office to reduce its spending and salaries.  Sheriff Weber makes clear that, what had changed between 2006, when he issued the permit, and 2007, when he did not issue a permit, was Paul's advocacy for the OCTA and the concern he received from the public for Paul's advocacy.

Giving Sheriff Weber more deference than is due his elected status, the court finds that Sheriff Weber denied Paul's application for a concealed weapons permit not because of the content of his First Amendment activity but because it was effective and agitated many members of the local community.  Had Paul passed out flyers at 2:00 a.m. in a public park where no one was there to receive them, used a bullhorn deep in the woods where no one could hear him advocate his sometimes unorthodox views, or written letters to the editor in the Washington Post where few, if any, residents of Osceola County would read them, then Sheriff Weber would have granted Paul the permit.  Paul was denied a permit precisely because Sheriff Weber believed that his free speech rights offended the majority of voters in Osceola County.

### III.   CONCLUSIONS OF LAW

Justice Oliver Wendell Holmes, Jr., explained:

> Persecution for the expression of opinions seems to me
> perfectly logical.  If you have no doubt of your premises or
> your power and want a certain result with all your heart you
> naturally express your wishes in law and sweep away all
> opposition.  To allow opposition by speech seems to indicate
> that you think the speech impotent, as when a man says that he
> has squared the circle, or that you do not care whole heartedly
> for the result, or that you doubt either your power or your
> premises.  But when men have realized that time has upset
> many fighting faiths, they may come to believe even more than
> they believe the very foundations of their own conduct that the
> ultimate good desired is better reached by free trade in
> ideas—that the best test of truth is the power of the thought to
> get itself accepted in the competition of the market, and that
> truth is the only ground upon which their wishes safely can be
> carried out.  That at any rate is the theory of our Constitution.

*Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22 (1919) (Holmes, J.,
dissenting); *see also New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 128
S.Ct. 791 (2008) ("The First Amendment creates an open marketplace where ideas, most
especially political ideas, may compete without government interference.") (citing *Abrams*,
250 U.S. at 630, 40 S.Ct. at 22).  This marketplace allowing for the free trade of ideas is
provided for, more specifically, in the First Amendment to the United States Constitution,
which states:  "Congress shall make no law respecting an establishment of religion, or
prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press;
or the right of the people peaceably to assemble, and to petition the Government for a
redress of grievances."  U.S. CONST. amend I.

10

The United States Supreme Court has explained the contentious disputes that may arise due to exercise of First Amendment rights, especially in regard to religious and political beliefs:

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

*Cantwell v. State of Connecticut*, 310 U.S. 296, 310, 60 S.Ct. 900, 906 (1940).  Current United States Supreme Court Justice Samuel Alito, while on the Third Circuit Court of Appeals, recognized that the First Amendment also protects deeply offensive statements:

> There is of course no question that non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause.  But there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs.

*Saxe v. State College Area School Dist.*, 240 F.3d 200, 206 (3rd Cir. 2001) (citing *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Cantwell*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213).

In this case, both Paul and Alexander Dorr allege that they engaged in activities protected by the First Amendment and that Sheriff Weber retaliated against them, because of the activities, by denying their applications for concealed weapons permits.  The Eighth

Circuit Court of Appeals requires that plaintiffs asserting a claim of First Amendment retaliation prove:  "(1) [that they] engaged in a protected activity, (2) the government official took adverse action against [them] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity."  *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004), *cert. denied*, 546 U.S. 860, 126 S.Ct. 371, 163 L.Ed.2d 140 (2005) (citing *Naucke v. City of Park Hills*, 284 F.3d 923, 927-28 (8th Cir. 2002); *see also Lewis v. Jacks*, 486 F.3d 1025, 1028 (2007) (citing *Revels*, 382 F.3d at 876); *Zutz v. Nelson*, 601 F.3d 842, 848-49 (2010) (citing *Lewis*, 486 F.3d at 1028).

Both Paul and Alexander Dorr engaged in protected activity, when writing letters to the editor and distributing flyers.  The United States Supreme Court has "long recognized that the right to distribute flyers and literature lies at the heart of the liberties guaranteed by the Speech and Press Clauses of the First Amendment."  *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 702-703, 112 S.Ct. 2711, 2720 (1992) (citing *Schneider v. State of New Jersey (Town of Irvington)*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)).  In fact, the Supreme Court has explained that leaflets, or pamphlets, have been "historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest."  *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 452, 58 S.Ct. 666, 669 (1938).  As much as activities, such as distributing flyers, are unusual in Osceola County, or unusual because of the way in which Paul performed the activities, they are nevertheless activities that the First Amendment protects from government interference.  The court finds that both Paul and Alexander have proven that they engaged in protected activity.

The court also finds that withholding a concealed weapons permit from an applicant would chill the speech of a person of ordinary firmness. *See Revels*, 382 F.3d at 876. The court recognizes that, "it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Naucke*, 284 F.3d at 928 (citations omitted). However, the nature of a concealed weapons permit convinces the court that an applicant, who presumably seeks the permit in order to carry a pistol or revolver on their person, would reasonably be deterred from exercising their First Amendment rights if it led to a denial of the permit. Denial of the permit would prevent the applicant from carrying a pistol or revolver under the circumstances provided for in the permit—an applicant may be motivated to carry a permit due to the perception that they are more able to defend themselves from an attack or the perception that possessing a weapon may deter an attack—and such a denial leaves the applicant with an unremedied concern for their own safety, or the safety of others. Alternatively, the applicant could decide to carry such a weapon and risk the possibility of criminal prosecution. *See* IOWA CODE § 724.4.[9] The

---

[9] Section 724.4 provides:

> Except as otherwise provided in this section, a person who goes armed with a dangerous weapon concealed on or about the person, or who, within the limits of any city, goes armed with a pistol or revolver, or any loaded firearm of any kind, whether concealed or not, or who knowingly carries or transports in a vehicle a pistol or revolver, *commits an aggravated misdemeanor*.

IOWA CODE § 724.4(1) (emphasis added). Having a permit insulates an individual from

(continued…)

court finds that a person of ordinary firmness would be deterred from exercising their First Amendment rights considering the consequences of having one's concealed weapons permit application denied.

Lastly, the court considers whether Sheriff Weber's decision to deny the Dorrs' applications for permits "was motivated at least in part by the exercise of the protected activity." *Revels*, 382 F.3d at 876. "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in those decisions." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (citing *Wishnatsky v. Rovner*, 433 F.3d 608, 613 (8th Cir.2006)). "Retaliatory motive . . . may be proved by circumstantial evidence giving rise to an inference of retaliatory intent." *Williams v. City of Carl Junction, Mo.*, 523 F.3d 841, 843 (8th Cir. 2008) (citations omitted).

Here, the Dorrs applied for concealed weapons permits under Iowa Code § 724.7, which provides that: "Any person who can reasonably justify going armed may be issued a nonprofessional permit to carry weapons.  . . .   All permits so issued shall be for a

---

[9](...continued)
criminal liability under the appropriate circumstances:

> Subsections 1 through 3 do not apply to any of the following:
> i. A person who has in the person's possession and who displays to a peace officer on demand a valid permit to carry weapons which has been issued to the person, and whose conduct is within the limits of that permit. A person shall not be convicted of a violation of this section if the person produces at the person's trial a permit to carry weapons which was valid at the time of the alleged offense and which would have brought the person's conduct within this exception if the permit had been produced at the time of the alleged offense.

IOWA CODE § 724.4(4)(i).

14

definite period as established by the issuing officer, but in no event shall exceed a period of twelve months." IOWA CODE § 724.7.   Sheriff Weber—though admitting that Paul and Alexander met the requirement to obtain a permit under 724.8[10]—exercised his discretion to deny the permit under § 724.11.   *See* IOWA CODE § 724.11 (". . . the issuance of the permit shall be by and at the discretion of the sheriff or commissioner, who shall, before issuing the permit, determine that the requirements of sections 724.6 to 724.10 have been satisfied.").[11]

Sheriff Weber has been generally consistent on his reason for denying Paul's applications.   In his deposition, which was admitted into evidence, Sheriff Weber was asked what had changed between 2006, the last year that he approved Paul's application for a permit, and 2007, the year Sheriff Weber first disapproved Paul's application for a

---

[10]   Section 724.8 excludes certain individuals from obtaining a nonprofessional, or professional, permit, and the permits may not be issued unless:

1. The person is eighteen years of age or older.
2. The person has never been convicted of a felony.
3. The person is not addicted to the use of alcohol or any controlled substance.
4. The person has no history of repeated acts of violence.
5. The issuing officer reasonably determines that the applicant does not constitute a danger to any person.
6. The person has never been convicted of any crime defined in chapter 708, except "assault" as defined in section 708.1 and "harassment" as defined in section 708.7.

IOWA CODE § 724.8.

[11]   The court recognizes that a change in Iowa's concealed weapons permit law will take effect on January 1, 2011, which alters both the level of discretion a sheriff has in issuing permits and the minimum age requirement for a nonprofessional permit.   *See* IA LEGIS S.F. 2379 (2010).

permit.  Sheriff Weber explained:

> Well, you brought up the OCTA, Mr. Dorr's affiliation with
> that.  He started sending out letters to the editor, emails,
> [flyers] on doors and cars, handing out brochures.  People
> talked about it.
>
> * * *
>
> He interjected himself into the public view or conscience or
> whatever you want to call—the consciousness, whatever you
> want to call it.  People started talking about him.
>
> * * *
>
> So to answer your question, that's what's changed, is that he
> was a lot more active locally.  I think a lot of his activities—I
> read a newspaper article, "The Gospel According to Paul
> Dorr," where he does other work in other towns, other states
> and so forth.  So we don't really hear that here, but—so he
> was kind of out of the public view, I—in my opinion.

Trial Exhibit 16.  Following this response, Sheriff Weber was asked whether it was "his

work with the OCTA that brought him into your public view?"  *Id.*  Sheriff Weber replied,

"Correct, and people started talking about it saying things like, 'Oh, that guy's a nut job.

Oh, that guy's whacko.'"  *Id.*  At trial, Sheriff Weber provided the same rationale for

denying Paul's permit:  Paul's involvement with the OCTA and the concern Sheriff Weber

received from the public due to his involvement with the OCTA.

Although the court can consider circumstantial evidence when deciding retaliatory

motive, *see Williams*, 523 F.3d at 843, the court has credited Sheriff Weber's account of

what he was thinking when he denied Paul's application.  Having credited Sheriff Weber's

testimony, the court finds that Paul's protected activity was not only a motivating factor,

or substantial factor, in Sheriff Weber's decision to deny the permit, but the sole factor

based on either Sheriff Weber's reaction to Paul's protected activities or Sheriff Weber's

reaction to the community's opinion of Paul's protected activities.  *See Kilpatrick*, 499

16

F.3d at 767 ("Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in those decisions.") (citations omitted).

In denying Paul a concealed weapons permit, Sheriff Weber single handedly hijacked the First Amendment and nullified its freedoms and protections. Ironically, Sheriff Weber, sworn to uphold the Constitution, in fact retaliated against a citizen of his county who used this important freedom of speech and association precisely in the manner envisioned by the founding members of our Nation who ratified the Bill of Rights on December 15, 1791. In doing so, this popularly elected Sheriff, who appears to be a fine man and an excellent law enforcement officer, in all other regards, blatantly caved in to public pressure and opinion and, in doing so, severely trampled the Constitution and Paul's First Amendment rights to freedom of speech and association. This is a great reminder that the First Amendment protects the sole individual who may be a gadfly, kook, weirdo, nut job, whacko, and spook, with the same force of protection as folks with more majoritarian and popular views.

For these reasons, the court finds Paul has proved that Sheriff Weber denied his application for a concealed weapons permit in retaliation for exercising his First Amendment rights to freedom of speech and freedom of association. Therefore, the court, having found Paul proved a claim of First Amendment retaliation, will order Sheriff Weber to reconsider, and approve, Paul's application for a concealed weapons permit.[12]

Alexander also assisted his father in distributing flyers on behalf of the OCTA. Sheriff Weber—who candidly admitted at trial that he denied Paul's application for a

---

[12] The court also received evidence and heard arguments on Paul Dorr's Fourteenth Amendment Equal Protection claim. However, the court's ruling on Paul's First Amendment retaliation claim makes unnecessary a decision on his Equal Protection claim.

permit due to Paul's protected activities with OCTA and the community's reaction to his protected activities—stated that he denied Alexander's permit because he was under 21 years of age.  According to Sheriff Weber, persons under 21 years of age are not mature enough to put a firearm in their pants and go downtown.  The court finds Sheriff Weber's testimony, concerning his reason for denying Alexander's permit, to be as credible as the rest of his testimony, and that his reasoning in this regard is neither unconstitutional nor unreasonable.  The court does not question Alexander's maturity now, as a twenty year old, or when he applied for the permit as an eighteen year old.  Nevertheless, the court finds that Sheriff Weber understandably had concerns about providing a concealed weapons permit to an individual under 21 years of age, and the court finds that he denied the application on those grounds and not as a result of First Amendment retaliation.[13]

## IV.  REMEDIES

The Dorrs waived their claims for nominal, compensatory, and punitive damages. *See* docket no. 50 (Stipulation of the Parties).  However, they preserved their claims to declaratory and injunctive relief.  *See* docket no. 34 (Second Amended Complaint).  The Dorrs also maintained their request for: "any injunctive relief deemed necessary to ensure rights protected under the United States Constitution as delineated are no longer violated nor will be violated by . . . Sheriff Weber. . . ."  *Id.*

---

[13]   The United States Supreme Court recently held that the Second Amendment of the United States Constitution is fully applicable to the States.  *See McDonald v. City of Chicago, Ill.*, --- S.Ct. ---, 2010 WL 2555188, *6 (2010).  The court finds that *McDonald* has no impact on the Dorrs' First Amendment claims or Paul's Equal Protection claim.  The court takes no position concerning *McDonald's* possible impact on Iowa's legislative amendments to its weapons laws.

The court has found that Sheriff Weber's denial of Paul's application for a concealed weapons permit was a violation of Paul's First Amendment rights. Thus, the court will provide Paul's requested declaratory relief and declare that Sheriff Weber's denial of Paul's application for a concealed weapons permit was unconstitutional retaliation for exercising his First Amendment rights of freedom of speech and freedom of association. The court will also grant injunctive relief by ordering Sheriff Weber to immediately issue Paul a nonprofessional permit to carry a weapon under Chapter 724 of the Iowa Code.

Additionally, the court will grant Paul's request for additional relief "necessary to ensure rights protected under the United States Constitution . . . are no longer violated . . . by Sheriff Weber . . . ." Docket no. 34. As was discussed in Plaintiffs' Post Trial Memorandum of Law Regarding Remedial Relief (docket no. 57)[14], the court has broad discretion to order remedial relief. *See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) (the court approved remedies in relation to the desegregation of schools and discussed the court's flexibility in fashioning such remedies) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329-330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944)). Court's have specifically recognized a federal district court's authority to order training as such remedial relief. *See Nicks v. State*, 67 F.3d 699, 702 (8th Cir. 1995) (recognizing the district court's grant of injunctive relief requiring a party to "circulate its sexual harassment policy and to conduct training on the topic."); *Selling v. Young*, 531 U.S. 250, 266, 121 S.Ct. 727, 736 (2001) (recognizing the district court's injunction requiring a

---

[14] Following trial, the court alerted the parties to the possibility that it might order Sheriff Weber to take a class to educate him on the First Amendment. It provided the parties with 10 days to file briefs relating to the court's authority to order such remedial relief. Sheriff Weber did not file a brief.

party to adopt and implement a plan for training and hiring); *Fisher v. City of San Jose*, 509 F.3d 952, 954 (9th Cir. 2007) (recognizing the district court's injunction regarding the future training of police officers), *reversed on other grounds*, 558 F.3d 1069 (9th Cir. 2009). The First Amendment of our Constitution reflects a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964) (citations omitted). Sheriff Weber's dramatic and stunning failure to appreciate, and to protect and defend, Paul's basic First Amendment rights, compels remedial relief.

The court provides Sheriff Weber with the following guidelines concerning the class that he must complete. First, the class must provide college level instruction on the United States Constitution, including—at least in part—a discussion of the First Amendment. The class may be taken online. Second, Sheriff Weber must obtain approval from the court before participating in the class. Approval must be obtained by filing, with the Clerk of Court, a motion for approval of the proposed class, which must contain a description of the class and contact information for the court to further inquire, if necessary, into the substance of the class. Third, upon completion of the class, Sheriff Weber must file an affidavit with the Clerk of Court stating that he has successfully completed the class. Sheriff Weber shall attach his transcript or other proof of completion to the affidavit—Sheriff Weber must obtain a passing grade or obtain an otherwise satisfactory assessment of his participation in the class.

## V.  CONCLUSION

THEREFORE, the court grants Paul Dorr's request for declaratory relief and declares that Defendant Sheriff Weber's denial of Paul's application for a concealed weapons permit was unconstitutional retaliation for Paul's exercising his First Amendment

rights of freedom of speech and freedom of association.   The court also grants Paul's request for injunctive relief and orders Sheriff Weber to immediately issue Paul a nonprofessional permit to carry a weapon under Chapter 724 of the Iowa Code.   Sheriff Weber is further ordered to enroll in, and successfully complete, a court approved course concerning the United States Constitution, and file proof of completion with this court, as discussed above—proof of completion must be filed with this court by January 1, 2011.

The court finds that Sheriff Weber did not retaliate against Alexander Dorr for exercising his rights under the First Amendment and, accordingly, orders no relief.

The court reminds plaintiffs' counsel that Local Rule 54.1(a) instructs that a motion for an award of attorneys fees must be filed within the time prescribed by Federal Rule of Civil Procedure 54(d)(2)(B), *see* N.D. Ia. L.R. 54.1(a), which requires that such motions be filed "no later than 14 days after the entry of judgment." Fed. R. Civ. P. 54(d)(2)(B).

**IT IS SO ORDERED.**

**DATED** this 7th day of July, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA